In re:

| | |
|---|---|
| RAGUSE FAMILY PARTNERSHIP (Lead Case), | Lead Case No. 26-60308 |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. 26-60312 |
| TRUMAN RAGUSE, | Case No. 26-60313 |
| R.A.G. HOLDINGS, LLC | Case No. 26-60309 |
| TRU AG LLC, and | Case No. 26-60311 |
| RED ROCK CATTLE, LLC | Case No. 26-60310 |

Debtors.

---

**NOTICE OF HEARING AND MOTION FOR INTERIM AND FINAL ORDERS
(I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION
FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH
COLLATERAL, AND (V) MODIFYING AUTOMATIC STAY,
AND (VI) GRANTING RELATED RELIEF**

---

TO:     THE PARTIES-IN-INTEREST AS SPECIFIED IN LOCAL RULE 9013-3.

1.      Debtors Raguse Family Partnership, R.A.G. Holdings LLC, Tru Ag LLC, and Red Rock Cattle, LLC (collectively, the "Corporate Debtors") as debtors and debtors-in-possession, by and through their undersigned counsel, moves the court for the relief requested below and gives notice of hearing.

2.      The court will hold a hearing on this motion for expedited hearing and on the portion of this Motion seeking interim orders at 8:00 a.m. on May 19, 2026 before the Honorable William J. Fisher. The hearing will be conducted telephonically.  Please contact Judge Fisher's Courtroom Deputy by email at mnb_fisher_hearings@mnb.uscourts.gov or by telephone at 651-848-1061 to obtain the dial-in information. Dial-in instructions for telephonic hearings will also

199545290v7

be displayed the day prior to the hearing on Judge Fisher's public calendar here: https://www.mnb.uscourts.gov/judges-calendars. Any person wanting to appear in person must contact Judge Fisher's Courtroom Deputy at 651-848-1061 at least 48 hours prior to the hearing. A hearing on the portion of this Motion seeking final orders will be held at a date and time to be determined before the Honorable William J. Fisher.

3. Local Rule 9006-1(b) provides deadlines for responses to this Motion. However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking entry of interim orders, the Corporate Debtors do not object to written responses being served and filed two hours prior to the hearing. Any response to the Motion for entry of final orders must be filed and served no later than at least two (2) hours prior to the hearing, pursuant to the applicable Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules. **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4. This court has jurisdiction over this motion under 28 U.S.C. § 1334.

5. The petitions commencing the Corporate Debtors' chapter 11 cases were filed on May 14, 2026 (the "Petition Date"). The cases are now pending before this court.

6. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Corporate Debtors consent to the Court entering a final order on the Motion.

7. Venue is proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409.

8. This motion arises under 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, and Fed. R. Bankr. P. 4001(b). This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rules 4001-2 and 9013.

2

9. The Corporate Debtors are authorized to operate their business and manage the property of their estates as a debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committee has been appointed.

10. Information about the Corporate Debtors' businesses and the events leading up to the Petition Date can be found in the Declaration of Truman Raguse in Support of Chapter 11 Petitions and First Day Motions, filed on May 14, 2026 (the "Raguse Declaration"), which is incorporated herein by reference.

## REQUEST FOR RELIEF

11. By this Motion, the Corporate Debtors seek immediate access to post-petition financing in order to ensure its continued operations while it pursues a plan of reorganization that will allow them to continue their operations which will benefit not only the Corporate Debtors but all parties and interests and ultimately emerge from these proceedings with a right-sized balance sheet that will help ensure the Corporate Debtors' future success. To accomplish these tasks, the Corporate Debtors require the use of a post-petition credit facility consisting of a non-revolving line of credit as more fully described below up to an aggregate principal amount of $12.5 million (the "DIP Financing"), as set forth in that certain Term Sheet (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof) described below and attached hereto as Exhibit A. The DIP Financing will provide the Corporate Debtors with the liquidity needed to fund their operations, bankruptcy costs including professional fees, working capital needs and general corporate purposes during these cases.

12. Without the DIP Financing, the Corporate Debtors will lack sufficient liquidity to operate. The cessation of operations will, in turn, result in immediate liquidation, the loss jobs and severe losses for vendors, customers and creditors. In sum, all of the Corporate Debtors'

199545290v7

constituents depend on and will benefit from the Corporate Debtors' ability to access the DIP Financing.

13. In addition, the DIP Financing is secured by presently unencumbered property and does not seek to prime the Corporate Debtors' pre-existing secured creditors as the DIP Lender either limits its collateral package to presently unencumbered property or has obtained the consent of the pre-petition first priority secured lender to subordinate that lender's interest in the collateral.

14. The Corporate Debtors request that the Court enter an interim order (the "Interim DIP Order") and a final order (the "Final DIP Order" and, collectively with the Interim DIP Order, the "DIP Orders" and the DIP Orders together with the Term Sheet, the "DIP Loan Documents"). The Interim DIP Order is attached hereto as Exhibit B and the Final DIP Order will be served and filed at least 10 days prior to the Final Hearing. In summary, the Corporate Debtors request orders granting:

a. authority, pursuant to sections 105, 363, and 364(c) and 364(d) of the Bankruptcy Code, for the Corporate Debtors to obtain senior secured post-petition financing in an aggregate principal amount of up to $12.5 million of which, (1) upon entry of the Interim Order and satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents, $8 million (the "Initial Draw") shall be made immediately available to the Corporate Debtors immediately, and (2) upon entry of a Final Order approving the Motion additional $4.5 million (the "Second Draw") shall be made available to the Corporate Debtors with the Corporate Debtors able to access upon three business days written notice, provided satisfaction or waiver of the borrowing conditions set forth in the DIP Loan Documents.

199545290v7

b.	authority for Corporate Debtors to enter into the Term Sheet, among the Corporate Debtors as Borrowers and East West Bank and/or one or more of its designees, as Lender (the "DIP Lender") in substantially the same form as attached hereto as Exhibit A;

c.	authority for the Corporate Debtors to use the proceeds of the DIP Loan Documents, including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral"), in accordance with the terms of the DIP Loan Documents and the DIP Budget (including the Permitted Variances), as further described herein, to pay for (i) working capital needs and to provide working capital for other general corporate purposes, of the Corporate Debtors and (ii) the costs and expenses of administering the cases, and reasonable and documents costs, fees and expenses incurred in connection with the restructuring to be implemented through these cases as provided in the DIP Orders and in the other DIP Loan Documents;

d.	authority for Corporate Debtors to grant to the DIP Lender valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to sections 364(c)(1) and 503(b) of the Bankruptcy Code, subject only to the Carve-Out pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in the DIP Collateral (as defined below) (and all proceeds thereof), including, without limitation, all property constituting Cash Collateral, to secure all DIP Obligations (as defined below), as more fully set forth in the DIP Orders;

e.      subject to and only effective upon entry of the Final Order, waiver by Corporate Debtors of all rights to surcharge against the Collateral of the DIP Lender pursuant to section 506(c) of the Bankruptcy Code;

f.      subject to and only effective upon entry of the Final Order, waiver of the equitable doctrine of marshaling or any other similar doctrine with respect to any collateral of the DIP Lender;

g.      modification of the automatic stay to the extent hereinafter set forth and waiving the 14-day stay provisions of Bankruptcy Rules 4001(a)(3) and 6004(h);

h.      the scheduling of a final hearing (the "Final Hearing") on the Motion for a date to be determined to consider entry of the Final DIP Order *inter alia,* authorizing borrowings under the DIP Facility on a final basis and approving notice procedures with respect thereto; and

i.      related relief.

### RULE 4001 STATEMENT

15.      Pursuant to Local Rule 4001-2(a), attached hereto as Exhibit C is the Corporate Debtors' 13-week cash flow projections (the "Proposed Budget").

16.      Pursuant to Fed. R. Bankr. P. 4001(b), the following summarizes the significant terms of the DIP Loan Documents. The Corporate Debtors believe that the following provisions are justified and necessary in the context and circumstances of these cases.[1]

| Lender: | East West Bank and/or one or more of its designees (the "DIP Lender"). |
|---|---|

---

[1] The following summary is provided for ease of reference only. To the extent of any inconsistency as between the following summary and either the Term Sheet and/or the Interim DIP Order, the Term Sheet and/or Interim DIP Order (as applicable) shall control. All capitalized terms used in this summary but not otherwise capitalized herein shall have the meanings given to them in the Term Sheet.

199545290v7

| | |
|---|---|
| **Borrower:** | Raguse Family Partnership<br>R.A.G. Holdings, LLC<br>Tru Ag LLC<br>Red Rock Cattle, LLC |
| **Guarantors** | Raguse Family Partnership<br>R.A.G. Holdings, LLC<br>Tru Ag LLC<br>Red Rock Cattle, LLC<br>David Raguse<br>Susan Raguse<br>Truman Raguse |
| **Line of Credit Commitment:** | Total aggregate principal amount not to exceed $12.5 million (see proviso in Funded Amount below), subject to entry of the Final DIP Order by the Court. |
| **Use of Proceeds:** | The proceeds will be available to the Borrower to fund the following subject to the Budget and Permitted Variance:<br><br>(a) working capital and other general corporate purposes of the Borrower, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Loan Documents;<br>(b) professional fees and expenses of the Borrower's estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Budget, the Bankruptcy Code, and any orders of the Bankruptcy Court, as applicable;<br>(c) fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and<br>(d) interest and other amounts payable under the DIP Facility and the DIP Documents.<br><br>• All payments disbursements of DIP Facility proceeds shall be submitted to the Debtors' financial advisor, Lakeshore Foods on a weekly basis for confirmation that the requested disbursements are in accordance with the approved Budget. Following such approval, the approved signatory for RFP may initiate the payment. |

199545290v7

| | |
|---|---|
| **Funded Amount and Funding Dates:** | • **Initial Draw: $8 million**. This amount will be immediately available for draw in accordance with the DIP Loan Documents upon the approval and entry of the Interim DIP Order by the Bankruptcy Court.<br><br>• **Second Draw Upon Final DIP Order: $4.5 million**. Upon entry of a Final DIP Order, and upon three business days written notice, the Borrower may draw an additional $4.5 million. |
| **Maturity:** | DIP Lender will be entitled to immediate repayment of all outstanding obligations under the DIP Loan Agreement upon the occurrence of the earlier of (the "Termination Date"):<br>(e) March 31, 2027;<br>(f) the effective date of any chapter 11 plan with respect to the Borrower (a "**Plan**");<br>(g) the consummation of the sale or other disposition of all or substantially all of the assets of the Borrower pursuant to section 363 of the Bankruptcy Code;<br>(h) the date of the acceleration of the DIP Loan and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined in the Term Sheet) in accordance with the DIP Loan;<br>(i) dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case; and<br>(j) forty-five (45) days after the Petition Date (or such later date as agreed to by the DIP Lender), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date. |
| **Amortization:** | None. |

199545290v7

| | |
|---|---|
| **Prepayment:** | <ul><li>**Voluntary Prepayments**. Permitted at any time in the minimum amount of at least $1 million of principal, with allocation of payments as specified in the DIP Loan Documents.</li><li>**Mandatory Prepayments**.</li></ul>(a) Within one business day of the date of receipt by any Loan Party of the Net Cash Proceeds (as that term is defined in the Term Sheet) of any disposition of DIP Collateral (which, for the avoidance of doubt, shall exclude the disposition of other DIP Collateral in the ordinary course), such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Loan Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions.<br>(b) Within one business day of the date on which any Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in any applicable DIP Loan Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Loan Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, <u>plus</u> the accrued interest and Exit Fee as applied to the principal amount of such prepayment. |
| **Loan Interest Rates and Fees:** | The DIP Loan interest rates and fees will be as follows:<br>(i)    **<u>Commitment Fee:</u>** $250,000 (2% of the DIP Commitments), which will be earned and payable no later than two business days upon entry of the Interim Order.<br>(ii)    **<u>Cash Interest:</u>** 11%, payable monthly<br>(iii)    **<u>Default Interest Rate:</u>** During the occurrence and continuance of an Event of Default, 13%, payable monthly.<br>(iv)    **<u>Exit Fee:</u>** The Borrower will pay the Lender an exit fee of $625,000 (5% of the DIP Commitment). The Exit Fee shall be payable by Borrower to Lender upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; |

199545290v7

|  |  |
|---|---|
|  | provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender. |
|  | (v)   **Work Fee:** The Borrower will reimburse Lender for its legal fees incurred through the date of a bankruptcy filing up to $250,000 within two business days from entry of the Interim Order and payable from the Initial Draw. |
| **Collateral:** | As security for the DIP Obligations, subject to only the Carve-Out, and effective upon entry of the Interim Order, each Loan Party shall grant to the DIP Lender (a) a first lien security interest on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that were unencumbered as of the Petition Date; (b) a first lien security interest on all of such Loan Party's right, title and interest in, to and under the Loan Parties' crops growing, grown or to be grown; all harvested crops and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral (the "2026 Crop and Livestock Collateral"); and (c) except as to the 2026 Crop and Livestock Collateral, a junior lien on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, in each case, including, but not limited to, the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown or to be grown) furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, |

199545290v7

| | |
|---|---|
| | letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions and any proceeds thereof, recoveries related thereto, and property received or recovered on account thereof. Negative pledge on all assets of the Loan Parties subject to the Carve-Out and permitted liens, if any, under the DIP Documents. In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender. |
| **Priority and Security:** | Subject to only the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall |

11

199545290v7

|  | be entitled to, as applicable, (i) a senior lien, (ii) junior secured liens, and iii) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**").<br><br>Subject to the Carve-Out, at a minimum, all DIP Obligations in respect of the DIP Facility shall be:<br><br>i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral);<br><br>ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date;<br><br>iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all all assets of the Loan Parties over which a lien was created or perfected on or before ninety (90) days of the Petition Date;<br><br>iv. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all assets of the Loan Parties that are subject to an Existing Lien or Permitted Lien as of the Petition Date.<br><br>The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Orders. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |
| **Covenants:** | Affirmative, negative, and other financial and operational covenants customary for transactions of this type |
| **Credit Bidding Rights:** | Lender will have the right to credit bid on any asset sales. |
| **Representations and Warranties:** | Usual and customary representations and warranties, including organization in good standing, validity of agreements, tax |

199545290v7

| | |
|---|---|
| | status, compliance with law, and operational and financial disclosures. |
| **Carve-Out** | The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated only to the Carve-Out, which means:<br><br>the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees and any other limits imposed by the amount set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds. |
| **Events of Default:** | Events of Default will include, in addition to other such events customarily found in similar transactions:<br><br>i.    payment, non-compliance with covenants set forth in the DIP Documents, judgments in excess of $750,000, impairment of security interest in |

199545290v7

| | |
|---|---|
| | the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
| | ii. the entry of the Interim Order shall have not occurred on or before May 15, 2026, or the Interim Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | iii. the entry of the Final Order shall have not occurred on or before the date that is forty-five (45) days after the Petition Date, or the Final Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | iv. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | v. non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Orders; |
| | vi. the entry of an order appointing a receiver, trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court or other court shall have entered an order providing for such appointment; |
| | vii. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure or other enforcement against any assets of the Loan Parties the aggregate fair market value of which exceeds \$750,000; |
| | viii. the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any |

14

199545290v7

|  | other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents; |
|--|--|
|  | ix. any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
|  | x. entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations and the DIP Obligations are Paid in Full upon the closing or initial funding under such financing; |
|  | xi. the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" or "second day" orders of the Bankruptcy Court acceptable to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court acceptable to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget (subject to the Permitted Variance), or (c) as otherwise agreed to by the DIP Lender; |
|  | xii. entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
|  | xiii. any Loan Party shall, directly or indirectly, seek to, or support any other Person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of |

199545290v7

| | | |
|---|---|---|
| | | the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document; |
| | xiv. | any Debtor files a Plan that is not in form and substance acceptable to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender sufficient to allow for the indefeasible Payment in Full of the outstanding DIP Obligations; |
| | xv. | the occurrence of a "change of control" of any of the Loan Parties through the purchase or otherwise of the beneficial ownership of 50% or more of the voting interest of such Loan Party or all or substantially all of the asset of such Loan Party without the prior written consent of the DIP Lender in its sole discretion; |
| | xvi. | the occurrence of any event, condition, contingency, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document; |
| | xvii. | any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have a material adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; or |
| | xviii. | any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code |

16

199545290v7

| | or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its sole discretion unless such sale would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender or another source of funding acceptable to the DIP Lender) upon the closing date of such sale). |
|---|---|

## PREPETITION FINANCING FACILITIES

17. As of the Petition Date, the Corporate Debtors owe approximately $36.2 million ("Prepetition Secured Obligations") in principal plus accrued interest to the Prepetition Secured Parties (defined below). A more detailed summary of the Prepetition Secured Obligations are set forth in the Raguse Declaration. Critically, with one exception, the Corporate Debtors do not seek to prime the Prepetition Secured Obligations and in that particular case, the first priority secured creditor has consented to their lien being primed in that collateral. Consequently, the DIP Lender will receive first priority liens over the Corporate Debtors' presently unencumbered property and or presently encumbered property with consent and junior liens over all other encumbered property.

18. The Corporate Debtors' primary prepetition secured lender is Cornerstone Bank ("Cornerstone") who is owed approximately $19 million through various loan agreements and promissory notes (together, the "Cornerstone Loan Documents") where Cornerstone was either the original lender or has purchased the debt from the original lender. The Cornerstone Loan Documents are secured by a significant collateral package, including (a) agricultural security agreements covering all farm products, crops, livestock (including increase and unborn), inventory, equipment, general intangibles, and related proceeds, (b) commercial security agreements and fixture filings covering equipment and fixtures located at multiple farm and

17

commercial sites in Minnesota and North Dakota, (c) a pledge of 225 shares of Minndak Farmers Cooperative beet stock, and (d) mortgages and assignments of rents encumbering extensive tracts of agricultural and related real property in Traverse County, Minnesota, Wilkin County, Minnesota, Otter Tail County, Minnesota, and Richland County, North Dakota, together with all fixtures and rents associated therewith (collectively, the "Cornerstone Collateral"). Cornerstone has filed UCC-1 financing statements with the Minnesota Secretary of State and other applicable filing offices and the recording of mortgages, mortgage modifications, fixture filings, and assignments of rents in the real estate records of the counties in which the real property collateral is situated.

19. Prior to the Petition Date, Cornerstone assigned to the DIP Lender its first priority, perfected security interest in the 2026 Crop and Livestock Collateral. The only other asserted lien over the 2026 Crop and Livestock Collateral over which the Corporate Debtors are aware is held by Old Second National Bank ("Old Second") which filed a UCC-1 on March 19, 2026. Old Second's security interest, which was created on March 1,2026 and perfected on March 19, 2026, is avoidable as a preference and entitled to no adequate protection.

20. The remaining balance of the Corporate Debtors' secured debt is spread out over various creditors including, but not necessarily limited to, Ally Bank, Ascentium Capital, Avanza Capital, CapFirst Equipment Finance, CNH Industrial Capital America, Deutsche Leasing, JPMorgan Chase Bank, Lazurus Capital, the SBA, Vermeer Credit, and Wells Fargo Leasing (collectively, and along with Cornerstone, Old Second and any other party asserting a prepetition secured interest in the Corporate Debtors' assets, the "Prepetition Secured Parties").[2] For the most

---

[2] Nothing in this Motion should be conveyed to limit the Corporate Debtors' ability to challenge the validity, amount or priority of any Prepetition Secured Creditors' alleged claims or liens.

199545290v7

part, these non-Cornerstone lenders are secured by discrete assets of the Corporate Debtors, typically vehicles and equipment. Except as discussed below, the proposed DIP Financing does not seek to impair any valid lien held by these parties. Instead, the DIP Lender is limiting its liens to those assets of the Corporate Debtors that are unencumbered as of the Petition Date or over which the first priority secured lender has providing priming consent.

### CORPORATE DEBTORS' NEED FOR ONGOING FINANCING AND USE OF CASH COLLATERAL

21.     The Corporate Debtors need access to DIP Financing and the related Cash Collateral to finance these cases to an effective date of a confirmed chapter 11 plan. These funds will be used to, among other things, (a) purchase goods from and make payments to vendors on a current basis post-petition; (b) pay employees; (c) pay ordinary operating expenses to fund inventory acquisition, utilities, taxes and fees; (d) pay the administrative costs of these cases; and (e) generally fund the Corporate Debtors' day-to-day operations. The Corporate Debtors' cash needs are set forth in the accompanying 13-week budget which was negotiated with the DIP Lender with an emphasis on optimizing value through prudent capital expenditures and reducing extraneous expenses.

22.     The DIP Financing is necessary. First, as of the Petition Date, the Corporate Debtors essentially have no cash available to them. The only way they can continue as a going concern is through DIP Financing. Second, the availability of DIP Financing sends a strong signal of support to vendors and suppliers that the Corporate Debtor will have adequate funding available to pay post-petition obligations. If approved, the DIP Financing will preserve and enhance the value of the Corporate Debtors' estates and, as such, entry into the DIP Financing is a sound exercise of the Corporate Debtors' business judgment.

199545290v7

23. Moreover, the terms of the DIP Financing minimize disruption to other creditors and are the best terms that were available to the Corporate Debtors. Prior to the Petition Date, the Corporate Debtors engaged in arms-length negotiations with the Cornerstone as well as dozens of additional third parties to potentially provide the Debtors with third-party financing. Cornerstone was unwilling to provide any further financing and no party was willing to provide unsecured or non-priority financing. Only the DIP Lender agreed to provide secured financing that essentially would be limited to presently unsecured collateral. Every other potential lender would have either required the attempted priming of all Prepetition Secured Parties' liens. In contrast, the DIP Lender seeks to prime only one subset of prepetition secured debt and has obtained the consent to do so from the first priority creditor of that collateral.

24. Given the Corporate Debtors' capital structure, the outcome of the prepetition marketing process for third-party financing, and the need for immediate liquidity, the only viable, actional source of debtor-in-possession financing was with the DIP Lender. The Corporate Debtors and the DIP Lender negotiated the DIP Loan Documents in a good faith and arm's length manner, with the advice of sophisticated counsel and advisors. Accordingly, the DIP Facility is in the best interests of the Corporate Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.

## PROPOSED DIP FINANCING

25. Recognizing the Corporate Debtors' need for financing, and in consultation with its advisors, the Corporate Debtors negotiated with the DIP Lender regarding the terms of potential DIP financing. As the result of good faith, arms-length negotiations, the DIP Lender has agreed to make available up to $12.5 million of post-petition financing, with $8 million immediately available to the Corporate Debtors upon the entry of the Interim Order. The terms of the DIP Loan Documents are summarized above.

199545290v7

26. As a condition to entry into the DIP Loan Documents, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Lender requires, and the Corporate Debtors agree, that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and the Interim Order, and in accordance with the Approved Budget, solely to pay expenses incurred by Corporate Debtors in the ordinary course of business and which are permitted to be paid by this Court and the Bankruptcy Code, in accordance with and up to the amounts provided for in the Budget.

**NOTICES**

27. Prior to the hearing on the Motion for a final order authorizing use of cash, and in settlement of any and all matters raised in this Motion, the Corporate Debtors may enter into a stipulation or agreed order with parties claiming a security interest in cash collateral assets of the Corporate Debtors concerning the use of cash collateral and other related matters. In the event that the Corporate Debtors enter into any such stipulation, they will seek approval of the stipulation without further notice or hearing pursuant to Rule 4001(d)(4) of the Federal Rules of Bankruptcy Procedure, and the CORPORATE DEBTORS HEREBY GIVE NOTICE OF THEIR INTENTION TO SEEK APPROVAL OF ANY SUCH STIPULATION.

28. Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed order, and proof of service.

29. No prior request for the relief sought in this Motion has been made by the Corporate Debtors to this or any other court.

30. Pursuant to Local Rule 9013-2(c), the Corporate Debtors give notice that it may, if necessary, call Truman Raguse to testify on behalf of Debtor about the factual matters raised in this Motion.

21

WHEREFORE, the Corporate Debtors request that the Court (a) enter the Interim DIP Order authorizing the Corporate Debtors to obtain the DIP Financing substantially in the form attached hereto as Exhibit A, and a final order granting the relief requested herein, and (b) that the Court grant such other and further relief as is just an proper.

Dated: May 14, 2026

**TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ James M. Jorissen*
    James M. Jorissen, #262833
    2200 IDS Center
    80 South Eighth Street
    Minneapolis, MN 55402
    Telephone: 612-977-8400
    Facsimile: 612-977-8650
    jjorissen@taftlaw.com

**PROPOSED COUNSEL FOR THE DEBTORS**

199545290v7

# VERIFICATION

I, Truman Raguse named in the foregoing motion, declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated this 14th day of May 2026.

_/s/ Truman Raguse_
Truman Raguse

# EXHIBIT A

Interim DIP Order

*(See attached)*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

| | |
|---|---|
| RAGUSE FAMILY PARTNERSHIP (Lead Case), | Lead Case No. 26-60308 |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. 26-60312 |
| TRUMAN RAGUSE, | Case No. 26-60313 |
| R.A.G. HOLDINGS, LLC | Case No. 26-60309 |
| TRU AG LLC, and | Case No. 26-60311 |
| RED ROCK CATTLE, LLC | Case No. 26-60310 |
| Debtors. | |

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, GRANT LIENS, PROVIDE
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND USE CASH
COLLATERAL, (II) MODIFYING THE AUTOMATIC STAY, (III) SCHEDULING A
FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Raguse Farming Partnership, R.A.G. Holdings, LLC,

Tru AG LLC, and Red Rock Cattle, LLC, as debtors and debtors in possession (collectively, the

"Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections

105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), 506, and 507 of title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003,

6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules

2002-1, 4001-1, 5005-1, and 9013-1 of the Bankruptcy Local Rules for the District of Minnesota

(the "Local Rules"), seeking entry of this interim order (together with all exhibits hereto, the

"Interim Order") that, among other things:

> i. authorizes the Debtors, jointly and severally, to obtain a non-amortizing, super-priority senior secured postpetition credit facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $12,500,000 of which, upon entry of this Interim Order and subject to the terms and conditions set forth herein and in the DIP Term Sheet attached as <u>Exhibit 1</u> hereto (the "DIP Term Sheet"),[1] (a) up to $8,000,00 (the "Interim Amount") will be

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the DIP Term Sheet, as applicable.

available upon entry of the Interim Order and (b) the remaining $4,500,000 (the "Final Amount"), subject to the maximum aggregate amount of the DIP Commitments (as defined in the DIP Term Sheet), will be available upon the Court's entry of a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") on or before the date that is 45 days after the Petition Date (or such later date as agreed to by the DIP Lender (as defined below)), in each case, subject to the terms and conditions set forth in this Interim Order, the DIP Term Sheet, and, as applicable, the credit agreement for the DIP Facility (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral, or related documents and agreements, including, without limitation, the DIP Term Sheet, as the case may be, and the DIP Orders, each as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");

ii.     approves the terms of the DIP Term Sheet and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

iii.    authorizes the Debtors, on an interim basis (except as set forth herein with respect to the Commitment Fee, the Work Fee, and the Exit Fee, which shall be approved on a final basis in this Interim Order), to incur and guarantee the DIP Loans and all other obligations, of any kind, to or for the benefit of the DIP Lender under the DIP Documents (including, without limitation, all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, premiums, the Commitment Fee, the Work Fee, the Exit Fee, and any other fees payable pursuant to the DIP Documents) (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.     authorizes and directs the Debtors, on an interim basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents and this Interim Order to (a) fund the working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents; (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the other DIP Documents; (c) pay interest and other amounts payable under the DIP Facility and the DIP Documents; and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget (as defined below), subject to the Permitted Variance, and this Interim Order;

v.      authorizes and approves, on an interim basis, the Debtors' grant to the DIP Lender of valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including, without limitation, (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject to only the Carve-Out (as defined below), and (b) liens in the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject to only the Carve-Out;

vi.     authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order, the DIP Term Sheet, and the other DIP Documents;

vii.        authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

viii.        subject to the terms hereof and entry of the Final Order, waives (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

ix.        modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in this Interim Order and the other DIP Documents;

x.        waives any applicable stay (including, without limitation, under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order; and

xi.        schedules a final hearing (the "Final Hearing") to consider final approval of the DIP Facility pursuant to the Final Order, as set forth in the Motion and the DIP Term Sheet.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the *Declaration of Truman Raguse in Support of Chapter 11 Petitions and First Day Motions* (the "Raguse Declaration"), the DIP Term Sheet, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held before this Court on May 19, 2026 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the

other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:** [2]

A.      **Petition Date**.  On May 14, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

B.      **Debtors in Possession**.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      **Jurisdiction and Venue**.  The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and Local Rule 1070-1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

E.      **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Minnesota (the "U.S. Trustee") has not appointed an official committee of unsecured

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F. **No Credit Available on More Favorable Terms**. Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, in each case, subject and subordinate to only the Carve-Out, as set forth herein and in the DIP Documents.

G. **Good Faith**. Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including, without limitation, the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in this Interim Order and the other DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical, and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and all terms, conditions, and relief set forth in and otherwise approved by this Interim Order shall be

entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

H. **Good Cause**. Good cause has been shown for the entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The relief requested in the Motion is fair and reasonable and in the best interest of the Debtors and their estates, and essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets.

I. **Need for Postpetition Financing and Use of Cash Collateral**. The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion. The financing provided pursuant to this Interim Order and the other DIP Documents and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) preserve and maintain the value of their assets and provide for the well-being of their livestock; (iii) fund any obligations benefiting from the Carve-Out; (iv) continue the orderly continuation of the operation of their business for the benefit of all their stakeholders; (v) maintain business relationships with customers, vendors, and suppliers; (vi) make payroll for their employees; and (vii) satisfy other working capital and operational needs.

J. **Willingness to Provide Financing**. The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of the DIP Orders; (ii) approval of the terms and conditions of the DIP Facility, the DIP Term Sheet, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Term Sheet and the other DIP Documents; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to this

Interim Order and the other DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the other DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

K. **Approved Budget**. The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget, a copy of which is attached to this Interim Order as Exhibit 2 (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet and the other DIP Documents, the "Initial DIP Budget"). The Initial DIP Budget reflects, among other things, for the thirteen-week period commencing on or around the week of entry of this Interim Order, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Term Sheet or the other DIP Documents, and such modified, amended, extended, and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, in consultation with any Committee, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet or the DIP Credit Agreement, as applicable) shall constitute, without duplication, an "Approved Budget"). The Approved Budget for purposes of this Interim Order is attached hereto as Exhibit 2. The Approved Budget has been prepared by the Debtors, their management, and their advisors. The Debtors believe that the Approved Budget is reasonable under the circumstances. The DIP Lender is relying, in part, on the Debtors' agreement to comply

with the Approved Budget (subject only to the Permitted Variance) and the terms of this Interim Order and the other DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for herein.

L.      **Use of Cash Collateral and DIP Facility Proceeds**.  As a condition to the Debtors' entry into the DIP Term Sheet and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Documents, and the Approved Budget (subject to the Permitted Variance).  Except as otherwise set forth in this Interim Order, all of the Debtors' cash, including, without limitation, the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

M.      **Section 506(c) and Marshaling**.  As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of only the Carve-Out, the DIP Lender is entitled to, subject to entry of the Final Order, (i) except as otherwise provided in paragraph 32(b) of this Interim Order, a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

N. **Requisite Authority**. Upon entry of this Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Term Sheet and the other DIP Documents to which it is a party and to perform its obligations thereunder.

O. **Immediate Entry**. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of DIP Collateral in accordance with this Interim Order and the other DIP Documents are, therefore, in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1. **Motion Granted**. The relief sought in the Motion is GRANTED on an interim basis as set forth herein. Entry into the DIP Term Sheet and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, on an interim basis and subject to the terms and conditions set forth in this Interim Order and in the DIP Documents, including the Approved Budget (subject to the Permitted Variance). All objections to the Motion and this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2. **Authorization of the DIP Facility**. The Debtors are expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Term Sheet and the other DIP Documents (in each case, to the extent not previously executed and delivered), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order

and the DIP Term Sheet, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Term Sheet, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Term Sheet. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Term Sheet and this Interim Order, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Term Sheet), including, without limitation, the Commitment Fee, the Exit Fee, and the Work Fee,[3] as well as any documented fees and expenses of counsel to the DIP Lender, as set forth herein and in the DIP Term Sheet, subject to paragraph 27 of this Interim Order, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Term Sheet. Upon execution and delivery, the DIP Term Sheet and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. All provisions of the DIP Term Sheet are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Term Sheet and the other DIP Documents.

3. **DIP Obligations**. This Interim Order and, upon execution and delivery thereof, the other DIP Documents shall constitute and evidence the validity and binding effect of the DIP

---

[3] As set forth in Section 9 of the DIP Term Sheet and paragraph 26 below, the Commitment Fee, the Exit Fee, and the Work Fee are hereby deemed fully earned, non-refundable, and allowed and not subject to reduction, setoff or recoupment for any reason on a final basis under this Interim Order. The Commitment Fee and the Work Fee shall be paid in cash to the DIP Lender promptly after entry of this Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after entry of this Interim Order in cash from the proceeds of the Initial Draw or cash on hand. The Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a pro rata basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.

Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto (the "Successors"),[4] including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (collectively, the "Successor Cases"). The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due in accordance with the DIP Documents, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under this Interim Order and the other DIP Documents, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under this Interim Order and the other DIP Documents. The Debtors, their estates, and their Successors shall be jointly and severally liable for the DIP Obligations and the repayment of any funds provided pursuant to the DIP Documents. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Term Sheet) or as otherwise set forth in the DIP Documents. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including, without limitation, any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

---

[4] For the avoidance of doubt, the term "**Successors**" as used herein shall not include any buyer of the Debtors' assets pursuant to an order of the Court.

4.      **Authorization to Borrow**.  The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Term Sheet (and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith.  Upon entry of this Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Term Sheet, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Term Sheet) without the need to seek further Court approval.  The borrowing of DIP Loans under this Interim Order and the DIP Term Sheet shall permanently decrease the DIP Commitments and, once repaid, the DIP Loans incurred may not be re-borrowed.

5.      **DIP Collateral**.  The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all of such Debtor's (and its estate's) assets and property, whether tangible, intangible, real, personal or mixed, whether now owned or existing or hereafter acquired and wherever located, whether arising before or after the Petition Date, including, without limitation, the following: (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all

12

of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions[5] and any proceeds thereof, recoveries related thereto, and property received or recovered on account thereof. The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of

---

[5]    The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the DIP Facility, if any.

6. **Proceeds of Subsequent Financing**. If any Debtor, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases obtains financing, other credit, or incur debt pursuant to section 364 of the Bankruptcy Code or otherwise in violation of the DIP Documents at any time (including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors) before the DIP Obligations have been indefeasibly Paid in Full, then all the cash proceeds derived from such financing, other credit, or debt shall immediately be applied to the DIP Obligations in accordance with this Interim Order and the other DIP Documents.

7. **DIP Liens**. To secure the DIP Obligations, effective immediately upon entry of this Interim Order, the DIP Lender is hereby granted on an interim basis continuing, effective, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to only the Carve-Out:

> a. **First Priority Liens on Unencumbered Property.** Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (collectively, the "**Unencumbered Property**").
>
> b. **First Priority Priming Liens Over 2026 Crops and Cattle**. Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority priming liens and security interests in the Debtors'

crops growing, grown or to be grown; all harvested crops and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral.

c.  **Junior DIP Liens**.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral that is subject to the Existing Liens or a Permitted Lien6 (all such DIP Collateral, the "DIP Junior Collateral," all DIP Collateral that is not DIP Junior Collateral, collectively, the "DIP Senior Collateral"), which DIP Liens shall be subject and subordinate only to such Existing Liens or Permitted Priority Liens and the Carve Out.

d.  **Priming DIP Liens**.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens in the DIP Senior Collateral shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Senior Collateral or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code), which DIP Liens shall be subject and subordinate only to the Carve Out.

e.  **DIP Liens Senior to Other Liens**.  Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

---

[6]     The terms "*Existing Liens*" and "*Permitted Liens*" mean, for the purposes of this Interim Order, the liens and security interest that are identified as such on Schedule 1 of the DIP Term Sheet.  These definitions remain subject to ongoing review and negotiation by the parties and may be revised in the Final Order and other DIP Documents.

8. **DIP Superpriority Claims**. Subject to and subordinate to only the Carve-Out, effective immediately upon entry of this Interim Order, the DIP Lender is hereby granted on an interim basis, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Cases (without the need to file any proof of claim) for all DIP Obligations (collectively, the "**DIP Superpriority Claims**") with priority in payment over any and all priority and administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and their estates all proceeds thereof, excluding only the Carve-Out.

9. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance or provide any other accommodation under the DIP Documents unless (a) all of the conditions precedent and other terms under this Interim Order and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Term Sheet or the other DIP Documents has occurred and is continuing, or would occur if any such loan, advance, or accommodation is made.

10. **Use of DIP Facility Proceeds**. The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only for the purposes specifically set forth in this Interim Order and the other DIP Documents, and subject in all respects to the Approved Budget (subject to the Permitted Variance).

11. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variance).

12. **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Interim Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variance), the Debtors are authorized on an interim basis to use Cash Collateral in accordance with the terms and conditions of this Interim Order and the other DIP Documents.

13. **Modification of DIP Documents**. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet any non-material modifications of the DIP Term Sheet without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Term Sheet shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon three (3) days' notice to the U.S. Trustee and any Committee; <u>provided</u> that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Term Sheet shall not require an order of this Court.

14. **DIP Facility Reporting**. Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget (subject to the Permitted Variance). The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.

15. **Perfection of DIP Liens**. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including, without limitation, the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted in this Interim Order. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, validate, perfect, continue, or enforce the DIP Liens. The DIP Lender may, in its sole discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. For the avoidance of doubt, any

deposit account control agreements contemplated by the DIP Term Sheet shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors or the DIP Lender. Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized and directed to take, execute, deliver, and file any such instruments contemplated by the DIP Term Sheet to enable the DIP Lender to further validate, perfect, preserve, continue, and enforce the DIP Liens. To the fullest extent permitted by the Bankruptcy Code, any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest, or proceeds thereof or other collateral related thereto, shall have no force or effect with respect to the transactions granting the DIP Liens in any such fee, leasehold, interest, or other collateral, or in the proceeds of any assignment and/or sale thereof by the Debtors in favor of the DIP Lender in accordance with the DIP Documents and this Interim Order.

16. **Modification of Automatic Stay**. The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors and the DIP Lender to accomplish the transactions contemplated by this Interim Order and the other DIP Documents.

17. **Payments Held in Trust**. Except as expressly permitted in this Interim Order, the DIP Documents, or otherwise ordered by this Court, including in respect of the Carve-Out, in the event that any person or entity other than the Debtors receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral

prior to the Payment in Full of the DIP Obligations and termination of the DIP Facility in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral, payment, or proceeds in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Interim Order or the other applicable DIP Documents.

18. **Restrictions on Granting Postpetition Liens**.  Other than the Carve-Out, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in any Chapter 11 Case, while any portion of the DIP Facility (or refinancing thereof), or any other DIP Obligations are outstanding.  Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364 of the Bankruptcy Code or otherwise.

19. **Maintenance of DIP Collateral**.  Until the Payment in Full of the DIP Obligations, the Debtors shall:  (a) continue to maintain and insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of the *Order (I) Granting Expedited Hearing; (II) Authorizing Maintenance and Use of Certain Bank Accounts as Debtor-in-Possession Accounts; (III) Authorizing Maintenance of Debtors' Existing Cash Management System; and (IV) Authorizing the Continued Use of Existing Business Forms* (the "**Cash Management Order**") and the DIP Documents.

20. **Right to Credit Bid**.  Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or

substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a Chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

21. **Effect of DIP Termination.**

a. **DIP Termination Event**. For purposes of this Interim Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach under this Interim Order by the Debtors or the occurrence of an Event of Default under the DIP Term Sheet or the other DIP Documents, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitments in accordance with the terms of the DIP Term Sheet or the other DIP Documents.

b. **Exercise of Remedies**. Upon the occurrence of a DIP Termination Event, of which written notice (including via email) of the occurrence of such DIP Termination Event is delivered by the DIP Lender to counsel for the Debtors, the U.S. Trustee, and counsel for any Committee (the "Remedies Notice" and such date, the "DIP Termination Declaration Date"), without further notice to, hearing of, application to, or order from this Court, subject to the expiration of the Waiting Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a Carve-Out

Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitments) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Term Sheet; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date (such period, the "Waiting Period"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including, without limitation, Cash Collateral) in accordance with the terms of this Interim Order and the Approved Budget (subject to the Permitted Variance), solely to pay any expenses necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet); provided, however, that the professional fees and expenses of the

Professional Persons (as defined below) shall be governed by paragraph 24 hereof and subject to the Approved Budget (subject to the Permitted Variance).

d. **Rights and Remedies Following Termination Date**. Following the expiration of the Waiting Period and, unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Interim Order, the DIP Term Sheet, the other DIP Documents (if any), applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the DIP Term Sheet, the other DIP Documents (if any), this Interim Order, and applicable law.

22. **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the other DIP Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order or the other DIP Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consent required hereunder or in any other DIP Document by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

23. **Carve-Out**.

a. **Priority of Carve-Out**. The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to only the Carve-Out. The Carve-Out shall be senior to all other claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Interim Order.

b. **Carve-Out**. The term "Carve-Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate and all fees and expenses for services provided under section 156(c) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") or any Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget (subject to the Permitted Variance) and any other limits imposed by the terms of this Interim Order; and (iv) allowed fees and expenses of Professional Persons (collectively, the "Professional Fees") in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv)

being the "Post-Carve-Out Trigger Notice Cap" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "Carve-Out Cap"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.

c. **Carve-Out Account**. As soon as reasonably practicable following the entry of this Interim Order, and each week thereafter, the Debtors shall transfer cash on hand or cash proceeds from the DIP Facility (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to the amount of fees and expenses reflected in the Approved Budget (subject to the Permitted Variance) for each Professional Person for such week into a segregated account not subject to control of the DIP Lender (the "Carve-Out Account"). The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amounts in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Persons that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. Until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Account and all allowed Professional Fees have been paid in full pursuant to a final order of the Court; provided, in no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the allowed Professional Fees due and

payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise). Notwithstanding anything contained herein to the contrary, funds transferred to the Carve-Out Account (i) shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising under the Carve-Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender or any other creditors and shall not constitute DIP Collateral; provided, however, that, until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the Carve-Out Account and all allowed fees of Professional Persons have been paid in full pursuant to a final order of the Court. All funds in the Carve-Out Account shall be used to pay all obligations set forth in the definition of Carve-Out until such obligations are paid in full. The DIP Lender shall not sweep or foreclose upon any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as required hereunder and all allowed Professional Fees have been paid in full pursuant to a final order of the Court.

d. **Carve-Out Trigger Notice**. For purposes of this Interim Order, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the Waiting Period, stating that the Post-Carve-Out Trigger Notice Cap has been invoked (the "Trigger Date"). The Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to transfer to the Carve-Out Account an amount of cash equal to the remaining unfunded

portion of the Carve-Out (less any retainers held by Professional Persons).  Any Carve-Out Trigger Notice shall be deemed a consent by the DIP Lender to authorize the Debtors to deposit Cash Collateral or proceeds of the DIP Facility into the Carve-Out Account in an amount equal to the unfunded portion of the sum of the Post-Carve-Out Trigger Notice Cap and any budgeted amounts reflected in the Approved Budget (subject to the Permitted Variance) through the date of the Carve-Out Trigger Notice that have not already been deposited in the Carve-Out Account.

e. **Carve-Out Draw**.  Subject to exhaustion of the DIP Commitments and the applicable terms of the DIP Documents, the Debtors shall be permitted to draw on the DIP Facility in the amount of any remaining unfunded portions of the Carve-Out, notwithstanding any default, Event of Default, or the occurrence of a Trigger Date.

f. **Payment of Allowed Professional Fees Prior to the Trigger Date**.  Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.

g. **Initial Draw**.  The foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw (as defined in the DIP Term Sheet).

h. **Restricted Use**.  The Carve-Out shall not include, apply to or be available for any party in connection with any Restricted Use (as defined in the DIP Term Sheet).

24. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**.  The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order, the other DIP Documents, or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses

of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses. Notwithstanding anything contained herein to the contrary, neither the Carve-Out nor the Approved Budget shall constitute a cap or limitation on the amount of Professional Fees that may be allowed by the Court and due and payable by the Debtors.

25. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee and the documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). The DIP Fees shall be part of the DIP Obligations. The Commitment Fee and the Work Fee, both of which shall be paid in full in cash from the proceeds of the Initial Draw or cash of hand and the Exit Fee are approved on a final basis upon entry of this Interim Order and are deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet and any other applicable DIP Documents without the need for any further order of this Court.

26. **DIP Lender's Professionals' Fees**. Professionals for the DIP Lender (the "DIP Lender Professionals") shall provide copies of any invoices in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information

constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (a) a summary of the work performed during the relevant compensation period; (b) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (c) the total fee amount being requested) by electronic mail to the U.S. Trustee and counsel to any Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. At the conclusion of the Review Period (as defined below) the DIP Lender or the Debtors, as requested, shall promptly pay in full all such invoiced fees and expenses of the DIP Lender Professionals, other than the Disputed Invoiced Fees (as defined below), directly to the applicable DIP Lender Professional, and such amount shall be added to the DIP Obligations. Any objections raised by the Debtors, the U.S. Trustee or any Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within five (5) business days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) business days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the date of entry of this Interim Order, the DIP Lender or the Debtors, as requested, shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. Notwithstanding the foregoing, on or about the date of entry of this Interim Order, the Debtors

shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. No DIP Lender Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27. **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant Indemnitee (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of any Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of any of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

28. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Cases, this Interim Order was deemed to constitute a timely

filed proof of claim, and the entry of the Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim. Any order entered by this Court in relation to the establishment of a bar date (a "Bar Date Order") for any claim (including, without limitation, administrative claims) in the Chapter 11 Cases or Successor Cases shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim (including master or aggregate proofs of claim) in the Chapter 11 Cases for any claim allowed herein or that the DIP Lender otherwise has or may have in respect of the Debtors.

29. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve-Out and Other Funds**. Except as otherwise permitted in the DIP Documents (including, without limitation, the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, the Carve-Out, and any portion of the foregoing shall not be used, directly or indirectly, by any of the Debtors, the Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any Restricted Use, including, without limitation, (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) except as permitted by the DIP Documents or order of this Court, using or seeking to use Cash Collateral or any insurance proceeds constituting DIP Collateral without the permission of the DIP Lender; (c) except as permitted by the DIP Documents or order of this Court, selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender (not to be unreasonably withheld); (d) seeking to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders or the DIP Documents, as

applicable, including, without limitation, seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) the investigation, initiation or prosecution of any claims, causes of action adversary proceedings, litigation, challenge, objection or other proceeding against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens or DIP Superpriority Claims; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including, without limitation, Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (g) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (h) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (i) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Documents.

30. **Releases**. Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their estates only, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such (each a "Released Party"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including,

without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; <u>provided</u>, <u>however</u>, that nothing contained herein shall release (i) any claims against a Released Party for liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence, or willful misconduct of such Released Party, or (ii) the DIP Lender from its commitments and obligations hereunder and under the DIP Documents.

31. **Waivers**.

a. **Limitation on Charging on Expenses**. Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b. **No Marshaling**. Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the other DIP Documents.

32. **No Lender Liability**. In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans. Furthermore, nothing in this Interim Order or the other DIP Documents shall impose or allow the imposition upon the

DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

33. **Limitation of Liability**. Nothing in this Interim Order, the other DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors or their respective creditors, shareholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

34. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, including, without limitation, with respect to the Carve-Out, this Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35. **Insurance Proceeds and Policies**. Within thirty (30) days after entry of the Final Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, to the extent allowable under the applicable insurance policies, named as an additional insured and loss payee on each insurance policy maintained by or for the benefit of the Debtors that in any way relates to the DIP Collateral until the Payment in Full of the DIP Obligations (notwithstanding anything to the contrary in the DIP Documents); provided, however, that such thirty (30) day

period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the agreed insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions).

36. **No Waivers or Modifications of Interim Order**. The Debtors have agreed not to and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

37. **Binding Effect of this Interim Order**. Immediately upon entry of this Interim Order, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective Successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any of the Chapter 11 Cases or any Successor Cases; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including, without limitation, Cash Collateral) by or extend any financing to any receiver, administrator, Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed for any of the Debtors or their respective estates.

38. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Payment in Full of the DIP Obligations has occurred, on or before the effective date of such confirmed plan.

39. **Survival**. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any Chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Cases. The terms and provisions of this Interim Order, including, without limitation, the claims, liens, security interests and other protections granted to the DIP Lender, the Carve-Out, or otherwise approved or set forth in this Interim Order and the other DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of any of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, the Payment in Full of the DIP Obligations, pursuant to this Interim Order and the other DIP Documents (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

40. **Necessary Actions**. The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Interim Order and the other DIP Documents.

41. **Payments Free and Clear**. Any and all payments or proceeds remitted to the DIP Lender or the DIP Lender Professionals shall be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.

42. **Joint and Several Liability**. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents, respectively.

43. **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

44. **Interim Order Controls**. In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and the other DIP Documents, the terms and provisions of this Interim Order shall govern and control to the extent of such conflict or inconsistency.

45. **Headings**. All paragraph headings used in this Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

46. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Interim Order.

47. **Final Hearing**. The Final Hearing on the Motion shall be held on **June ___, 2026, at __:___ _.m. (prevailing Central Time)** in the United States Bankruptcy Court for the District of Minnesota, _____. Any objections or responses to entry of the Final Order on the Motion shall be filed on or before **June ___, 2026, at 4:00 p.m. (prevailing Central Time)** and

served on the following parties: (a) the Debtors; (b) proposed counsel to the Debtors: Taft Stettinius & Hollister LLP, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, c/o James M. Jorissen (jjorissen@taftlaw.com); (c) attorneys for the DIP Lender, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Robert M. Hirsh (robert.hirsh@nortonrosefulbright.com), Francisco Vazquez (francisco.vazquez@nortonrosefulbright.com), and James A. Copeland (james.copeland@nortonrosefulbright.com); (d) the Office of the United States Trustee, 300 South Fourth Street, Suite 1015, Minneapolis, MN 55415, Attn: Sarah J. Wencil (Sarah.J.Wencil@usdoj.gov); and (e) counsel to any Committee appointed in these Chapter 11 Cases (collectively, the "Notice Parties"). In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter the Final Order without need for the Final Hearing.

48. **Miscellaneous**.

a. Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

b. All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

c. No later than two business days after the date of this Interim Order, the Debtors shall serve on the Notice Parties a copy of this Interim Order and shall file a certificate of service no later than 24 hours after service.

### # # # END OF ORDER # # #

## Exhibit 1

## DIP Term Sheet

**Raguse Farming Partnership,** *et al.*
**$12,500,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, this "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement between the DIP Lender and Borrowers from and after, and subject to, the entry of the Interim Order with respect to the DIP Facility (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (in each case, as defined below), the terms of the DIP Orders (as defined below), as applicable, shall govern.**

**This Term Sheet is a binding and enforceable agreement, subject to entry of the Interim Order with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth in this Term Sheet.**

| 1. | *Borrowers and Guarantors* | • Raguse Farming Partnership, R.A.G Holdings, LLC, Tru Ag LLC and Red Rock Cattle, LLC (collectively, the "**Borrowers**," and each a "**Borrower**"). |
|---|---|---|
| | | • All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower and David Raguse, Susan Raguse and Truman Raguse (collectively, the "**Loan Parties**" and each a "**Loan Party**"). |
| | | • The Borrowers are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**," and the Borrowers and their applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**") on or around May 13, 2026 (such filing date, the "**Petition Date**"). |
| | | • For the purposes of this Term Sheet and the DIP Facility, Raguse Farming Partnership (i) is hereby designated and appointed by each Loan Party as its authorized representative and agent to act on its behalf (the "**Borrower Representative**") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | *DIP Lender* | • East West Bank ("**EWB**") and its designees or assignees (together with EWB, the "**DIP Lender**"). |

| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $12,500,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**"). |
|---|---|---|
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |
| | | • Any Initial Draw shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used solely in accordance with the Budget, subject to the Permitted Variance (in each case, as defined below). |
| | | • Subsequent DIP Loan proceeds to be funded into a new segregated Bank Account to be opened or otherwise designated by a Borrower (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 30 days after the entry of the Final Order subject to a 30-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the interim order approving the DIP Facility, in form and substance acceptable to the DIP Lender (the "**Interim Order**"). |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $8,000,000 (the "**Interim Amount**") and the Borrowers shall be entitled to make a draw of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the first draw under the DIP Facility, the "**Initial Draw**" and all draws before the entry of the Final Order, the "**Initial Draws**"). The closing of definitive DIP Documents (such date shall be referred to herein as the "**Closing Date**") shall occur as soon as reasonably possible after the entry of the Final Order, but in any event no later than two (2) business days thereafter unless the DIP Lender agrees otherwise. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**," and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (subject to the |

| | | |
|---|---|---|
| | | • Permitted Variance), up to the amount of the undrawn DIP Commitments. |
| | | • Each Draw shall be made (in an aggregate minimum amount of [$2,000,000] (and multiples thereof) upon three (3) business days' written notice (or such shorter period as agreed to by the DIP Lender its sole discretion), up to the aggregate amount of the available undrawn DIP Commitments at any time prior to three (3) business days before the DIP Termination Date (as defined below); <u>provided</u> that the Initial Draw shall be in an amount up to the Interim Amount in accordance with the terms of the DIP Documents, and funded within two (2) business days following after the DIP Lender's receipt of a customary borrowing notice following entry of the Interim Order. |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of (such earliest date, the "**DIP Termination Date**"): |
| | |     i.   March 31, 2027 (the "**Maturity Date**"); |
| | |     ii.   the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | |     iii.   the consummation of the sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
| | |     iv.   the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and in the DIP Documents) in accordance with the DIP Documents; |
| | |     v.   dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case; and |
| | |     vi.   forty-five (45) days after the Petition Date (or such later date as agreed to by the DIP Lender), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date. |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and use any proceeds thereof (other than the Carve-Out), including Cash Collateral (as defined in the DIP Orders) and shall terminate the DIP Commitments and any |

---

[1]   For purposes hereof, the term "**Payment in Full**" or, as applicable, "**Paid in Full**," means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| | | |
|---|---|---|
| | | • further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.<br><br>• For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the DIP Termination Date under the DIP Orders and the other DIP Documents. |
| 8. | *Interest Rate* | • The DIP Loans shall bear interest at a per annum rate equal to 11.0% payable in cash on the first business day of each month in arrears (the "**Non-Default Interest**").<br><br>• Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | *Commitment Fee, Work Fee, Exit Fee, and Other Fees* | • **Commitment Fee**. The Borrowers shall pay to the DIP Lender a commitment fee totaling 2.0% of the DIP Commitments (the "**Commitment Fee**," which for the avoidance of doubt is $250,000), which Commitment Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The Commitment Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand. For the avoidance of doubt, the Commitment Fee, to the extent earned, shall be payable even if the DIP Facility is never drawn.<br><br>• **Work Fee**. The Loan Parties shall reimburse the DIP Lender its legal fees incurred through the Petition Date up to $250,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order. The Interim Order shall provide that the Work Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason. The Work Fee shall be paid in cash to the DIP Lender (or directly to its counsel) promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand.<br><br>• If the Interim Order is not entered by the Bankruptcy Court within seven (7) days after the Petition Date (or such later date as agreed to by the DIP Lender in its discretion), this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect.<br><br>• **Exit Fee**. The Borrowers shall pay to the DIP Lender an exit fee totaling 5.0% of the DIP Commitment (the "**Exit Fee**," which for the avoidance of doubt is $625,000), which Exit Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The |

| | | |
|---|---|---|
| | | Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br><br>• The Commitment Fee , Work Fee, and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as set forth above as part of the Interim Order.  If such fees are not approved on a final basis by the Bankruptcy Court in the Interim Order and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| 10. | *Use of Proceeds* | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to (ii), (iii), and (iv) below, subject to the Budget and the Permitted Variance as set forth below:<br><br>    i.    working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents;<br><br>    ii.    professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Budget, the Bankruptcy Code, and any orders of the Bankruptcy Court, as applicable;<br><br>    iii.    fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and<br><br>    iv.    interest and other amounts payable under the DIP Facility and the DIP Documents.<br><br>• All payments disbursements of DIP Facility proceeds shall be submitted to the Debtors' financial advisor, Lakeshore Foods on a weekly basis for confirmation that the requested disbursements are in accordance with the approved Budget.  Following such approval, the approved signatory for RFP may initiate the payment.<br><br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in any Chapter 11 Case, or any trustee or examiner appointed in any Chapter 11 Case or any successor cases, including any chapter 7 cases, or any other Person, party or entity (each of the following, a "**Restricted Use**"): |

| | | |
|---|---|---|
| | | i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding: |
| | |  a. against the DIP Lender, or its respective predecessors-in-interest, successors, assigns, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or any other term, condition, or aspect of the DIP Facility; or |
| | |  b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim, or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under any of the DIP Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; |
| | | ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Orders, each in accordance with the DIP Documents and the DIP Orders, as applicable; <u>provided</u>, <u>however</u>, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Orders and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; |
| | | iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or |
| | | iv. to apply to the Bankruptcy Court for authority to approve claims or grant liens (other than the Carve-Out) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Orders have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | *Voluntary and Mandatory Prepayments* | • **Voluntary Prepayments**. Optional prepayments of the DIP Loans shall be permitted at any time, subject to (i) allocation of such payment to the ratable portion of the Exit Fee due thereon (which, for the avoidance of doubt, shall be deemed to be due and payable on the date of such voluntary |

| | | prepayment), (ii) accrued interest on the amount prepaid, and (iii) in minimum amounts of at least $1,000,000 of principal. |
|---|---|---|
| | | • **Mandatory Prepayments**. |
| | |    i.  **Dispositions**. Within one (1) business day of the date of receipt by any Loan Party of the Net Cash Proceeds[2] of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of DIP Collateral (which, for the avoidance of doubt, shall exclude the disposition of other DIP Collateral in the ordinary course), such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee. |
| | |    ii.  **Indebtedness**. Within one (1) business day of the date on which a Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in any applicable DIP Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, plus the accrued interest and Exit Fee as applied to the principal amount of such prepayment. |
| | | • No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender. |
| 12. | *Security* | • As security for the DIP Obligations, subject to only the Carve-Out, and effective upon entry of the Interim Order, each Loan Party shall grant to the DIP Lender (a) a first lien security interest on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that were unencumbered as of the Petition Date, (b) a first lien security interest on all of such Loan Party's right, title and interest in, to and under the Loan Parties' crops growing, grown or to be grown; all harvested crops |

---

[2] For purposes hereof, the term "**Net Cash Proceeds**" means, with respect to any sale or disposition of the DIP Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction. Moreover, for the purposes hereof, the term "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral; and (c) a junior lien on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, in each case, including, but not limited to, the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown, or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions[3] and any proceeds

---

[3] The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections

| | | |
|---|---|---|
| | | thereof, recoveries related thereto, and property received or recovered on account thereof. |
| | | • Negative pledge on all assets of the Loan Parties subject to the Carve-Out and permitted liens, if any, under the DIP Documents. |
| | | • In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender. |
| 13. | *Priority and Security* | • Subject to only the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a senior lien, (ii) junior secured liens, and (iii) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**"). |
| | | • Subject to the Carve-Out, at a minimum, all DIP Obligations in respect of the DIP Facility shall be: |
| | |    i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); |
| | |    ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date; and |
| | |    iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all assets of the Loan Parties that are subject to an Existing Lien or Permitted Lien as of the Petition Date. |
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Orders. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |

---

544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to (subject to the Carve-Out): |
|---|---|---|
| | |     i. declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |
| | |     ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | |     iii. charge interest at the default rate under the DIP Documents; |
| | |     iv. subject to the Carve-Out, declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral; or |
| | |     v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders and the Loan Parties' right to seek an emergency hearing before the Bankruptcy Court with respect to the exercise of remedies by the DIP Lender. |
| 15. | *Conditions Precedent to Initial Draws* | • Entry of the Interim Order on or before three (3) business days after the Petition Date (or such later date as agreed to by the DIP Lender in its sole discretion), and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the Interim Order or the Final Order (if entered before the Initial Draw); |
| | | • Delivery of the Initial Budget (as defined below) acceptable to the DIP Lender in its sole discretion; |
| | | • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee and the Work Fee), the DIP Documents, or the DIP Orders shall have been paid in accordance with this Term Sheet or the applicable DIP Documents; |
| | | • The representations and warranties of the Loan Parties under this Term Sheet and any other DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |

| | | |
|---|---|---|
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing; |
| | | • The Debtors shall be in compliance in all material respects with the applicable DIP Documents (including the DIP Orders); |
| | | • No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents; and |
| | | • The Borrowers shall have delivered to the DIP Lender a customary borrowing notice in form and substance acceptable to the DIP Lender. |
| 16. | *Conditions Precedent to Availability of Other Draws* | • No DIP Order, or any material provision thereof, shall have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its sole discretion.<br><br>• In addition to the conditions set forth in Section 15 above, the DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:<br><br>   i.   execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance mutually acceptable to the Loan Parties and the DIP Lender;<br><br>   ii.   delivery of any Budget or Updated Budget, acceptable to the DIP Lender in its sole discretion, as applicable;<br><br>   iii.   no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a Person other than a Loan Party exercising control over its assets or operations;<br><br>   iv.   the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);<br><br>   v.   the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents;<br><br>   vi.   the Loan Parties shall be in compliance in all material respects with the DIP Orders;<br><br>   vii.   no default or event of default shall have occurred and be continuing under the DIP Documents;<br><br>   viii.   no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner |

| | | any DIP Order or any material provision thereof (other than an amendment or modification acceptable to the DIP Lender in its sole discretion); |
|---|---|---|
| | ix. | since the Petition Date, other than the commencement of the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
| | x. | within thirty (30) days after the entry of the Final Order, the Debtors shall have all applicable insurance policies maintained by Loan Parties name, to the extent allowable under the applicable insurance policies, the DIP Lender as additional insured and loss payee; <u>provided</u>, <u>however</u>, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the applicable insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions); |
| | xi. | all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise required to be paid to the DIP Lender shall have been paid when due; and |
| | xii. | a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code shall have occurred and been approved by the Bankruptcy Court. |
| 17. | *Documentation* | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Orders, any DIP Loan agreement and all definitive guaranties, security agreements, and any documents executed pursuant hereto or thereto (the "**DIP Documents**") shall be mutually agreed upon by the Loan Parties, and in form and substance acceptable to the DIP Lender in its sole discretion. |
| 18. | *Representations and Warranties* | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties (with exceptions and thresholds to be agreed) as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes or effects, |

| | | |
|---|---|---|
| | | title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility. |
| | | • Each Loan Party represents and warrants that none of its assets and properties are subject to any valid, perfected liens, security interests or encumbrances as of the Petition Date, other than the Existing Liens set forth in **Schedule 1**. No liens, security interests, or encumbrances will be created on or after the Petition Date except, in each case, the Carve-Out and as expressly permitted under the DIP Documents. |
| 19. | *Affirmative Covenants* | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties (with baskets and thresholds to be agreed) in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. For the avoidance of doubt, no audited financial statements shall be required. |
| 20. | *Negative Covenants* | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties, including the following, with exceptions and baskets to be agreed: limitations on indebtedness, liens (other than the Carve-Out, the Existing Liens, and the Permitted Liens (as defined in Schedule 1)) subject to a $750,000 aggregate materiality threshold, investments, sale of assets, restricted payments, affiliate transactions, bankruptcy matters; provided that the DIP Documents will permit, among other things: (a) the Debtors to pursue one or more sale processes for, in the aggregate, all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for and require the Payment in Full of the DIP Obligations; (b) the ability to reject or modify contracts; (c) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (d) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers, and in all respects subject to the Budget (subject to the Permitted Variance); and (e) provide for any adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |
| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Lender on the fifth Thursday (or, if later, the fourth business day of such week) following the prior Budget's approval and every fifth Thursday (or, if later, the fourth business day of such week) thereafter, with such updated Budget |

|     |             | extending the term thereof and the DIP Lender, in its sole discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within five (5) business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender in its sole discretion.  In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five (5) business day period, such Updated Budget shall become effective as the Budget. |
|-----|-------------|---|
|     |             | • On a weekly basis after the delivery of the first Budget, the Borrowers shall deliver to the DIP Lender a variance report for the eight-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating disbursements for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative eight-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Cash Flow Variance (as defined below) solely with respect to net operating Cash Flow that exceed 15.0% in the aggregate in the Measuring Period shall be material and shall constitute and Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably acceptable to the DIP Lender).  For the avoidance of doubt, net operating disbursements shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases. |
|     |             | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Cash Flow Variance**").  For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15.0% for Budget Variances in the aggregate in the Measuring Period with respect to the Net Operating Cash Flow Variance, each as set forth in the applicable Variance Report.  For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, the Loan Parties, and any Committee, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Cash Flow Variance calculation. |
| 22. | *DIP Orders* | • The interim order (the "**Interim Order**") and the final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**") approving the DIP Facility, which, in each case, shall be in form and substance acceptable to the DIP Lender in its sole discretion, shall, among other things, authorize and approve, in each case on a final basis: |

| | | |
|---|---|---|
| | | i. the DIP Facility; |
| | | ii. the making of the DIP Loans in accordance with the DIP Documents; |
| | | iii. the granting of the superpriority claims and liens against the Debtors, their estates, and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | | iv. the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 25 of this Term Sheet (provided that the Commitment Fee and the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (including the Work Fee) shall be paid out of the proceeds of the Initial Draw); |
| | | v. the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order as set forth above; and |
| | | vi. the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | *Carve-Out* | • The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated only to the Carve-Out. |
| | | • As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees and any other limits imposed by the amount set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed [$750,000] incurred after the first |

| | | |
|---|---|---|
| | | business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.<br><br>• Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be required to deposit into a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") cash (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors. The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Person that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The DIP Lender shall have a reversionary interest, up to the Payment in Full of the DIP Obligations, in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court.<br><br>• For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.<br><br>• The Carve-Out shall not include, apply to, or be available for any Person or party in connection with any Restricted Use.<br><br>• The DIP Orders, as applicable, shall provide that the foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw. |
| 24. | *Events of Default* | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor- |

| | | in-possession financing facilities of this type (with exceptions and thresholds to be agreed), including, without limitation: |
|---|---|---|

i. payment, non-compliance with covenants set forth in the DIP Documents, judgments in excess of $750,000, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature;

ii. the entry of the Interim Order shall have not occurred on or before May 15, 2026, or the Interim Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender;

iii. the entry of the Final Order shall have not occurred on or before the date that is forty-five (45) days after the Petition Date, or the Final Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender;

iv. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;

v. non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Orders;

vi. the entry of an order appointing a receiver, trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court or other court shall have entered an order providing for such appointment;

vii. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure or other enforcement against any assets of the Loan Parties the aggregate fair market value of which exceeds $750,000;

viii. the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents;

| | | ix. | any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
| | | x. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations and the DIP Obligations are Paid in Full upon the closing or initial funding under such financing; |
| | | xi. | the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" or "second day" orders of the Bankruptcy Court acceptable to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court acceptable to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget (subject to the Permitted Variance), or (c) as otherwise agreed to by the DIP Lender; |
| | | xii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
| | | xiii. | any Loan Party shall, directly or indirectly, seek to, or support any other Person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document; |
| | | xiv. | any Debtor files a Plan that is not in form and substance acceptable to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender sufficient to allow for the indefeasible Payment in Full of the outstanding DIP Obligations; |
| | | xv. | the occurrence of a "change of control" of any of the Loan Parties through the purchase or otherwise of the beneficial ownership of 50% or more of the voting interest of such Loan Party or all or substantially all of the asset of such Loan Party without the prior written consent of the DIP Lender in its sole discretion; |

| | | xvi. | the occurrence of any event, condition, contingency, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document; |
| | | xvii. | any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have a material adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; or |
| | | xviii. | any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its sole discretion unless such sale would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender or another source of funding acceptable to the DIP Lender) upon the closing date of such sale). |
| 25. | *Indemnification and Reimbursement of Expenses* | | • The DIP Documents (including the Interim Order) shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "**Indemnitees**"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. <br><br> • Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 26. | *Release* | | • The DIP Orders shall include a customary release of the DIP Lender with respect to any and all claims and causes of action arising from or related to the DIP Facility, the Debtors, and/or the Chapter 11 Cases (including any related chapter 11 plan, sale or other disposition, reorganization transaction, or matters related thereto). |
| 27. | *Waivers* | | • The DIP Orders shall include terms and conditions customary for interim and final DIP financing orders, as applicable, and shall be acceptable to the DIP Lender in its sole discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" |

| | | provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
|---|---|---|
| 28. | *Counterparts and Electronic Transmission* | • This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| 29. | *Governing Law* | • The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>• The Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |

[*Signatures on following pages.*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**RAGUSE FARMING PARTNERSHIP,**
as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties


By: _____
    Name:
    Title:

**EAST WEST BANK**,
as DIP Lender


By: _____
     Name: Edward Hirshfield
     Title:  SVP-Head of DIP Lending and Distressed Situations

_

<u>**Schedule 1**</u>

Existing and Permitted Liens

For purposes of this Term Sheet, the term "**Existing Liens**" means the following:

- Ally Bank, Auto Loan; 2022 GMC Sierra; Claim Amount: $88,538.14
- Ascentium Capital; Equipment Loan; John Deere 560R; Claim Amount: $50,000
- Ascentium Capital; Equipment Loan; John Deer Accumulator; Claim Amount: $10,000
- Ascentium Capital; Equipment Loan; John Deere 8R370; Claim Amount: $350,000
- Avanza Capital, Merchant Cash Advance, Receivables, Claim Amount: $130,766.34
- CapFirst Equipment Finance, Inc: Equipment Loan, 2010 H&S Beet Cart; Claim Amount: $50,265.00
- CNH Capital, Equipment Loan; Claim Amount: $5,838,840.24
- CNH Capital, Equipment Loan; Case IH 475, Claim Amount: $93,000.00
- CHN Capital; Equipment Loan, Brent 2096; Claim Amount: $103,000.00
- CNH Capital; Equipment Loan, 2018 Corn Header; Claim Amount $215,000.00
- CNH Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,800,000.00
- CHN Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,100,000.00
- CHN Capital; Equipment Loan, 2024 Geringhoff; Claim Amount $400,000
- Cornerstone Bank; Revolving Line of Credit, Claim Amount $19,051,122.68
- Deutsche Leasing USA, Inc.; Equipment Loan, Holmer Tarra Dos T5-40, Claim Amount $1,108,500.19
- Deutsche Leasing USA, Inc.; Equipment Loan, Beet Car, Claim Amount $239,825.00
- JPMorgan Chase Bank NA, Auto Loan, 2021 GMS 2500HD, Claim Amount $28,277.03
- Lazurus Capital, Merchant Cash Advance, Receivables, Claim Amount: $612,793.44
- Old Second National Bank; Promissory Note; Crops and Livestock, Claim Amount $500,000.00
- SBA Loan, Promissory Note; Tangible and Intangible Personal Property (subordinated), Claim Amount $2,000,000.00
- Vermeer Credit, Equipment Loan, Feed Mixer, Bail Processor, and Bail Rake, $130,000
- Wells Fargo, Equipment Loan, 2020 John Deere DB66, Claim Amount: $400,000.

For purposes of this Term Sheet, the term "**Permitted Liens**" means the following:

a. pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any lien imposed by ERISA;

b. pledges and deposits to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

c. easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrowers taken as a whole and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property, and (ii) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by

any government, statutory or regulatory authority, developer, landlord or other third party on property over which a Borrower has easement rights or on any leased property with respect to which a Loan Party or its subsidiary is the tenant and subordination or similar arrangements relating thereto and (iii) any condemnation or eminent domain proceedings affecting any real property;

d.  liens existing on the Petition Date other than liens and any replacement, renewals, replacements or extensions thereof, provided that (i) such replacement, renewal or extension lien shall not apply to any other property or asset of any Borrower other than (A) improvements thereon or proceeds thereof and (B) after-acquired property that is affixed or incorporated into the property covered by such lien; notwithstanding anything herein, liens over the 2026 Crop and Livestock Collateral shall not be considered a Permitted Lien.

e.  liens pursuant to any DIP Facility;

f.  the Carve-Out;

g.  statutory or common law liens of landlords and sub-landlords securing obligations that are not overdue by more than thirty (30) days or are being contested in good faith;

h.  liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions and securities intermediaries;

i.  Liens arising from precautionary UCC filings regarding operating leases, the consignment or bailment of goods to a Borrower on equipment of the Borrowers granted in the ordinary course of business to a client or supplier at which such equipment is located;

j.  liens or rights of setoff against credit balances of Borrowers with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to such Borrower in the ordinary course of business; and

k.  any interest or title of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses (including software and other technology licenses).

<u>**Exhibit 2**</u>

**Budget**

**Raguse Family Partnership**
**13-Week Cash Flow Forecast**

5/13/2026 14:23

| ($ and volume in thousands) | Budget | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 15-May-26 | 22-May-26 | 29-May-26 | 5-Jun-26 | 12-Jun-26 | 19-Jun-26 | 26-Jun-26 | 3-Jul-26 | 10-Jul-26 | 17-Jul-26 | 24-Jul-26 | 31-Jul-26 | 7-Aug-26 | 14-Aug-26 | Period |
| Company Period | May | May | May | May/Jun | June | June | June | Jun/Jul | Jul | Jul | Jul | Jul/Aug | Aug | Aug | Total |
| Model Week | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | |
| **SALES** | | | | | | | | | | | | | | | |
| Net Sales | $ - | $ - | $ - | $ - | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 768 | $ 3,603 |
| **CASH FLOW SUMMARY** | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | |
| Customer Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ 158 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 2,363 |
| Discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Government Payments | - | - | 800 | - | - | - | - | - | - | - | - | - | - | - | 800 |
| Crop Insurance Indemnity Payments | - | - | 153 | - | - | - | 10 | - | - | - | - | 435 | - | - | 597 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [] | | | | | | | | | | | | | | | |
| **Net Receipts** | $ - | $ - | $ 953 | $ - | $ - | $ - | $ 167 | $ 315 | $ 315 | $ 315 | $ 315 | $ 750 | $ 315 | $ 315 | $ 3,760 |
| **General Disbursements** | | | | | | | | | | | | | | | |
| Crop Input Costs | $ 500 | $ 1,069 | $ - | $ 200 | $ 250 | $ 100 | $ 71 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 11 | $ 11 | $ 2,299 |
| Cattle Input Costs | - | 27 | 943 | 921 | 921 | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | 2,843 |
| Land & Equipment | 500 | 1,770 | - | 4 | - | 52 | 1 | 4 | - | - | 1 | 3 | 1 | 9 | 2,345 |
| Labor & Benefits | 80 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 380 |
| Insurance | - | 244 | 151 | - | - | - | - | - | - | - | - | - | - | - | 395 |
| Utilities | - | - | - | 15 | - | - | - | 15 | - | - | - | 15 | - | - | 45 |
| Other Operating Expenses | - | 183 | 138 | 56 | 56 | 46 | 41 | 14 | 9 | 9 | 9 | 14 | 12 | 12 | 602 |
| [] | | | | | | | | | | | | | | | |
| Total General Disbursements | $ 1,080 | $ 3,292 | $ 1,283 | $ 1,196 | $ 1,277 | $ 202 | $ 167 | $ 54 | $ 80 | $ 30 | $ 81 | $ 53 | $ 78 | $ 36 | $ 8,909 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | | |
| Critical Vendors | $ 100 | $ 100 | $ 100 | $ 50 | $ 50 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 400 |
| Capital Spending | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Payments | 160 | - | 1,010 | 34 | 40 | - | 328 | 400 | 315 | 315 | 315 | 1,011 | 315 | 315 | 4,558 |
| [] | | | | | | | | | | | | | | | |
| Total Other Operating Disbursements | $ 260 | $ 100 | $ 1,110 | $ 84 | $ 90 | $ - | $ 328 | $ 400 | $ 315 | $ 315 | $ 315 | $ 1,011 | $ 315 | $ 315 | $ 4,958 |
| **Net Operating Cash Flow** | $ (1,340) | $ (3,392) | $ (1,440) | $ (1,280) | $ (1,367) | $ (202) | $ (328) | $ (139) | $ (80) | $ (30) | $ (81) | $ (314) | $ (78) | $ (36) | $ (10,108) |
| **Professional Fees** | $ 285 | $ 74 | $ 67 | $ 67 | $ 304 | $ 82 | $ 47 | $ 46 | $ 53 | $ 81 | $ 46 | $ 46 | $ 53 | $ 81 | $ 1,330 |
| **Total Disbursements** | $ 1,625 | $ 3,466 | $ 2,459 | $ 1,346 | $ 1,671 | $ 283 | $ 542 | $ 500 | $ 448 | $ 426 | $ 442 | $ 1,110 | $ 447 | $ 432 | $ 15,198 |
| **U.S. Trustee Expenses** | $ - | $ - | $ - | $ - | $ - | $ - | $ 98 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 98 |
| **Cash Flow** | $ (1,625) | $ (3,466) | $ (1,506) | $ (1,346) | $ (1,671) | $ (283) | $ (473) | $ (185) | $ (133) | $ (111) | $ (127) | $ (360) | $ (132) | $ (117) | $ (11,535) |
| Weekly Starting Cash | - | 6,375 | 2,909 | 1,403 | 56 | 385 | 102 | 2,129 | 1,944 | 1,811 | 1,700 | 1,573 | 1,213 | 1,081 | - |
| Change in Cash before DIP Draw | (1,625) | (3,466) | (1,506) | (1,346) | (1,671) | (283) | (473) | (185) | (133) | (111) | (127) | (360) | (132) | (117) | (11,535) |
| Net Cash before DIP Draw | (1,625) | 2,909 | 1,403 | 56 | (1,615) | 102 | (371) | 1,944 | 1,811 | 1,700 | 1,573 | 1,213 | 1,081 | 965 | (11,535) |
| Plus: DIP Draw | 8,000 | - | - | - | 2,000 | - | 2,500 | - | - | - | - | - | - | - | 12,500 |
| **Ending Cash** | $ 6,375 | $ 2,909 | $ 1,403 | $ 56 | $ 385 | $ 102 | $ 2,129 | $ 1,944 | $ 1,811 | $ 1,700 | $ 1,573 | $ 1,213 | $ 1,081 | $ 965 | $ 965 |
| Initial DIP Draw | $ 8,000 | $ - | - | - | - | - | - | - | - | - | - | - | - | - | 8,000 |
| Other DIP Draw | - | - | - | - | $ 2,000 | - | $ 2,500 | - | - | - | - | - | - | - | 4,500 |
| **Total DIP Drawn** | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 10,000 | $ 10,000 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 |

In re:

| | |
|---|---|
| RAGUSE FAMILY PARTNERSHIP (Lead Case), | Lead Case No. 26-60308 |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. 26-60312 |
| TRUMAN RAGUSE, | Case No. 26-60313 |
| R.A.G. HOLDINGS, LLC | Case No. 26-60309 |
| TRU AG LLC, and | Case No. 26-60311 |
| RED ROCK CATTLE, LLC | Case No. 26-60310 |
| Debtors. | |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR INTERIM AND FINAL ORDERS (I) GRANTING EXPEDITED HEARING, (II) APPROVING POSTPETITION FINANCING, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) AUTHORIZING USE OF CASH COLLATERAL, (V) MODIFYING AUTOMATIC STAY, AND (VI) GRANTING RELATED RELIEF**

_____

Debtors Raguse Family Partnership, R.A.G. Holdings, LLC, Tru Ag LLC, and Red Rock Cattle, LLC (collectively, the "Corporate Debtors") as debtors and debtors-in-possession, by and through their undersigned counsel, submits this memorandum of law in support of its motion in the above-entitled matter and in accordance with Local Rule 9013-2(a). The relief requested in the Motion should be granted to allow Debtors to continue operating their business.

**FACTUAL BACKGROUND**

The supporting facts are set forth in the verified Motion. All capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the motion.

1

<u>**ARGUMENT**</u>

**I.     THE CORPORATE DEBTORS' REQUEST FOR EXPEDITED RELIEF SHOULD BE GRANTED.**

The Corporate Debtor requests expedited relief. Bankruptcy Rule 9006(c) provides that the Court may reduce the notice period "for cause shown." Cause exists here to grant the Motion on an expedited basis. As described in the Motion, the liquidity to be provided under the DIP Financing is essential to the Corporate Debtors' continued operations and the success of the their efforts to maximize the value of the estates, and is needed on the most urgent basis possible. Without the proceeds of the DIP Financing, the Corporate Debtors will be unable to fund operating expenses. Indeed, unless the requested relief is granted on an expedited basis, the Corporate Debtors will almost certain be forced to convert the case and to liquidate under Chapter 7. Expedited relief is therefore necessary and appropriate to avoid immediate and irreparable harm.

**II.     THE CORPORATE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN THE DIP FINANCING UNDER SECTION 364 OF THE BANKRUPTCY CODE**

Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain postpetition financing and to grant superpriority administrative status and liens on its property. Specifically, Section 364(c) provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>         (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; [or]
>         (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>         (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c). Further, § 364(d) provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate only if:
>         (A)     the trustee is unable to obtain such credit otherwise; and

2

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

Provided that an agreement to obtain secured credit is consistent with the Bankruptcy Code and its underlying policies, courts afford debtors considerable deference in exercising sound business judgment to obtain such credit. *See, e.g., In re Barbara K. Enters., Inc*., No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc*., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

Further, in determining whether the Corporate Debtors exercised sound business judgment in deciding to enter into the DIP Loan Documents, the Court may appropriately take into consideration the non-economic benefits to the Corporate Debtors that accompany the proposed postpetition facility. For example, in *In re ION Media Networks, Inc*., the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to

obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

Here, given all the facts and circumstances present in these cases, the Corporate Debtors have satisfied the necessary conditions under §§ 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Financing. The Corporate Debtors exercised proper business judgment in securing the DIP Financing on terms that are fair and reasonable and the best available to it in the current market. The Corporate Debtor could not obtain credit on an unsecured or administrative expense basis. The Corporate Debtors were, however, able to obtain DIP Financing that is either secured with (i) unencumbered assets; or (ii) with the consent of the first priority lender being primed. For all the reasons discussed below, therefore, the Court should grant the Corporate Debtors' request to enter into the DIP Financing pursuant to §§ 364(c) and (d) of the Bankruptcy Code.

### A. The Corporate Debtors Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Financing

Based on the facts of these Cases, the DIP Financing represents a proper exercise of the Corporate Debtors' business judgment. Bankruptcy courts routinely defer to debtors' business judgment on most business decisions, including decisions about whether and how to borrow money. *Grp. Of Institutional Investors v. Chi., Milwaukee, St. Paull & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Farmland Indus., Inc.* at 882) ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo.

1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id*. at 513-14 (footnote omitted).

To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc*., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

Here, the Corporate Debtors exercised sound business judgment in determining that the DIP Financing is appropriate. The Corporate Debtors presently have no cash collateral and are not able to operate. In other words, DIP financing is necessary to enable the Corporate Debtors to survive. Despite these conditions, the Corporate Debtors (with the assistance of its advisors) were able to procure DIP Financing that generally speaking does not seek to prime any current secured

creditor. For the one type of collateral where priming is sought, the primary secured creditor of that collateral has consented and any other creditor's alleged interest in that collateral is avoidable as a preference. In sum, the DIP Financing represents the best terms available in the current market. Given the immediate need for financing, the Corporate Debtors' decision is sound and reasonable.

The DIP Financing also will send a strong signal to the Corporate Debtors' employees, vendors, and other parties in interest regarding the viability of the Corporate Debtors' operations. If approved, the DIP Financing will preserve and enhance the value of the Corporate Debtors' estates. Entry into the DIP Financing is a sound exercise of the Corporate Debtors' business judgment.

**B.      The Corporate Debtors Meet the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [Bankruptcy Code]. . . ." 11 U.S.C. § 364(c).

Courts have articulated a three-part test to determine whether a debtor is entitled to obtain financing under § 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

(a)      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative expense claim;
(b)      the credit transaction is necessary to preserve the assets of the estate; and
(c)      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores, Inc*., 115 B.R. at 37-39; *accord In re St. Mary Hosp*., 86 B.R. 893, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Grp., Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

In order to satisfy this test, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v.*

*Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *accord In re Ames Dep't Stores, Inc*., 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.,* 71 B.R. at 549 (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id*.; *see also Pearl-Phil GMT (Far East) Ltd. V. Caldor Corp*., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is especially true when time is of the essence. *In re Reading Tube Indus*., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely to be able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc*., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of § 364(c) by approaching four lending institutions and selecting the most favorable of the two offers it received).

As laid out in the Raguse Declaration, the Corporate Debtors made reasonable efforts to secure the best possible postpetition financing under the circumstances. Because of the Corporate Debtors' urgent need for liquidity, they were unable to solicit any viable proposals that authorized financing on an unsecured or administrative expense basis. To the contrary, the Corporate Debtors' negotiations made clear that their only viable option was to obtain financing from the DIP Lender on the terms provided in the DIP Loan Documents.

The Court should therefore authorize the Corporate Debtors to provide the DIP Lender superpriority administrative expense status for any obligations arising under the DIP Credit Agreement as provided for in § 364(c)(1) of the Bankruptcy Code.

**C.      The Corporate Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Liens That are Senior to the Liens Securing the Prepetition Secured Debt**

In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1). Here, Cornerstone Bank has consented to the DIP Lender priming it as it relates to Cornerstone Bank's asserted secured interest in the 2026 Crop and Livestock Collateral.

Moreover, the only creditor with a security interest in the 2026 Crop and Livestock Collateral is Old Second National Bank ("Old Second"), which filed a UCC-1 with the Minnesota Secretary of State asserting a lien of all crops and livestock (and all proceeds) of the Partnership and Truman Raguse on March 19, 2026. The underlying debt supporting this alleged lien concerns a certain Agricultural Loan Agreement and Promissory Note dated March 5, 2025, in the principal amount of $500,000 and entered into between the Partnership and Truman Raguse, as borrowers, and Evergreen Bank Group (later acquired by Old Second Bancorp), as lender. Old Second's alleged security interest is plainly an avoidable preference. A "transfer" of a security interest occurs "at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time…" Old Second's security interest was created on March 1, 2026, when the Partnership went into default and thus the "transfer" occurred on that date as Old Second filed its financing statement within thirty days. Consequently, Old Second's security interest was a transfer made on account of an antecedent debt (the debt having

8

arisen in March 2025) that was made within ninety days of the Partnership's bankruptcy filing; thus, an avoidable transfer.

Even if Cornerstone had not consented (and it has), and even if Old Second's lien was not avoidable (and it is) the requested relief still should be granted. When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- Whether alternative financing is available on any other basis (i.e., whether any other proposals are before the court);

- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- Whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10.

The DIP Financing satisfies each of these factors. First, as described above, despite significant efforts, the Corporate Debtor were unable to obtain alternative DIP financing on equal or better terms. The agreement before the court reflects the most favorable terms on which the Corporate Debtors were able to obtain financing.

Second, the Corporate Debtors urgently need the funds to be provided under the DIP Financing to preserve the value of its estate for the benefit of all creditors and other parties in

9

interest. Without the DIP Financing, the Corporate Debtors will not be able to continue operations. Providing the Corporate Debtors with the liquidity necessary to preserve its going concern value through the pendency of these cases is in the best interests of all stakeholders.

Third, the terms of the DIP Financing are reasonable and adequate to support the Corporate Debtors' necessary activities through the pendency of these cases. The interest rates and fees under the DIP Financing are market rates in comparison to the interest rates and fees in other recent cases.

Fourth, as described in greater detail above and in the Raguse Declaration, the Corporate Debtors and the DIP Lender negotiated the DIP Loan Documents in good faith and at arms' length, and Debtor's entry into the DIP Loan Documents is an exercise of its sound business judgment. The DIP Financing is on the most favorable terms available to the Corporate Debtors under current market conditions and the Corporate Debtors' financial condition. In light of all these factors, the Corporate Debtor should be authorized to secure the DIP Financing with first priority senior priming liens over the 2026 Crops and Livestock Collateral.

## III. THE CORPORATE DEBTORS SHOULD BE AUTHORIZED TO USE THE CASH COLLATERAL

Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that: "The trustee may not use, sell, or lease cash collateral . . . unless—

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [section 363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without

a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

The Corporate Debtors do not have pre-petition cash collateral. As to the DIP Financing cash collateral, the DIP Lender has consented to the use of Cash Collateral on the terms set forth in the DIP Orders.

## IV.  THE CORPORATE DEBTORS SHOULD BE AUTHORIZED TO PAY THE FEES IN CONNECTION WITH THE DIP FINANCING

The Corporate Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lender in connection with the DIP Financing. Specifically, the Corporate Debtors will pay a $250,000 Work Fee, a 5% Exit Fee, and a 2.0% as a Commitment Fee (collectively, the "Fees"). The Fees are in line with market rates and other comparable DIP facilities and represent the most favorable terms on which the DIP Lender would agree to make the DIP Financing available. The Fees are also lower than what had been offered by other potential lenders in connection with the Corporate Debtors' efforts to locate such financing prepetition. The Corporate Debtors considered the Fees when determining in its sound business judgment that the DIP Loan Documents constituted the best terms on which the Corporate Debtors could obtain the postpetition financing necessary to continue its operations and prosecute these cases, and paying the Fees in order to obtain the DIP Financing is in the best interests of the Corporate Debtors' estate, creditors and other parties in interest.

## VI.  THE DIP LENDER SHOULD BE DEEMED TO HAVE ACTED IN GOOD FAITH UNDER SECTION 364(e)

Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

11

The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

As explained in detail herein and in the Raguse Declaration, the DIP Loan Documents are the result of Corporate Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain the critically needed postpetition financing, and did so upon arm's-length, good faith negotiations with the Corporate Debtors. The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VII. MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

The DIP Loan Documents contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default, all rights and remedies provided for in the DIP Loan Documents, and to take various other actions without further order of or application to the Court, subject to a required notice period.

Stay modification provisions of this sort are ordinary features of DIP financing and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g., In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at *31-32 (Bankr. D. Neb. Nov. 18, 2009); *In re*

12

*Trilogy Dev. Co.*, 2009 Bankr. LEXIS 5178, at \*19 (Bankr. W.D. Mo. July 14, 2009); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Banbkr. E.D. Va. Dec. 18, 2012); *In re Patriot Coal Corp.*, No. 12-12900 (SCC) (Bankr. S.D.N.Y. Aug. 3, 2012); *In re Eastman Kodak Co.*, No. 12-10202 (ALG) (Bankr. S.D.N.Y. Feb. 16, 2012); *In re Roomstore, Inc.*, No. 11-37790 (KLP) (Bankr. E.D. Va. Jan. 5, 2012); *In re The Great Atl. & Pac Tea Co.*, No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2011); *In re Canal Corp. f/k/a Chesapeake Corp.*, No. 08-36642 (DOT) (Bankr. E.D. Va. Feb. 3, 2009); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 23, 2008).

## VIII. THE CORPORATE DEBTORS REQUIRE IMMEDIATE ACCESS TO THE DIP FINANCING

The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

The Corporate Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Corporate Debtor to borrow up to $8 million under the DIP Financing, is not granted promptly after the Petition Date. As noted above, the Corporate Debtors currently have no access to cash and the DIP Financing is necessary immediately to enable the Corporate Debtors to continue as an operating concern maintain its relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy working capital and operational needs, all of which is required to preserve and maintain the Corporate Debtors' enterprise value for the benefit of all parties in interest.

The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district and others in similar circumstances. *See, e.g, In re Genmar Holdings, Inc.,* No. 09-43537 (Bankr. D. Minn. June 4, 2009) [ECF No. 23] (approving DIP loan with granting of senior lien); *In re US Fidelis, Inc.*, 2010 Bankr. LEXIS 5837, at \*10 (Bankr. E.D. Mo. May 28, 2010) (authorizing secured postpeititon financing on a superpriority basis); *In re Premium Protein Prods., LLC*, 2009 Bankr. LEXIS 5285, at \*6-9 (Bankr. D. Neb. Nov. 18, 2009) (authorizing debtor to incur postpetition secured indebtedness on an interim basis); *In re Trilogy Dev. Co*., 2009 Bankr. LEXIS 5178, at \*7 (Bankr. W.d. Mo. July 14, 2009) (authorizing postpetition secured financing with superpriority DIP liens priming prepetition secured construction loan); *In re Va. United Methodist Homes of Williamsburg, Inc*., No. 13-31098 (KRH) (Bankr. E.D. Va. Mar. 6, 2013) (approving postpetition financing on an interim basis); *In re AMF Bowling Worldwide, Inc*, No. 12-36495 (KRH) (Bankr.E.D. Va. Nov.. 14, 2012); *In re Patriot Coal Corp.,* No. 12-12900 (ALG) (Bankr. S.D.N.Y. July 12, 2012); *In re Eastman Kodak Co*., No. 12-10202 (ALG) (Bankr. S.D.N.Y. Jan. 20, 2012); *In re Roomstore, Inc*., No. 11-37790 (KLP) (Bankr. E.D. Va. Dec. 14, 2011); *In re Bear Island Paper Co., L.L.C*., No. 10-31202 (DOT) (Bankr. E.D. Va. Feb. 26, 2010); *In re Lyondell Chem. Co*., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009). Likewise, for the reasons set forth above, prompt entry of the Interim Order authorizing the DIP Financing and authorizing use of cash collateral is necessary to avert immediate and irreparable harm to Corporate Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## CONCLUSION

For the foregoing reasons, the Corporate Debtors respectfully request that the Court grant the relief requested in this Motion.

14

Dated: May 14, 2026        **TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ James M. Jorissen*
     James M. Jorissen, #262833
     2200 IDS Center
     80 South Eighth Street
     Minneapolis, MN 55402
     Telephone: 612-977-8400
     Facsimile: 612-977-8650
     jjorissen@taftlaw.com

     **PROPOSED COUNSEL FOR THE CORPORATE DEBTORS**

200460374v1

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

| | |
|---|---|
| RAGUSE FAMILY PARTNERSHIP (Lead Case), | Lead Case No. 26-60308 |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. 26-60312 |
| TRUMAN RAGUSE, | Case No. 26-60313 |
| R.A.G. HOLDINGS, LLC | Case No. 26-60309 |
| TRU AG LLC, and | Case No. 26-60311 |
| RED ROCK CATTLE, LLC | Case No. 26-60310 |
| Debtors. | |

---

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANT LIENS, PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND USE CASH COLLATERAL, (II) MODIFYING THE AUTOMATIC STAY, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of Raguse Farming Partnership, R.A.G. Holdings, LLC, Tru AG LLC, and Red Rock Cattle, LLC, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Bankruptcy Local Rules for the District of Minnesota (the "Local Rules"), seeking entry of this interim order (together with all exhibits hereto, the "Interim Order") that, among other things:

i. authorizes the Debtors, jointly and severally, to obtain a non-amortizing, super-priority senior secured postpetition credit facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $12,500,000 of which, upon entry of this Interim Order and subject to the terms and conditions set forth herein and in the DIP Term Sheet attached as Exhibit 1 hereto (the "DIP Term Sheet"),[1] (a) up to $8,000,00 (the "Interim Amount") will be

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the DIP Term Sheet, as applicable.

available upon entry of the Interim Order and (b) the remaining $4,500,000 (the "Final Amount"), subject to the maximum aggregate amount of the DIP Commitments (as defined in the DIP Term Sheet), will be available upon the Court's entry of a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders") on or before the date that is 45 days after the Petition Date (or such later date as agreed to by the DIP Lender (as defined below)), in each case, subject to the terms and conditions set forth in this Interim Order, the DIP Term Sheet, and, as applicable, the credit agreement for the DIP Facility (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement" and, together with any ancillary, collateral, or related documents and agreements, including, without limitation, the DIP Term Sheet, as the case may be, and the DIP Orders, each as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");

ii.    approves the terms of the DIP Term Sheet and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

iii.    authorizes the Debtors, on an interim basis (except as set forth herein with respect to the Commitment Fee, the Work Fee, and the Exit Fee, which shall be approved on a final basis in this Interim Order), to incur and guarantee the DIP Loans and all other obligations, of any kind, to or for the benefit of the DIP Lender under the DIP Documents (including, without limitation, all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, premiums, the Commitment Fee, the Work Fee, the Exit Fee, and any other fees payable pursuant to the DIP Documents) (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv.    authorizes and directs the Debtors, on an interim basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents and this Interim Order to (a) fund the working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents; (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Interim Order and the other DIP Documents; (c) pay interest and other amounts payable under the DIP Facility and the DIP Documents; and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget (as defined below), subject to the Permitted Variance, and this Interim Order;

v.    authorizes and approves, on an interim basis, the Debtors' grant to the DIP Lender of valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including, without limitation, (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject to only the Carve-Out (as defined below), and (b) liens in the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject to only the Carve-Out;

vi.    authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order, the DIP Term Sheet, and the other DIP Documents;

vii.  authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

viii.  subject to the terms hereof and entry of the Final Order, waives (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

ix.  modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in this Interim Order and the other DIP Documents;

x.  waives any applicable stay (including, without limitation, under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order; and

xi.  schedules a final hearing (the "Final Hearing") to consider final approval of the DIP Facility pursuant to the Final Order, as set forth in the Motion and the DIP Term Sheet.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the *Declaration of Truman Raguse in Support of Chapter 11 Petitions and First Day Motions* (the "Raguse Declaration"), the DIP Term Sheet, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held before this Court on May 19, 2026 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the interim relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Term Sheet and the

3

other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARING:** [2]

A.     **Petition Date**.  On May 14, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

B.     **Debtors in Possession**.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.     **Jurisdiction and Venue**.  The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and Local Rule 1070-1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     **Notice**.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner sufficient under the circumstances and no other or further notice of the Motion or the entry of this Interim Order shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.

E.     **Committee Formation**.  As of the date hereof, the United States Trustee for the District of Minnesota (the "U.S. Trustee") has not appointed an official committee of unsecured

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.  **No Credit Available on More Favorable Terms**.  Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Interim Hearing, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility.  The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense.  The Debtors are also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, in each case, subject and subordinate to only the Carve-Out, as set forth herein and in the DIP Documents.

G.  **Good Faith**.  Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including, without limitation, the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and other covenants and payments as set forth in this Interim Order and the other DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical, and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and all terms, conditions, and relief set forth in and otherwise approved by this Interim Order shall be

entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

H.    **Good Cause**.  Good cause has been shown for the entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.  The relief requested in the Motion is fair and reasonable and in the best interest of the Debtors and their estates, and essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets.

I.    **Need for Postpetition Financing and Use of Cash Collateral**.  The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion.  The financing provided pursuant to this Interim Order and the other DIP Documents and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) preserve and maintain the value of their assets and provide for the well-being of their livestock; (iii) fund any obligations benefiting from the Carve-Out; (iv) continue the orderly continuation of the operation of their business for the benefit of all their stakeholders; (v) maintain business relationships with customers, vendors, and suppliers; (vi) make payroll for their employees; and (vii) satisfy other working capital and operational needs.

J.    **Willingness to Provide Financing**.  The DIP Lender has committed to provide financing to the Debtors subject to:  (i) entry of the DIP Orders; (ii) approval of the terms and conditions of the DIP Facility, the DIP Term Sheet, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Term Sheet and the other DIP Documents; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to this

Interim Order and the other DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the other DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

K. **Approved Budget**. The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget, a copy of which is attached to this Interim Order as Exhibit 2 (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet and the other DIP Documents, the "Initial DIP Budget"). The Initial DIP Budget reflects, among other things, for the thirteen-week period commencing on or around the week of entry of this Interim Order, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Term Sheet or the other DIP Documents, and such modified, amended, extended, and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, in consultation with any Committee, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Term Sheet or the DIP Credit Agreement, as applicable) shall constitute, without duplication, an "Approved Budget"). The Approved Budget for purposes of this Interim Order is attached hereto as Exhibit 2. The Approved Budget has been prepared by the Debtors, their management, and their advisors. The Debtors believe that the Approved Budget is reasonable under the circumstances. The DIP Lender is relying, in part, on the Debtors' agreement to comply

with the Approved Budget (subject only to the Permitted Variance) and the terms of this Interim Order and the other DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for herein.

L. **Use of Cash Collateral and DIP Facility Proceeds**. As a condition to the Debtors' entry into the DIP Term Sheet and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Interim Order, the DIP Documents, and the Approved Budget (subject to the Permitted Variance). Except as otherwise set forth in this Interim Order, all of the Debtors' cash, including, without limitation, the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

M. **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of only the Carve-Out, the DIP Lender is entitled to, subject to entry of the Final Order, (i) except as otherwise provided in paragraph 32(b) of this Interim Order, a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral.

N.     **Requisite Authority**.   Upon entry of this Interim Order, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Term Sheet and the other DIP Documents to which it is a party and to perform its obligations thereunder.

O.     **Immediate Entry**.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of DIP Collateral in accordance with this Interim Order and the other DIP Documents are, therefore, in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1.     **Motion Granted**.   The relief sought in the Motion is GRANTED on an interim basis as set forth herein.   Entry into the DIP Term Sheet and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, on an interim basis and subject to the terms and conditions set forth in this Interim Order and in the DIP Documents, including the Approved Budget (subject to the Permitted Variance).   All objections to the Motion and this Interim Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2.     **Authorization of the DIP Facility**.   The Debtors are expressly and immediately authorized, empowered, and directed to execute and deliver the DIP Term Sheet and the other DIP Documents (in each case, to the extent not previously executed and delivered), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order

and the DIP Term Sheet, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Term Sheet, and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Term Sheet. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Term Sheet and this Interim Order, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Term Sheet), including, without limitation, the Commitment Fee, the Exit Fee, and the Work Fee,[3] as well as any documented fees and expenses of counsel to the DIP Lender, as set forth herein and in the DIP Term Sheet, subject to paragraph 27 of this Interim Order, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Term Sheet. Upon execution and delivery, the DIP Term Sheet and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. All provisions of the DIP Term Sheet are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Term Sheet and the other DIP Documents.

3. **DIP Obligations**. This Interim Order and, upon execution and delivery thereof, the other DIP Documents shall constitute and evidence the validity and binding effect of the DIP

---

[3] As set forth in Section 9 of the DIP Term Sheet and paragraph 26 below, the Commitment Fee, the Exit Fee, and the Work Fee are hereby deemed fully earned, non-refundable, and allowed and not subject to reduction, setoff or recoupment for any reason on a final basis under this Interim Order. The Commitment Fee and the Work Fee shall be paid in cash to the DIP Lender promptly after entry of this Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after entry of this Interim Order in cash from the proceeds of the Initial Draw or cash on hand. The Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a pro rata basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.

Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto (the "Successors"),[4] including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (collectively, the "Successor Cases"). The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due in accordance with the DIP Documents, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under this Interim Order and the other DIP Documents, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under this Interim Order and the other DIP Documents. The Debtors, their estates, and their Successors shall be jointly and severally liable for the DIP Obligations and the repayment of any funds provided pursuant to the DIP Documents. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Term Sheet) or as otherwise set forth in the DIP Documents. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including, without limitation, any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

---

[4] For the avoidance of doubt, the term "**Successors**" as used herein shall not include any buyer of the Debtors' assets pursuant to an order of the Court.

4. **Authorization to Borrow**. The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Term Sheet (and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith. Upon entry of this Interim Order, the Debtors are authorized to borrow up to aggregate amount of the Interim Amount, and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Term Sheet, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Term Sheet) without the need to seek further Court approval. The borrowing of DIP Loans under this Interim Order and the DIP Term Sheet shall permanently decrease the DIP Commitments and, once repaid, the DIP Loans incurred may not be re-borrowed.

5. **DIP Collateral**. The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all of such Debtor's (and its estate's) assets and property, whether tangible, intangible, real, personal or mixed, whether now owned or existing or hereafter acquired and wherever located, whether arising before or after the Petition Date, including, without limitation, the following: (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all

of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions[5] and any proceeds thereof, recoveries related thereto, and property received or recovered on account thereof. The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of

---

[5] The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as applicable, in existence as of the Petition Date and permitted pursuant to the DIP Facility, if any.

6.    **Proceeds of Subsequent Financing**.  If any Debtor, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases obtains financing, other credit, or incur debt pursuant to section 364 of the Bankruptcy Code or otherwise in violation of the DIP Documents at any time (including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors) before the DIP Obligations have been indefeasibly Paid in Full, then all the cash proceeds derived from such financing, other credit, or debt shall immediately be applied to the DIP Obligations in accordance with this Interim Order and the other DIP Documents.

7.    **DIP Liens**.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, the DIP Lender is hereby granted on an interim basis continuing, effective, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to only the Carve-Out:

> a.  **First Priority Liens on Unencumbered Property.**  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (collectively, the "**Unencumbered Property**").
>
> b.  **First Priority Priming Liens Over 2026 Crops and Cattle**. Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority priming liens and security interests in the Debtors'

crops growing, grown or to be grown; all harvested crops and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral.

c. **Junior DIP Liens**. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral that is subject to the Existing Liens or a Permitted Lien6 (all such DIP Collateral, the "DIP Junior Collateral," all DIP Collateral that is not DIP Junior Collateral, collectively, the "DIP Senior Collateral"), which DIP Liens shall be subject and subordinate only to such Existing Liens or Permitted Priority Liens and the Carve Out.

d. **Priming DIP Liens**. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens in the DIP Senior Collateral shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Senior Collateral or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code), which DIP Liens shall be subject and subordinate only to the Carve Out.

e. **DIP Liens Senior to Other Liens**. Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

---

6 The terms "*Existing Liens*" and "*Permitted Liens*" mean, for the purposes of this Interim Order, the liens and security interest that are identified as such on Schedule 1 of the DIP Term Sheet. These definitions remain subject to ongoing review and negotiation by the parties and may be revised in the Final Order and other DIP Documents.

8. **DIP Superpriority Claims**. Subject to and subordinate to only the Carve-Out, effective immediately upon entry of this Interim Order, the DIP Lender is hereby granted on an interim basis, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Cases (without the need to file any proof of claim) for all DIP Obligations (collectively, the "**DIP Superpriority Claims**") with priority in payment over any and all priority and administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and their estates all proceeds thereof, excluding only the Carve-Out.

9. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance or provide any other accommodation under the DIP Documents unless (a) all of the conditions precedent and other terms under this Interim Order and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (b) no Event of Default under the DIP Term Sheet or the other DIP Documents has occurred and is continuing, or would occur if any such loan, advance, or accommodation is made.

10. **Use of DIP Facility Proceeds**. The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only for the purposes specifically set forth in this Interim Order and the other DIP Documents, and subject in all respects to the Approved Budget (subject to the Permitted Variance).

11. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variance).

12. **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Interim Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variance), the Debtors are authorized on an interim basis to use Cash Collateral in accordance with the terms and conditions of this Interim Order and the other DIP Documents.

13. **Modification of DIP Documents**. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Term Sheet any non-material modifications of the DIP Term Sheet without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Term Sheet shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon three (3) days' notice to the U.S. Trustee and any Committee; <u>provided</u> that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Term Sheet shall not require an order of this Court.

14. **DIP Facility Reporting**. Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget (subject to the Permitted Variance). The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.

15. **Perfection of DIP Liens**. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including, without limitation, the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted in this Interim Order. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, validate, perfect, continue, or enforce the DIP Liens. The DIP Lender may, in its sole discretion, file an electronic copy or photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. For the avoidance of doubt, any

deposit account control agreements contemplated by the DIP Term Sheet shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors or the DIP Lender.  Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized and directed to take, execute, deliver, and file any such instruments contemplated by the DIP Term Sheet to enable the DIP Lender to further validate, perfect, preserve, continue, and enforce the DIP Liens.  To the fullest extent permitted by the Bankruptcy Code, any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest, or proceeds thereof or other collateral related thereto, shall have no force or effect with respect to the transactions granting the DIP Liens in any such fee, leasehold, interest, or other collateral, or in the proceeds of any assignment and/or sale thereof by the Debtors in favor of the DIP Lender in accordance with the DIP Documents and this Interim Order.

16.     **Modification of Automatic Stay**.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors and the DIP Lender to accomplish the transactions contemplated by this Interim Order and the other DIP Documents.

17.     **Payments Held in Trust**.  Except as expressly permitted in this Interim Order, the DIP Documents, or otherwise ordered by this Court, including in respect of the Carve-Out, in the event that any person or entity other than the Debtors receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral

prior to the Payment in Full of the DIP Obligations and termination of the DIP Facility in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral, payment, or proceeds in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Interim Order or the other applicable DIP Documents.

18. **Restrictions on Granting Postpetition Liens**. Other than the Carve-Out, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in any Chapter 11 Case, while any portion of the DIP Facility (or refinancing thereof), or any other DIP Obligations are outstanding. Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364 of the Bankruptcy Code or otherwise.

19. **Maintenance of DIP Collateral**. Until the Payment in Full of the DIP Obligations, the Debtors shall: (a) continue to maintain and insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of the *Order (I) Granting Expedited Hearing; (II) Authorizing Maintenance and Use of Certain Bank Accounts as Debtor-in-Possession Accounts; (III) Authorizing Maintenance of Debtors' Existing Cash Management System; and (IV) Authorizing the Continued Use of Existing Business Forms* (the "**Cash Management Order**") and the DIP Documents.

20. **Right to Credit Bid**. Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or

substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a Chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

21. **Effect of DIP Termination.**

a. **DIP Termination Event**. For purposes of this Interim Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach under this Interim Order by the Debtors or the occurrence of an Event of Default under the DIP Term Sheet or the other DIP Documents, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitments in accordance with the terms of the DIP Term Sheet or the other DIP Documents.

b. **Exercise of Remedies**. Upon the occurrence of a DIP Termination Event, of which written notice (including via email) of the occurrence of such DIP Termination Event is delivered by the DIP Lender to counsel for the Debtors, the U.S. Trustee, and counsel for any Committee (the "Remedies Notice" and such date, the "DIP Termination Declaration Date"), without further notice to, hearing of, application to, or order from this Court, subject to the expiration of the Waiting Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a Carve-Out

Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitments) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Term Sheet as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Term Sheet; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**. The Debtors may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date (such period, the "Waiting Period"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including, without limitation, Cash Collateral) in accordance with the terms of this Interim Order and the Approved Budget (subject to the Permitted Variance), solely to pay any expenses necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith, the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Term Sheet); provided, however, that the professional fees and expenses of the

Professional Persons (as defined below) shall be governed by paragraph 24 hereof and subject to the Approved Budget (subject to the Permitted Variance).

        d.       **Rights and Remedies Following Termination Date**. Following the expiration of the Waiting Period and, unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Interim Order, the DIP Term Sheet, the other DIP Documents (if any), applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with the DIP Term Sheet, the other DIP Documents (if any), this Interim Order, and applicable law.

22.     **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Interim Order, the other DIP Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Interim Order, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Interim Order or the other DIP Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consent required hereunder or in any other DIP Document by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

23.     **Carve-Out**.

a.      **Priority of Carve-Out**.  The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to only the Carve-Out.  The Carve-Out shall be senior to all other claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Interim Order.

b.      **Carve-Out**.  The term "Carve-Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate and all fees and expenses for services provided under section 156(c) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") or any Committee, if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget (subject to the Permitted Variance) and any other limits imposed by the terms of this Interim Order; and (iv) allowed fees and expenses of Professional Persons (collectively, the "Professional Fees") in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv)

being the "Post-Carve-Out Trigger Notice Cap" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "Carve-Out Cap"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.

c.        **Carve-Out Account**.  As soon as reasonably practicable following the entry of this Interim Order, and each week thereafter, the Debtors shall transfer cash on hand or cash proceeds from the DIP Facility (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to the amount of fees and expenses reflected in the Approved Budget (subject to the Permitted Variance) for each Professional Person for such week into a segregated account not subject to control of the DIP Lender (the "Carve-Out Account").  The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full.  The amounts in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Persons that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid.  The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  Until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Account and all allowed Professional Fees have been paid in full pursuant to a final order of the Court; provided, in no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the allowed Professional Fees due and

payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise). Notwithstanding anything contained herein to the contrary, funds transferred to the Carve-Out Account (i) shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising under the Carve-Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender or any other creditors and shall not constitute DIP Collateral; provided, however, that, until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the Carve-Out Account and all allowed fees of Professional Persons have been paid in full pursuant to a final order of the Court. All funds in the Carve-Out Account shall be used to pay all obligations set forth in the definition of Carve-Out until such obligations are paid in full. The DIP Lender shall not sweep or foreclose upon any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as required hereunder and all allowed Professional Fees have been paid in full pursuant to a final order of the Court.

d. **Carve-Out Trigger Notice**. For purposes of this Interim Order, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Committee, which notice may be delivered following the Waiting Period, stating that the Post-Carve-Out Trigger Notice Cap has been invoked (the "Trigger Date"). The Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to transfer to the Carve-Out Account an amount of cash equal to the remaining unfunded

portion of the Carve-Out (less any retainers held by Professional Persons). Any Carve-Out Trigger Notice shall be deemed a consent by the DIP Lender to authorize the Debtors to deposit Cash Collateral or proceeds of the DIP Facility into the Carve-Out Account in an amount equal to the unfunded portion of the sum of the Post-Carve-Out Trigger Notice Cap and any budgeted amounts reflected in the Approved Budget (subject to the Permitted Variance) through the date of the Carve-Out Trigger Notice that have not already been deposited in the Carve-Out Account.

e. **Carve-Out Draw**. Subject to exhaustion of the DIP Commitments and the applicable terms of the DIP Documents, the Debtors shall be permitted to draw on the DIP Facility in the amount of any remaining unfunded portions of the Carve-Out, notwithstanding any default, Event of Default, or the occurrence of a Trigger Date.

f. **Payment of Allowed Professional Fees Prior to the Trigger Date**. Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.

g. **Initial Draw**. The foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw (as defined in the DIP Term Sheet).

h. **Restricted Use**. The Carve-Out shall not include, apply to or be available for any party in connection with any Restricted Use (as defined in the DIP Term Sheet).

24. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**. The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order, the other DIP Documents, or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses

of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses. Notwithstanding anything contained herein to the contrary, neither the Carve-Out nor the Approved Budget shall constitute a cap or limitation on the amount of Professional Fees that may be allowed by the Court and due and payable by the Debtors.

25. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee and the documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). The DIP Fees shall be part of the DIP Obligations. The Commitment Fee and the Work Fee, both of which shall be paid in full in cash from the proceeds of the Initial Draw or cash of hand and the Exit Fee are approved on a final basis upon entry of this Interim Order and are deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Term Sheet and any other applicable DIP Documents without the need for any further order of this Court.

26. **DIP Lender's Professionals' Fees**. Professionals for the DIP Lender (the "DIP Lender Professionals") shall provide copies of any invoices in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information

constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (a) a summary of the work performed during the relevant compensation period; (b) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (c) the total fee amount being requested) by electronic mail to the U.S. Trustee and counsel to any Committee contemporaneously with the delivery of such fee and expense statements to the Debtors.  At the conclusion of the Review Period (as defined below) the DIP Lender or the Debtors, as requested, shall promptly pay in full all such invoiced fees and expenses of the DIP Lender Professionals, other than the Disputed Invoiced Fees (as defined below), directly to the applicable DIP Lender Professional, and such amount shall be added to the DIP Obligations. Any objections raised by the Debtors, the U.S. Trustee or any Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within five (5) business days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) business days' prior written notice by the submitting party of any hearing on such motion or other pleading).  Notwithstanding the foregoing, on or about the date of entry of this Interim Order, the DIP Lender or the Debtors, as requested, shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. Notwithstanding the foregoing, on or about the date of entry of this Interim Order, the Debtors

shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. No DIP Lender Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

27. **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant Indemnitee (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of any Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of any of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

28. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Cases, this Interim Order was deemed to constitute a timely

filed proof of claim, and the entry of the Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim. Any order entered by this Court in relation to the establishment of a bar date (a "Bar Date Order") for any claim (including, without limitation, administrative claims) in the Chapter 11 Cases or Successor Cases shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim (including master or aggregate proofs of claim) in the Chapter 11 Cases for any claim allowed herein or that the DIP Lender otherwise has or may have in respect of the Debtors.

29. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve-Out and Other Funds**. Except as otherwise permitted in the DIP Documents (including, without limitation, the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, the Carve-Out, and any portion of the foregoing shall not be used, directly or indirectly, by any of the Debtors, the Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any Restricted Use, including, without limitation, (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) except as permitted by the DIP Documents or order of this Court, using or seeking to use Cash Collateral or any insurance proceeds constituting DIP Collateral without the permission of the DIP Lender; (c) except as permitted by the DIP Documents or order of this Court, selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender (not to be unreasonably withheld); (d) seeking to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders or the DIP Documents, as

applicable, including, without limitation, seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) the investigation, initiation or prosecution of any claims, causes of action adversary proceedings, litigation, challenge, objection or other proceeding against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens or DIP Superpriority Claims; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including, without limitation, Cash Collateral) or any other claims held by or on behalf of the DIP Lender; (g) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (h) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (i) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Documents.

30. **Releases**. Upon entry of this Interim Order, the Debtors, on their own behalf and on behalf of their estates only, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such (each a "Released Party"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including,

32

without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; provided, however, that nothing contained herein shall release (i) any claims against a Released Party for liabilities that a court of competent jurisdiction determines results from the bad faith, fraud, gross negligence, or willful misconduct of such Released Party, or (ii) the DIP Lender from its commitments and obligations hereunder and under the DIP Documents.

31.     **Waivers**.

a.      **Limitation on Charging on Expenses**.  Subject to entry of the Final Order, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b.      **No Marshaling**.  Subject to entry of the Final Order, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Interim Order and the other DIP Documents.

32.     **No Lender Liability**.  In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans.  Furthermore, nothing in this Interim Order or the other DIP Documents shall impose or allow the imposition upon the

DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

33. **Limitation of Liability**. Nothing in this Interim Order, the other DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts or (b) any fiduciary duties to the Debtors or their respective creditors, shareholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

34. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, including, without limitation, with respect to the Carve-Out, this Interim Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

35. **Insurance Proceeds and Policies**. Within thirty (30) days after entry of the Final Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, to the extent allowable under the applicable insurance policies, named as an additional insured and loss payee on each insurance policy maintained by or for the benefit of the Debtors that in any way relates to the DIP Collateral until the Payment in Full of the DIP Obligations (notwithstanding anything to the contrary in the DIP Documents); provided, however, that such thirty (30) day

period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the agreed insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions).

36. **No Waivers or Modifications of Interim Order**. The Debtors have agreed not to and shall not seek any modification or extension of this Interim Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

37. **Binding Effect of this Interim Order**. Immediately upon entry of this Interim Order, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of any of the Debtors, any Committee, and all other parties in interest and their respective Successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any of the Chapter 11 Cases or any Successor Cases; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including, without limitation, Cash Collateral) by or extend any financing to any receiver, administrator, Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed for any of the Debtors or their respective estates.

38. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Payment in Full of the DIP Obligations has occurred, on or before the effective date of such confirmed plan.

39.     **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any Chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including, without limitation, the claims, liens, security interests and other protections granted to the DIP Lender, the Carve-Out, or otherwise approved or set forth in this Interim Order and the other DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of any of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, in respect of the DIP Facility, the Payment in Full of the DIP Obligations, pursuant to this Interim Order and the other DIP Documents (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

40.     **Necessary Actions**.  The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Interim Order and the other DIP Documents.

41.     **Payments Free and Clear**.  Any and all payments or proceeds remitted to the DIP Lender or the DIP Lender Professionals shall be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors.

42. **Joint and Several Liability**. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents, respectively.

43. **Enforceability**. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

44. **Interim Order Controls**. In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order and the other DIP Documents, the terms and provisions of this Interim Order shall govern and control to the extent of such conflict or inconsistency.

45. **Headings**. All paragraph headings used in this Interim Order are for ease of reference only and shall not affect the construction or interpretation hereof.

46. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Interim Order.

47. **Final Hearing**. The Final Hearing on the Motion shall be held on **June \_\_\_, 2026, at \_\_:\_\_\_ \_.m. (prevailing Central Time)** in the United States Bankruptcy Court for the District of Minnesota, _____. Any objections or responses to entry of the Final Order on the Motion shall be filed on or before **June \_\_\_, 2026, at 4:00 p.m. (prevailing Central Time)** and

served on the following parties: (a) the Debtors; (b) proposed counsel to the Debtors: Taft Stettinius & Hollister LLP, 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, c/o James M. Jorissen (jjorissen@taftlaw.com); (c) attorneys for the DIP Lender, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Robert M. Hirsh (robert.hirsh@nortonrosefulbright.com), Francisco Vazquez (francisco.vazquez@nortonrosefulbright.com), and James A. Copeland (james.copeland@nortonrosefulbright.com); (d) the Office of the United States Trustee, 300 South Fourth Street, Suite 1015, Minneapolis, MN 55415, Attn: Sarah J. Wencil (Sarah.J.Wencil@usdoj.gov); and (e) counsel to any Committee appointed in these Chapter 11 Cases (collectively, the "Notice Parties"). In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter the Final Order without need for the Final Hearing.

48. **Miscellaneous**.

a. Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

b. All time periods set forth in this Interim Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

c. No later than two business days after the date of this Interim Order, the Debtors shall serve on the Notice Parties a copy of this Interim Order and shall file a certificate of service no later than 24 hours after service.

**# # # END OF ORDER # # #**

<u>**Exhibit 1**</u>

**DIP Term Sheet**

**Raguse Farming Partnership,** *et al.*
**$12,500,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, this "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement between the DIP Lender and Borrowers from and after, and subject to, the entry of the Interim Order with respect to the DIP Facility (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (in each case, as defined below), the terms of the DIP Orders (as defined below), as applicable, shall govern.**

**This Term Sheet is a binding and enforceable agreement, subject to entry of the Interim Order with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth in this Term Sheet.**

| 1. | *Borrowers and Guarantors* | • Raguse Farming Partnership, R.A.G Holdings, LLC, Tru Ag LLC and Red Rock Cattle, LLC (collectively, the "**Borrowers**," and each a "**Borrower**"). |
|---|---|---|
| | | • All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower and David Raguse, Susan Raguse and Truman Raguse (collectively, the "**Loan Parties**" and each a "**Loan Party**"). |
| | | • The Borrowers are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**," and the Borrowers and their applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**") on or around May 13, 2026 (such filing date, the "**Petition Date**"). |
| | | • For the purposes of this Term Sheet and the DIP Facility, Raguse Farming Partnership (i) is hereby designated and appointed by each Loan Party as its authorized representative and agent to act on its behalf (the "**Borrower Representative**") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | *DIP Lender* | • East West Bank ("**EWB**") and its designees or assignees (together with EWB, the "**DIP Lender**"). |

| 3. | *Type and Amount of the DIP Facility* | • A non-amortizing, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $12,500,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**"). |
|---|---|---|
| | | • The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |
| | | • Any Initial Draw shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used solely in accordance with the Budget, subject to the Permitted Variance (in each case, as defined below). |
| | | • Subsequent DIP Loan proceeds to be funded into a new segregated Bank Account to be opened or otherwise designated by a Borrower (the "**DIP Bank Account**") and the Loan Parties shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 30 days after the entry of the Final Order subject to a 30-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the interim order approving the DIP Facility, in form and substance acceptable to the DIP Lender (the "**Interim Order**"). |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $8,000,000 (the "**Interim Amount**") and the Borrowers shall be entitled to make a draw of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the first draw under the DIP Facility, the "**Initial Draw**" and all draws before the entry of the Final Order, the "**Initial Draws**"). The closing of definitive DIP Documents (such date shall be referred to herein as the "**Closing Date**") shall occur as soon as reasonably possible after the entry of the Final Order, but in any event no later than two (2) business days thereafter unless the DIP Lender agrees otherwise. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**," and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (subject to the |

| | | |
|---|---|---|
| | | Permitted Variance), up to the amount of the undrawn DIP Commitments. |
| | | • Each Draw shall be made (in an aggregate minimum amount of [$2,000,000] (and multiples thereof) upon three (3) business days' written notice (or such shorter period as agreed to by the DIP Lender its sole discretion), up to the aggregate amount of the available undrawn DIP Commitments at any time prior to three (3) business days before the DIP Termination Date (as defined below); <u>provided</u> that the Initial Draw shall be in an amount up to the Interim Amount in accordance with the terms of the DIP Documents, and funded within two (2) business days following after the DIP Lender's receipt of a customary borrowing notice following entry of the Interim Order. |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of (such earliest date, the "**DIP Termination Date**"): |
| | |     i.    March 31, 2027 (the "**Maturity Date**"); |
| | |     ii.    the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
| | |     iii.    the consummation of the sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
| | |     iv.    the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and in the DIP Documents) in accordance with the DIP Documents; |
| | |     v.    dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case; and |
| | |     vi.    forty-five (45) days after the Petition Date (or such later date as agreed to by the DIP Lender), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date. |
| | | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and use any proceeds thereof (other than the Carve-Out), including Cash Collateral (as defined in the DIP Orders) and shall terminate the DIP Commitments and any |

---

[1] For purposes hereof, the term "**Payment in Full**" or, as applicable, "**Paid in Full**," means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| | | |
|---|---|---|
| | | • further obligation the DIP Lender has to make any DIP Loans under the DIP Documents. |
| | | • For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the DIP Termination Date under the DIP Orders and the other DIP Documents. |
| 8. | *Interest Rate* | • The DIP Loans shall bear interest at a per annum rate equal to 11.0% payable in cash on the first business day of each month in arrears (the "**Non-Default Interest**"). |
| | | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | *Commitment Fee, Work Fee, Exit Fee, and Other Fees* | • **Commitment Fee**. The Borrowers shall pay to the DIP Lender a commitment fee totaling 2.0% of the DIP Commitments (the "**Commitment Fee**," which for the avoidance of doubt is $250,000), which Commitment Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The Commitment Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand. For the avoidance of doubt, the Commitment Fee, to the extent earned, shall be payable even if the DIP Facility is never drawn. |
| | | • **Work Fee**. The Loan Parties shall reimburse the DIP Lender its legal fees incurred through the Petition Date up to $250,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order. The Interim Order shall provide that the Work Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason. The Work Fee shall be paid in cash to the DIP Lender (or directly to its counsel) promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand. |
| | | • If the Interim Order is not entered by the Bankruptcy Court within seven (7) days after the Petition Date (or such later date as agreed to by the DIP Lender in its discretion), this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| | | • **Exit Fee**. The Borrowers shall pay to the DIP Lender an exit fee totaling 5.0% of the DIP Commitment (the "**Exit Fee**," which for the avoidance of doubt is $625,000), which Exit Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The |

| | | |
|---|---|---|
| | | Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br><br>• The Commitment Fee , Work Fee, and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as set forth above as part of the Interim Order.  If such fees are not approved on a final basis by the Bankruptcy Court in the Interim Order and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| 10. | *Use of Proceeds* | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to (ii), (iii), and (iv) below, subject to the Budget and the Permitted Variance as set forth below:<br><br>  i.  working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents;<br><br>  ii.  professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Budget, the Bankruptcy Code, and any orders of the Bankruptcy Court, as applicable;<br><br>  iii.  fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and<br><br>  iv.  interest and other amounts payable under the DIP Facility and the DIP Documents.<br><br>  • All payments disbursements of DIP Facility proceeds shall be submitted to the Debtors' financial advisor, Lakeshore Foods on a weekly basis for confirmation that the requested disbursements are in accordance with the approved Budget.  Following such approval, the approved signatory for RFP may initiate the payment.<br><br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in any Chapter 11 Case, or any trustee or examiner appointed in any Chapter 11 Case or any successor cases, including any chapter 7 cases, or any other Person, party or entity (each of the following, a "**Restricted Use**"): |

| | | |
|---|---|---|
| | | i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding: |
| | | a. against the DIP Lender, or its respective predecessors-in-interest, successors, assigns, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or any other term, condition, or aspect of the DIP Facility; or |
| | | b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim, or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under any of the DIP Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise; |
| | | ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Orders, each in accordance with the DIP Documents and the DIP Orders, as applicable; provided, however, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Orders and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; |
| | | iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or |
| | | iv. to apply to the Bankruptcy Court for authority to approve claims or grant liens (other than the Carve-Out) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Orders have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | *Voluntary and Mandatory Prepayments* | • **Voluntary Prepayments**. Optional prepayments of the DIP Loans shall be permitted at any time, subject to (i) allocation of such payment to the ratable portion of the Exit Fee due thereon (which, for the avoidance of doubt, shall be deemed to be due and payable on the date of such voluntary |

| | | |
|---|---|---|
| | | prepayment), (ii) accrued interest on the amount prepaid, and (iii) in minimum amounts of at least $1,000,000 of principal. |
| | | • **Mandatory Prepayments**. |
| | |     i.  **Dispositions**. Within one (1) business day of the date of receipt by any Loan Party of the Net Cash Proceeds[2] of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of DIP Collateral (which, for the avoidance of doubt, shall exclude the disposition of other DIP Collateral in the ordinary course), such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee. |
| | |     ii.  **Indebtedness**. Within one (1) business day of the date on which a Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in any applicable DIP Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, plus the accrued interest and Exit Fee as applied to the principal amount of such prepayment. |
| | | • No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender. |
| 12. | *Security* | • As security for the DIP Obligations, subject to only the Carve-Out, and effective upon entry of the Interim Order, each Loan Party shall grant to the DIP Lender (a) a first lien security interest on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that were unencumbered as of the Petition Date, (b) a first lien security interest on all of such Loan Party's right, title and interest in, to and under the Loan Parties' crops growing, grown or to be grown; all harvested crops |

---

[2]    For purposes hereof, the term "**Net Cash Proceeds**" means, with respect to any sale or disposition of the DIP Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction. Moreover, for the purposes hereof, the term "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

| | | and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral; and (c) a junior lien on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, in each case, including, but not limited to, the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown, or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions[3] and any proceeds |

---

[3] The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections

| | | |
|---|---|---|
| | | thereof, recoveries related thereto, and property received or recovered on account thereof. |
| | | • Negative pledge on all assets of the Loan Parties subject to the Carve-Out and permitted liens, if any, under the DIP Documents. |
| | | • In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender. |
| 13. | *Priority and Security* | • Subject to only the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a senior lien, (ii) junior secured liens, and (iii) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**"). |
| | | • Subject to the Carve-Out, at a minimum, all DIP Obligations in respect of the DIP Facility shall be: |
| | |     i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); |
| | |     ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Loan Parties that are not subject to a valid and perfected lien on the Petition Date; and |
| | |     iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all assets of the Loan Parties that are subject to an Existing Lien or Permitted Lien as of the Petition Date. |
| | | • The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Orders. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |

544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to (subject to the Carve-Out): |
|---|---|---|
| | |     i.   declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws; |
| | |     ii.   declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties; |
| | |     iii.   charge interest at the default rate under the DIP Documents; |
| | |     iv.   subject to the Carve-Out, declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral; or |
| | |     v.   take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law. |
| | | Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders and the Loan Parties' right to seek an emergency hearing before the Bankruptcy Court with respect to the exercise of remedies by the DIP Lender. |
| 15. | *Conditions Precedent to Initial Draws* | • Entry of the Interim Order on or before three (3) business days after the Petition Date (or such later date as agreed to by the DIP Lender in its sole discretion), and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the Interim Order or the Final Order (if entered before the Initial Draw); |
| | | • Delivery of the Initial Budget (as defined below) acceptable to the DIP Lender in its sole discretion; |
| | | • All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee and the Work Fee), the DIP Documents, or the DIP Orders shall have been paid in accordance with this Term Sheet or the applicable DIP Documents; |
| | | • The representations and warranties of the Loan Parties under this Term Sheet and any other DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |

| | | |
|---|---|---|
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing; |
| | | • The Debtors shall be in compliance in all material respects with the applicable DIP Documents (including the DIP Orders); |
| | | • No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents; and |
| | | • The Borrowers shall have delivered to the DIP Lender a customary borrowing notice in form and substance acceptable to the DIP Lender. |
| 16. | *Conditions Precedent to Availability of Other Draws* | • No DIP Order, or any material provision thereof, shall have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its sole discretion.<br><br>• In addition to the conditions set forth in Section 15 above, the DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:<br><br>  i.  execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance mutually acceptable to the Loan Parties and the DIP Lender;<br><br>  ii.  delivery of any Budget or Updated Budget, acceptable to the DIP Lender in its sole discretion, as applicable;<br><br>  iii.  no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a Person other than a Loan Party exercising control over its assets or operations;<br><br>  iv.  the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);<br><br>  v.  the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents;<br><br>  vi.  the Loan Parties shall be in compliance in all material respects with the DIP Orders;<br><br>  vii.  no default or event of default shall have occurred and be continuing under the DIP Documents;<br><br>  viii.  no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner |

| | | |
|---|---|---|
| | | any DIP Order or any material provision thereof (other than an amendment or modification acceptable to the DIP Lender in its sole discretion); |
| | | ix. since the Petition Date, other than the commencement of the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
| | | x. within thirty (30) days after the entry of the Final Order, the Debtors shall have all applicable insurance policies maintained by Loan Parties name, to the extent allowable under the applicable insurance policies, the DIP Lender as additional insured and loss payee; provided, however, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the applicable insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions); |
| | | xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise required to be paid to the DIP Lender shall have been paid when due; and |
| | | xii. a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code shall have occurred and been approved by the Bankruptcy Court. |
| 17. | *Documentation* | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Orders, any DIP Loan agreement and all definitive guaranties, security agreements, and any documents executed pursuant hereto or thereto (the "**DIP Documents**") shall be mutually agreed upon by the Loan Parties, and in form and substance acceptable to the DIP Lender in its sole discretion. |
| 18. | *Representations and Warranties* | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties (with exceptions and thresholds to be agreed) as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes or effects, |

| | | title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility. |
|---|---|---|
| | | • Each Loan Party represents and warrants that none of its assets and properties are subject to any valid, perfected liens, security interests or encumbrances as of the Petition Date, other than the Existing Liens set forth in **Schedule 1**. No liens, security interests, or encumbrances will be created on or after the Petition Date except, in each case, the Carve-Out and as expressly permitted under the DIP Documents. |
| 19. | *Affirmative Covenants* | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties (with baskets and thresholds to be agreed) in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. For the avoidance of doubt, no audited financial statements shall be required. |
| 20. | *Negative Covenants* | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties, including the following, with exceptions and baskets to be agreed: limitations on indebtedness, liens (other than the Carve-Out, the Existing Liens, and the Permitted Liens (as defined in Schedule 1)) subject to a $750,000 aggregate materiality threshold, investments, sale of assets, restricted payments, affiliate transactions, bankruptcy matters; provided that the DIP Documents will permit, among other things: (a) the Debtors to pursue one or more sale processes for, in the aggregate, all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for and require the Payment in Full of the DIP Obligations; (b) the ability to reject or modify contracts; (c) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (d) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers, and in all respects subject to the Budget (subject to the Permitted Variance); and (e) provide for any adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |
| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Lender on the fifth Thursday (or, if later, the fourth business day of such week) following the prior Budget's approval and every fifth Thursday (or, if later, the fourth business day of such week) thereafter, with such updated Budget |

| | | |
|---|---|---|
| | | extending the term thereof and the DIP Lender, in its sole discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within five (5) business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender in its sole discretion. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five (5) business day period, such Updated Budget shall become effective as the Budget.<br><br>• On a weekly basis after the delivery of the first Budget, the Borrowers shall deliver to the DIP Lender a variance report for the eight-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating disbursements for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative eight-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Cash Flow Variance (as defined below) solely with respect to net operating Cash Flow that exceed 15.0% in the aggregate in the Measuring Period shall be material and shall constitute and Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably acceptable to the DIP Lender). For the avoidance of doubt, net operating disbursements shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases.<br><br>• For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Cash Flow Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15.0% for Budget Variances in the aggregate in the Measuring Period with respect to the Net Operating Cash Flow Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, the Loan Parties, and any Committee, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Cash Flow Variance calculation. |
| 22. | *DIP Orders* | • The interim order (the "**Interim Order**") and the final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**") approving the DIP Facility, which, in each case, shall be in form and substance acceptable to the DIP Lender in its sole discretion, shall, among other things, authorize and approve, in each case on a final basis: |

| | | |
|---|---|---|
| | | i. the DIP Facility; |
| | | ii. the making of the DIP Loans in accordance with the DIP Documents; |
| | | iii. the granting of the superpriority claims and liens against the Debtors, their estates, and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral; |
| | | iv. the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 25 of this Term Sheet (provided that the Commitment Fee and the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (including the Work Fee) shall be paid out of the proceeds of the Initial Draw); |
| | | v. the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order as set forth above; and |
| | | vi. the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | *Carve-Out* | • The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated only to the Carve-Out. |
| | | • As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees and any other limits imposed by the amount set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed [$750,000] incurred after the first |

business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); <u>provided</u> that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.

- Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Loan Parties shall be required to deposit into a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") cash (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors. The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Person that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The DIP Lender shall have a reversionary interest, up to the Payment in Full of the DIP Obligations, in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court.

- For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

- The Carve-Out shall not include, apply to, or be available for any Person or party in connection with any Restricted Use.

- The DIP Orders, as applicable, shall provide that the foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw.

| 24. | *Events of Default* | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor- |
| --- | --- | --- |

| | | in-possession financing facilities of this type (with exceptions and thresholds to be agreed), including, without limitation: |
|---|---|---|
| | | i. payment, non-compliance with covenants set forth in the DIP Documents, judgments in excess of $750,000, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
| | | ii. the entry of the Interim Order shall have not occurred on or before May 15, 2026, or the Interim Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | | iii. the entry of the Final Order shall have not occurred on or before the date that is forty-five (45) days after the Petition Date, or the Final Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender; |
| | | iv. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | | v. non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Orders; |
| | | vi. the entry of an order appointing a receiver, trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court or other court shall have entered an order providing for such appointment; |
| | | vii. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure or other enforcement against any assets of the Loan Parties the aggregate fair market value of which exceeds $750,000; |
| | | viii. the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents; |

| | | ix. | any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
| | | x. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations and the DIP Obligations are Paid in Full upon the closing or initial funding under such financing; |
| | | xi. | the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" or "second day" orders of the Bankruptcy Court acceptable to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court acceptable to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget (subject to the Permitted Variance), or (c) as otherwise agreed to by the DIP Lender; |
| | | xii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
| | | xiii. | any Loan Party shall, directly or indirectly, seek to, or support any other Person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document; |
| | | xiv. | any Debtor files a Plan that is not in form and substance acceptable to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender sufficient to allow for the indefeasible Payment in Full of the outstanding DIP Obligations; |
| | | xv. | the occurrence of a "change of control" of any of the Loan Parties through the purchase or otherwise of the beneficial ownership of 50% or more of the voting interest of such Loan Party or all or substantially all of the asset of such Loan Party without the prior written consent of the DIP Lender in its sole discretion; |

| | | |
|---|---|---|
| | | xvi. the occurrence of any event, condition, contingency, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document; |
| | | xvii. any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have a material adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; or |
| | | xviii. any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its sole discretion unless such sale would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender or another source of funding acceptable to the DIP Lender) upon the closing date of such sale). |
| 25. | *Indemnification and Reimbursement of Expenses* | • The DIP Documents (including the Interim Order) shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "**Indemnitees**"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof. <br><br>• Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 26. | *Release* | • The DIP Orders shall include a customary release of the DIP Lender with respect to any and all claims and causes of action arising from or related to the DIP Facility, the Debtors, and/or the Chapter 11 Cases (including any related chapter 11 plan, sale or other disposition, reorganization transaction, or matters related thereto). |
| 27. | *Waivers* | • The DIP Orders shall include terms and conditions customary for interim and final DIP financing orders, as applicable, and shall be acceptable to the DIP Lender in its sole discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" |

| | | provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
|---|---|---|
| 28. | *Counterparts and Electronic Transmission* | • This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| 29. | *Governing Law* | • The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>• The Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |

[*Signatures on following pages.*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**RAGUSE FARMING PARTNERSHIP**,
as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties

By: _____
    Name:
    Title:

**EAST WEST BANK**,
as DIP Lender


By: _____
    Name: Edward Hirshfield
    Title:  SVP-Head of DIP Lending and Distressed Situations

_

## Schedule 1

### Existing and Permitted Liens

For purposes of this Term Sheet, the term "**Existing Liens**" means the following:

- Ally Bank, Auto Loan; 2022 GMC Sierra; Claim Amount: $88,538.14
- Ascentium Capital; Equipment Loan; John Deere 560R; Claim Amount: $50,000
- Ascentium Capital; Equipment Loan; John Deer Accumulator; Claim Amount: $10,000
- Ascentium Capital; Equipment Loan; John Deere 8R370; Claim Amount: $350,000
- Avanza Capital, Merchant Cash Advance, Receivables, Claim Amount: $130,766.34
- CapFirst Equipment Finance, Inc: Equipment Loan, 2010 H&S Beet Cart; Claim Amount: $50,265.00
- CNH Capital, Equipment Loan; Claim Amount: $5,838,840.24
- CNH Capital, Equipment Loan; Case IH 475, Claim Amount: $93,000.00
- CHN Capital; Equipment Loan, Brent 2096; Claim Amount: $103,000.00
- CNH Capital; Equipment Loan, 2018 Corn Header; Claim Amount $215,000.00
- CNH Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,800,000.00
- CHN Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,100,000.00
- CHN Capital; Equipment Loan, 2024 Geringhoff; Claim Amount $400,000
- Cornerstone Bank; Revolving Line of Credit, Claim Amount $19,051,122.68
- Deutsche Leasing USA, Inc.; Equipment Loan, Holmer Tarra Dos T5-40, Claim Amount $1,108,500.19
- Deutsche Leasing USA, Inc.; Equipment Loan, Beet Car, Claim Amount $239,825.00
- JPMorgan Chase Bank NA, Auto Loan, 2021 GMS 2500HD, Claim Amount $28,277.03
- Lazurus Capital, Merchant Cash Advance, Receivables, Claim Amount: $612,793.44
- Old Second National Bank; Promissory Note; Crops and Livestock, Claim Amount $500,000.00
- SBA Loan, Promissory Note; Tangible and Intangible Personal Property (subordinated), Claim Amount $2,000,000.00
- Vermeer Credit, Equipment Loan, Feed Mixer, Bail Processor, and Bail Rake, $130,000
- Wells Fargo, Equipment Loan, 2020 John Deere DB66, Claim Amount: $400,000.

For purposes of this Term Sheet, the term "**Permitted Liens**" means the following:

a. pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any lien imposed by ERISA;

b. pledges and deposits to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

c. easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrowers taken as a whole and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property, and (ii) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by

any government, statutory or regulatory authority, developer, landlord or other third party on property over which a Borrower has easement rights or on any leased property with respect to which a Loan Party or its subsidiary is the tenant and subordination or similar arrangements relating thereto and (iii) any condemnation or eminent domain proceedings affecting any real property;

d. liens existing on the Petition Date other than liens and any replacement, renewals, replacements or extensions thereof, provided that (i) such replacement, renewal or extension lien shall not apply to any other property or asset of any Borrower other than (A) improvements thereon or proceeds thereof and (B) after-acquired property that is affixed or incorporated into the property covered by such lien; notwithstanding anything herein, liens over the 2026 Crop and Livestock Collateral shall not be considered a Permitted Lien.

e. liens pursuant to any DIP Facility;

f. the Carve-Out;

g. statutory or common law liens of landlords and sub-landlords securing obligations that are not overdue by more than thirty (30) days or are being contested in good faith;

h. liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions and securities intermediaries;

i. Liens arising from precautionary UCC filings regarding operating leases, the consignment or bailment of goods to a Borrower on equipment of the Borrowers granted in the ordinary course of business to a client or supplier at which such equipment is located;

j. liens or rights of setoff against credit balances of Borrowers with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to such Borrower in the ordinary course of business; and

k. any interest or title of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses (including software and other technology licenses).

## Exhibit 2

## Budget

**Raguse Family Partnership**
**13-Week Cash Flow Forecast**

5/13/2026 14:23

*($ and volume in thousands)*

| | Budget | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 15-May-26 | 22-May-26 | 29-May-26 | 5-Jun-26 | 12-Jun-26 | 19-Jun-26 | 26-Jun-26 | 3-Jul-26 | 10-Jul-26 | 17-Jul-26 | 24-Jul-26 | 31-Jul-26 | 7-Aug-26 | 14-Aug-26 | | **13-Week** |
| **Company Period** | May | May | May | May/Jun | June | June | June | Jun/Jul | Jul | Jul | Jul | Jul/Aug | Aug | Aug | | **Period** |
| **Model Week** | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | | **Total** |
| ***SALES*** | | | | | | | | | | | | | | | | |
| Net Sales | $ - | $ - | $ - | $ - | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 768 | | $ 3,603 |
| ***CASH FLOW SUMMARY*** | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | |
| Customer Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ 158 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | $ 315 | | $ 2,363 |
| Discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| Government Payments | - | - | 800 | - | - | - | - | - | - | - | - | - | - | - | | 800 |
| Crop Insurance Indemnity Payments | - | - | 153 | - | - | - | 10 | - | - | - | - | 435 | - | - | | 597 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| [] | | | | | | | | | | | | | | | | |
| **Net Receipts** | $ - | $ - | $ 953 | $ - | $ - | $ - | $ 167 | $ 315 | $ 315 | $ 315 | $ 315 | $ 750 | $ 315 | $ 315 | | $ 3,760 |
| **General Disbursements** | | | | | | | | | | | | | | | | |
| Crop Input Costs | $ 500 | $ 1,069 | $ - | $ 200 | $ 250 | $ 100 | $ 71 | $ 18 | $ 18 | $ 18 | $ 18 | $ 18 | $ 11 | $ 11 | | $ 2,299 |
| Cattle Input Costs | - | 27 | 943 | 921 | 921 | 4 | 4 | 3 | 3 | 3 | 3 | 3 | 4 | 4 | | 2,843 |
| Land & Equipment | 500 | 1,770 | - | 4 | - | 52 | 1 | 4 | - | - | 1 | 3 | 1 | 9 | | 2,345 |
| Labor & Benefits | 80 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | | 380 |
| Insurance | - | 244 | 151 | - | - | - | - | - | - | - | - | - | - | - | | 395 |
| Utilities | - | - | - | 15 | - | - | - | 15 | - | - | - | 15 | - | - | | 45 |
| Other Operating Expenses | - | 183 | 138 | 56 | 56 | 46 | 41 | 14 | 9 | 9 | 9 | 14 | 12 | 12 | | 602 |
| [] | | | | | | | | | | | | | | | | |
| **Total General Disbursements** | $ 1,080 | $ 3,292 | $ 1,283 | $ 1,196 | $ 1,277 | $ 202 | $ 167 | $ 54 | $ 80 | $ 30 | $ 81 | $ 53 | $ 78 | $ 36 | | $ 8,909 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | | | |
| Critical Vendors | $ 100 | $ 100 | $ 100 | $ 50 | $ 50 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ 400 |
| Capital Spending | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | - |
| Debt Payments | 160 | - | 1,010 | 34 | 40 | - | 328 | 400 | 315 | 315 | 315 | 1,011 | 315 | 315 | | 4,558 |
| [] | | | | | | | | | | | | | | | | |
| **Total Other Operating Disbursements** | $ 260 | $ 100 | $ 1,110 | $ 84 | $ 90 | $ - | $ 328 | $ 400 | $ 315 | $ 315 | $ 315 | $ 1,011 | $ 315 | $ 315 | | $ 4,958 |
| **Net Operating Cash Flow** | $ (1,340) | $ (3,392) | $ (1,440) | $ (1,280) | $ (1,367) | $ (202) | $ (328) | $ (139) | $ (80) | $ (30) | $ (81) | $ (314) | $ (78) | $ (36) | | $ (10,108) |
| **Professional Fees** | $ 285 | $ 74 | $ 67 | $ 67 | $ 304 | $ 82 | $ 47 | $ 46 | $ 53 | $ 81 | $ 46 | $ 46 | $ 53 | $ 81 | | $ 1,330 |
| **Total Disbursements** | $ 1,625 | $ 3,466 | $ 2,459 | $ 1,346 | $ 1,671 | $ 283 | $ 542 | $ 500 | $ 448 | $ 426 | $ 442 | $ 1,110 | $ 447 | $ 432 | | $ 15,198 |
| **U.S. Trustee Expenses** | $ - | $ - | $ - | $ - | $ - | $ - | $ 98 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | | $ 98 |
| **Cash Flow** | $ (1,625) | $ (3,466) | $ (1,506) | $ (1,346) | $ (1,671) | $ (283) | $ (473) | $ (185) | $ (133) | $ (111) | $ (127) | $ (360) | $ (132) | $ (117) | | $ (11,535) |
| Weekly Starting Cash | - | 6,375 | 2,909 | 1,403 | 56 | 385 | 102 | 2,129 | 1,944 | 1,811 | 1,700 | 1,573 | 1,213 | 1,081 | | - |
| Change in Cash before DIP Draw | (1,625) | (3,466) | (1,506) | (1,346) | (1,671) | (283) | (473) | (185) | (133) | (111) | (127) | (360) | (132) | (117) | | (11,535) |
| Net Cash before DIP Draw | (1,625) | 2,909 | 1,403 | 56 | (1,615) | 102 | (371) | 1,944 | 1,811 | 1,700 | 1,573 | 1,213 | 1,081 | 965 | | (11,535) |
| Plus: DIP Draw | 8,000 | - | - | - | 2,000 | - | 2,500 | - | - | - | - | - | - | - | | 12,500 |
| **Ending Cash** | $ 6,375 | $ 2,909 | $ 1,403 | $ 56 | $ 385 | $ 102 | $ 2,129 | $ 1,944 | $ 1,811 | $ 1,700 | $ 1,573 | $ 1,213 | $ 1,081 | $ 965 | | $ 965 |
| Initial DIP Draw | $ 8,000 | $ - | - | - | - | - | - | - | - | - | - | - | - | - | | 8,000 |
| Other DIP Draw | - | - | - | - | $ 2,000 | - | $ 2,500 | - | - | - | - | - | - | - | | 4,500 |
| **Total DIP Drawn** | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 10,000 | $ 10,000 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | | $ 12,500 |