**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

| | | |
|---|---|---|
| RAGUSE FAMILY PARTNERSHIP (Lead Case), | Lead Case No. | 26-60308 |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. | 26-60312 |
| TRUMAN RAGUSE, | Case No. | 26-60313 |
| R.A.G. HOLDINGS, LLC | Case No. | 26-60309 |
| TRU AG LLC, and | Case No. | 26-60311 |
| RED ROCK CATTLE, LLC | Case No. | 26-60310 |

Debtors.

**DECLARATION OF TRUMAN RAGUSE**
**IN SUPPORT OF CHAPTER 11 PETITIONS**
**AND FIRST DAY MOTIONS**

I, Truman Raguse, declare as follows:

1. I am a General Partner of the Raguse Family Partnership (the "Partnership"), Vice-President of R.A.G. Holdings, LLC ("RAG"), President of Tru Ag LLC ("Tru Ag") and Vice-President of Red Rock Cattle, LLC ("Red Rock," and together with the Partnership, RAG, and Tru Ag, the "Corporate Debtors"). I also own 100% of Tru Ag, 50% of RAG and Red Rock, and 33% of the Partnership.

2. I submit this Declaration (the "Declaration") to assist the Court and parties in interest in (a) understanding the Corporate Debtors' operations and capital structure; (b) understanding the circumstances related to the commencement of their Chapter 11 cases; and (c) in support of: (i) their petitions for relief under Chapter 11 of Title 11 of the United States Code filed on the date hereof (the "Petition Date"); and (ii) the relief requested by the Corporate Debtors

in various First Day Motions filed with the Court along with the petitions for relief (the "First Day Motions").

3. Based on my position and experience with the Corporate Debtors, I am familiar with their day-to-day operations, business affairs, assets and liabilities, and books and records. Except as otherwise indicated herein, all facts set forth in this Declaration are based on: (a) my personal knowledge of Corporate Debtors' operations and finances; (b) my experience with the Corporate Debtors; (c) information supplied to me by other members of the Corporate Debtors' management or advisors; (d) information obtained from my review of the relevant documents; and (e) information obtained from other sources relating to the Corporate Debtors' operations and financial condition.

4. On the date of this Declaration, the Corporate Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

5. The Corporate Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee of creditors has been appointed in this case.

## HISTORY, OPERATIONS AND EVENTS LEADING TO THE FILINGS

## II. OVERVIEW OF THE BUSINESS

6. Raguse Family Partnership is a Minnesota partnership with a principal executive office at 6867 740th Street, Wheaton, MN 56296. Truman Raguse holds a 33% ownership interest in the Partnership; David Raguse holds a 42% interest in the Partnership; and Susan Raguse holds a 25% interest in the Partnership.

7. R.A.G. Holdings, LLC is a Minnesota limited liability company with its principal executive office at 6867 740th Street, Wheaton, MN 56296. Truman Raguse and David Raguse each hold a 50% interest in RAG.

8. Tru Ag LLC is a Minnesota limited liability company with its principal executive office at 6867 740th Street, Wheaton, MN 56296. Truman Raguse holds the 100% interest in Tru Ag.

9. Red Rock Cattle, LLC is a Minnesota limited liability company with its principal executive office at 6867 740th Street, Wheaton, MN 56296. Truman Raguse and David Raguse each hold a 50% interest in Red Rock.

10. Together, the Corporate Debtors operate a diverse crop and cattle operation that farms in the Red River Valley of Minnesota and North Dakota. The farm grows corn, soybeans, white corn, and sugar beets over approximately 9,300 acres. Grains are marketed to major commodity buyers in the Midwest and are shipped primarily via BNSF rail line. The underlying infrastructure contains multiple storage facilities, including a $1.1 million bushel elevator located on a BNSF railroad spur, which presents opportunities for further geographic expansion in the coming years. In addition, historically the farms feeds and supports approximately 1,100 heads of cattle but has the capacity for up to 5,000 heads of cattle each year.

11. As explained in more detail below, due in significant part to factors well beyond its control, including weather, tariffs and delays in insurance payments, the Corporate Debtors now require Chapter 11 protection to address their existing obligations, remain a going concern, and achieve their long term objectives, which are to see the Corporate Debtors became a fully integrated cattle, cropping, and rail-based logistics platform that generates stable, diversified, year-

round revenue with projected growth to 8,000 head of cattle (annually), and 8,000 acres of row crop.

## III. EVENTS LEADING UP TO THE PETITIONS

12. A variety of factors contributed to the Corporate Debtors' financial difficulties and eventual bankruptcy filings.

13. Over the last three years, farmers all over the United States, but particularly the Midwest, have faced a "perfect storm" of challenges that have significantly strained even well-established operations. Specifically, agricultural producers and cattle operators have experienced the conflation of quickly rising production costs (fertilizer, fuel, labor) exacerbated by tariffs, increased international competition (also exacerbated by tariffs), falling commodity prices, and high interest rates. By way of example, on a national-level corn prices are down approximately 50% from their high in 2022 and net farming income is down in that same period by 26%. In addition, the Midwest has seen drought conditions in the past few years coupled with extreme weather events that further inhibited recent growing seasons through reduced yields, degraded pasture conditions, and increased reliance on purchased feed. Cattle operations in particular, have been damaged by elevated feed costs and constrained forage.

14. These factors, plus significant cuts to federal funding programs for farmers and delays in payment to farmers due to recent government shutdowns, have led to a significant tightening of margins and increased reliance by farmers (including the Corporate Debtors) on debt—at higher and higher interest rates—to sustain operations. Each of these factors have made it increasingly difficult for farm operators to plan for and maintain predictable revenue streams.

15. Unfortunately, while famers such as the Corporate Debtors have grown more reliant on financing, traditional agricultural lenders have materially tightened credit availability to farming operations across the region through reduced operating lines, stricter borrowing bases,

and increasingly declining to renew longstanding credit facilities. The Corporate Debtors' present financial condition reflects these broader trends rather than an operational failure unique to the Corporate Debtors.

16. In November 2025, it became clear to the Corporate Debtors that their two primary sources of bank funding, Red River State Bank ("Red River") and Cornerstone Bank ("Cornerstone"), were unlikely to offer further extensions of credit and that a new lending source would need to be procured. Indeed since that time, Cornerstone Bank, which had been the Debtors primary general corporate banking partner, not only refused to provide additional financing but engaged in sweeps of the Corporate Debtors accounts, eliminating the Corporate Debtors' access to hundreds of thousands of dollars

17. Also beginning in November 2025, the Corporate Debtors sought to procure such financing. In total, the Corporate Debtors reached out to dozens of parties regarding funding for the 2026 growing season. The Corporate Debtors were able to procure such financing in May 2026 with East West Bank (the "DIP Lender") who will, subject to this Court's approval, provide $12.5 million in post-petition debtor-in-possession financing (the "DIP Financing"). With one exception, the DIP Financing does not seek to prime the Corporate Debtors pre-existing secured lenders. Instead, the DIP Financing will provide the DIP Lender with a first priority, perfected, secured interest in the Corporate Debtors' presently unencumbered assets. The one exception is that Cornerstone Bank has agreed to subordinate its first priority security interest in the Corporate Debtor's 2026 crops and cattle to the DIP Lender. In sum, the DIP Financing either does not impact the Debtor's pre-petition secured creditors or does so with the first priority lender's consent.

18. With the DIP Financing, the Corporate Debtors will be able fully operate during the 2026 growing season, fund these Chapter 11 cases and emerge from bankruptcy with a right-

sized balance sheet that will allow the Corporate Debtors to not only survive this challenging environment but also position them for future growth. In sum, the decision to seek relief under Chapter 11 of the Bankruptcy Code is intended to provide the necessary breathing room to restructure obligations, stabilize operations, and preserve the long-term viability of the Corporate Debtors in the face of ongoing industry-wide challenges.

## PREPETITION SECURED DEBT

19. The Corporate Debtors have approximately $36.2 million in secured debt amongst various lenders.

### Cornerstone

20. Cornerstone extended multiple agricultural and term loans to the Corporate Debtors pursuant to an Agricultural Loan Agreement dated April 29, 2025, and related promissory notes and loan documents (together, the "Cornerstone Loan Documents"). The Cornerstone Loan Documents evidence and govern, among other obligations, (a) an operating line of credit in the original principal amount of $6,000,000.00 (Note 6845), (b) an operating line of credit in the original principal amount of $3,000,000.00 (Note 6859), (c) a crop operating advance facility in the original principal amount of $700,000.00 (Note 8203), (d) a farmland refinance term loan in the original principal amount of $2,478,501.80 (Note 6852), and (e) a term loan in the original principal amount of $1,000,000.00 used to term out a revolving line of credit (Note 8196, and together with Notes 6845, 6859, 8203 and 6852, the "Cornerstone Notes").

21. Each Cornerstone Note bears interest at a variable or fixed rate as set forth therein, provides for scheduled payments, a stated maturity, and imposes late charges on past-due payments. As of the Petition Date, the Corporate Debtors owe approximately $14 million on the Cornerstone Notes, comprised of principal, accrued interest, and applicable late fees, with interest continuing to accrue in accordance with the Cornerstone Notes.

22. The Cornerstone Indebtedness is secured by a comprehensive collateral package granted by the Corporate Debtors in favor of Cornerstone, including (a) agricultural security agreements covering all farm products, crops, livestock (including increase and unborn), inventory, equipment, general intangibles, and related proceeds, (b) commercial security agreements and fixture filings covering equipment and fixtures located at multiple farm and commercial sites in Minnesota and North Dakota, (c) a pledge of 225 shares of Minndak Farmers Cooperative beet stock, and (d) mortgages and assignments of rents encumbering extensive tracts of agricultural and related real property in Traverse County, Minnesota, Wilkin County, Minnesota, Otter Tail County, Minnesota, and Richland County, North Dakota, together with all fixtures and rents associated therewith (collectively, the "Cornerstone Collateral").

23. To protect its interest in the Cornerstone Collateral, Cornerstone has filed, among other things, UCC-1 financing statements with the Minnesota Secretary of State and other applicable filing offices and the recording of mortgages, mortgage modifications, fixture filings, and assignments of rents in the real estate records of the counties in which the real property collateral is situated. The Cornerstone Indebtedness is further supported by unlimited commercial guaranties executed by David Raguse, Susan Raguse, and Truman Raguse in favor of Cornerstone Bank (collectively, the "Cornerstone Guaranties").

24. The Cornerstone Loan Documents also impose ongoing affirmative and negative covenants on Corporate Debtors, including, without limitation, maintenance of specified global equity-to-asset and global debt service coverage ratios, periodic financial reporting and borrowing base reporting, farm and cattle inspections, insurance and tax compliance, restrictions on capital expenditures and fundamental changes, and comprehensive events of default and remedies (including acceleration, setoff, foreclosure on the Cornerstone Collateral, and exercise of Article

9 remedies). It is my understanding that Cornerstone has agreed to subordinate its lien in the Corporate Debtors' interest in the 2026 crops and livestock to the DIP Lender.

**Red River**

25. Red River, a Minnesota banking corporation, previously extended multiple agricultural real estate and operating loans to the Partnership and David Raguse and Susan Raguse (collectively, the "Red River Borrowers"), pursuant to various promissory notes, agricultural loan agreements, commercial security agreements, mortgages, guaranties, forbearance agreements, and related ancillary documents (collectively, the "Red River Loan Documents"). The Red River Loan Documents evidence and govern, among other obligations, (a) Loan 41114, a farmland refinance facility in the original principal amount of $3,700,000.00, (b) Loan 41130, a term facility in the original principal amount of $466,600.00 (as later extended and modified), (c) Loan 51412, an FSA-guaranteed term loan in the original principal amount of $1,776,000.00, and (d) Loan 51419, an SBA-guaranteed term loan in the original principal amount of $590,000.00 (collectively, the "Red River Loans").

26. Each of the Red River Loans accrues interest at the applicable fixed or variable rate set forth in the governing promissory note, requires scheduled annual payments with balloon maturities, imposes late charges on past-due installments, and provides for default interest upon the occurrence of events of default. Red River and the Red River Borrowers entered into a forbearance agreement dated March 14, 2024, under which Red River agreed to temporarily forbear from exercising remedies on payment defaults under the Red River Loans, subject to specified cure payments, limited extension of the January 1, 2024 payment on Loan 41114, modified interest and amortization on that loan, and the execution of an assignment of rents in favor of Red River. As of the Petition Date, the Corporate Debtors owe approximately $5 million

on the Red River Loans including principal, accrued interest, late charges, and other amounts due under the Red River Loans.

27. The Red River indebtedness is secured by a broad collateral package, including (a) mortgages encumbering multiple tracts of agricultural real property in Traverse County, Minnesota, granted by David Dean Raguse and Susan Eve Raguse in favor of Red River and recorded under Traverse County Document Nos. 152015, 152709, 152707, and 152673 (the "Red River Mortgages"), (b) commercial security agreements granting a first-priority security interest in all assets of the Partnership and related obligors, including all equipment, titled vehicles, farm products (crops and livestock), inventory, accounts, general intangibles, government payments, deposit accounts, and proceeds, and (c) perfected liens on numerous titled trucks, trailers, and other vehicles as reflected in Minnesota Department of Public Safety lien cards and related assignments. Red River's security interests are perfected by recorded real estate mortgages and assignments of rents, Minnesota UCC-1 financing statements, and notation of Red River as secured party on certificates of title to the listed vehicles.

28. The Red River Loans are also supported by personal commercial guaranties executed by David Raguse, Susan Raguse, and Truman Raguse, who jointly and severally guaranteed payment and performance of the indebtedness under Loans 41114, 41130, 51412, and 51419, in addition to their roles as borrowers, mortgagors, and grantors under various of the Red River Loan Documents. Certain Red River facilities carry federal credit support, including SBA guarantees associated with Loans 41114 and 41130 and an FSA guaranty associated with Loan 51412, and Red River has agreed to transfer and assign to Cornerstone Bank any rights it may have under those SBA and FSA guaranties as part of the assignment described below.

29. On March 13, 2026, pursuant to an Assignment of Notes, Mortgages, and Ancillary Loan Documents, Red River, as lender/assignor, sold, assigned, and transferred to Cornerstone, as assignee, all of its right, title, and interest in and to the Red River Loans, the Red River Mortgages, the related commercial security agreements and UCC filings, the guaranties, the forbearance agreement, any associated SBA and FSA guaranties, and all other loan and collateral documents described as the 41114 Loan Documents, 41130 Loan Documents, 51419 Loan Documents, and 51412 Loan Documents (collectively, the "Assigned Documents"). In connection with that transaction, Red River also executed and delivered various lien assignment forms with the Minnesota Department of Public Safety assigning its security interests in specified titled vehicles to Cornerstone Bank, so that from and after March 13, 2026, Cornerstone succeeded to Red River's position as holder of the indebtedness and as secured party and mortgagee with respect to the collateral described in the Assigned Documents.

30. Consequently, all of the Red River Loans, the Red River Loan Documents, the Red River Mortgages, the SBA and FSA guarantees, and all personal property and real property collateral, liens, and security interests assigned by Red River State Bank to Cornerstone Bank pursuant to the Assignment of Notes, Mortgages, and Ancillary Loan Documents dated March 13, 2026 (including, without limitation, the Assigned Documents and vehicle lien assignments described therein), are considered part of the "Cornerstone Loan Documents," the indebtedness evidenced are included in the "Cornerstone Indebtedness," and the collateral securing such indebtedness are included in the "Cornerstone Collateral," as if such loans and security interests had been originally made in favor of Cornerstone Bank.

**<u>CNH Industrial Capital America LLC</u>**

31. The Partnership entered into several Retail Installment Sales Contracts with CNH Industrial Capital America LLC ("CNH") as assignee. These purchase money security contracts

cover various equipment purchases, including IH Steiger Tractors, Case IH combines, a Puma 220 CVX Tractor, a Loader-AG Model L117, a Brent Grain Cart, and a Universal Trailer with purchase prices ranging from $155,260 to $3,129,126.16 interest rates between 5.35% and 8.10% and maturity dates from September 1, 2027, to September 22, 2028. As of the Petition Date, the Partnership owed approximately $11.5 million on the Retail Installment Sales Contracts.

**SBA**

32. The Partnership is also a borrower pursuant to a loan agreement with the U.S. Small Business Administration ("SBA") in the principal loan amount of $2 million dated of December 6, 2021 (the "SBA Loan"). The SBA Loan is secured by a security interest in all tangible and intangible personal property of the Partnership but the SBA has subordinated its lien to Cornerstone. As of the Petition Date, $2 million remained outstanding on the SBA Loan.

**Deutsche Leasing USA, Inc.**

33. The Partnership is a borrower under a Loan Agreement with Deutsche Leasing USA, Inc. ("Deutsche") for a loan of $1,108,560.19 at a fixed interest rate of 6.85% per annum. The loan is secured by a Holmer Beet Cart and a Holmer Terra Dos T5-40. The loan requires repayment in 7 annual installments of $192,865.84, with payments due on December 1st each year, commencing in 2024. The maturity date for the final loan payment is December 1, 2030. As of the Petition Date, the Partnership owed approximately $1.1 million on the Loan Agreement.

**Vermeer Credit Corporation**

34. Both the Partnership and Red Rock Cattle are borrowers pursuant to certain loan agreements (the "Vermeer Loan Agreements") with Vermeer Credit Corporation ("Vermeer"). In the first agreement, on March 22, 2024, the Partnership entered into a 60 month loan with Vermeer for $71,300.00 with a 5.50% interest rate. This loan is secured by a purchase money security

interest in the Vermeer VT830 equipment. As of the Petition Date, approximately $83,000 is owing under this loan agreement.

35. The second loan agreement, dated January 24, 2025, and with a sixty month term is between Red Rock (as borrower) and Vermeer (as lender) for $26,700 for the purchase of a Vermeer BPX9010. This loan carries an interest rate of 1.90%. As of the Petition Date, approximately $50,000 is owing under this loan agreement.

36. The third loan agreement, dated October 3, 2025, is between Red Rock (as borrower) and Vermeer (as lender) for the purchase of a Vermeer VR 1428 in the principal amount of $16,200 and an interest rate of 5.50% over a sixty month term. As of the Petition Date, approximately $13,300 is owing under this loan agreement.

**Ascentium Capital**

37. The Partnership entered into two loan agreements with Ascentium Capital ("Ascentium"). The first was a purchase money loan dated April 2, 2024 for a 2018 Top Air and 2022 John Deer equipment in the amount of $395,025.00, with an interest rate of 10.75% per annum. The second was a purchase money loan for a JD 560R Baler in the amount of $91,025 and an interest rate of 11.58%. As of the Petition Date, the Partnership owed Ascentium approximately $500,000 to Ascentium.

**Ally Bank**

38. On May 21, 2022, the Partnership and Smith Motors, Inc. entered into a loan agreement for the purchase of a 2022 GMC Sierra 2500HD for $73,260.59 with a 8.19% interest rate with a maturity date of May 21, 2028. The loan was subsequently assigned to Ally Bank. As of the Petition Date, approximately $88,000 remained on the loan.

**JPMorgan Chase**

39. On March 22, 2021, the Partnership and Gem City Motors entered into a Retail Installment Contract and Security Agreement for the purchase of a2021 GMC Sierra 2500HD for $73,846 with an annual percentage rate of 4.99% over the course of 75 months. The contract was subsequently assigned to JPMorgan Chase Bank. As of the Petition Date, $56,000 remained on the loan.

**Old Second National Bank**

40. On March 5, 2025, the Partnership and Truman Raguse entered into a certain Agricultural Loan Agreement and Promissory Note dated March 5, 2025, in the principal amount of $500,000 Evergreen Bank Group (later acquired by Old Second Bancorp). The entire balance was due on March 1, 2026. After payment was not made, on March 19, 2026, Old Second filed a UCC-1 with the Minnesota Secretary of State asserting a lien of all crops and livestock (and all proceeds) of the Partnership and Truman Raguse.

**CapFirst Equipment Finance, Inc.**

41. On April 9, 2024, The Partnership and CapFirst Equipment Finance, Inc. ("CapFirst") entered into equipment financing in the principal amount of $58,000 in connection with the purchase of a 2010 H&S 30T HYD beet cart. As of the Petition Date, the Partnership owes approximately $58,000 to CapFirst for the equipment financing.

**Wells Fargo Bank**

42. On June 7, 2023, the Partnership and Wells Fargo Bank ("Wells Fargo") entered into a loan agreement for a John Deere planter for the principal amount of $400,000. As of the Petition Date, the Partnership owes approximately $234,000 to Wells Fargo for the equipment financing.

## REAL PROPERTY

43. The majority of the real estate that constitutes the Corporate Debtors' farming operations are owned by David Raguse, Susan Raguse and/or Truman Raguse. R.A.G. owns a fee interest in the following parcels of real estate or fixtures on real estate:

a. 7888 710th Avenue, Taylor, MN (Parcel ID: 12-004000) (5 acres with a residential property located on the parcel);

b. 1209 3rd Avenue South, Wheaton, MN (Parcel ID 23-0813000) (residential property);

c. 700 Pacific Avenue, Campbell, MN (Parcel ID 24-001-0145) (Grain Elevator);

d. 26275 US Hwy 59, Fergus Falls, MN (Parcel ID 26000080047003) (2.61 acres with a warehouse located on the parcel)

e. 307 W. Channing Ave. Fergus Falls, MN 56637) (Parcel ID 71004990364000) (residential property).

## FIRST DAY MOTIONS

44. To enable the Corporate Debtors to minimize adverse effects and disruptions from the commencement of these cases, the Corporate Debtors have requested various types of relief in certain "first day" applications and motions (together the "First Day Motions") filed concurrently with this Declaration.

45. I have reviewed the First Day Motions (including all related attachments and exhibits). The facts stated therein and in this Declaration are true and correct to the best of my knowledge, information and belief, and I believe the relief sought in each of the First Day Motions is necessary to enable the Corporate Debtors to: (a) continue operating their businesses and maintain going concern value; and (b) maximize the value of the Corporate Debtors' assets for the benefit of the Corporate Debtors' estates, creditors and other constituents.

46. It is my further belief that, with respect to those First Day Motions requesting authority to pay certain, limited prepetition claims, the relief requested is essential to the Corporate Debtors' efforts to preserve and maximize value in these cases and to avoid immediate and irreparable harm to the Corporate Debtors and their estates and creditors.

47. I believe that any diminution in the limited relief requested in the First Day Motions could have an immediate and irreparably-harmful impact on the value of Corporate Debtors' assets to the detriment of all of the Corporate Debtors' stakeholders. The Corporate Debtors believe that payment of those selected prepetition claims identified in the First Day Motions and the ability to access postpetition financing will protect the Corporate Debtors from the onset of such harm and that the Corporate Debtors and its creditors will benefit from the relief requested.

## IV. HONOR OBLIGATIONS TO CRITICAL VENDORS

48. The Corporate Debtors seek authorization (but not the obligation) to pay valid prepetition amounts due to certain critical vendors, each of whom provides essential goods and/or services to the Corporate Debtors (collectively, the "Critical Vendors").

49. The Critical Vendors include, but are not limited to, those vendors that supply the Corporate Debtor equipment (along with equipment repairs and parts), farming supplies, fertilizer, and cattle. In other words, the Critical Vendors provide the goods and services necessary for the Corporate Debtors' operations to function. The operations of the Corporate Debtors and their future viability depend in substantial part on the services provided by and its relationships with the Critical Vendors.

50. Based on communications I and others associated with the Corporate Debtors have had with various vendors and suppliers in the past several weeks, many of them will not continue to do business with the Corporate Debtors on an ongoing basis unless at least some of their prepetition claims are satisfied. Over the past several weeks, I and others associated with the

Corporate Debtors have had daily discussions with dozens of vendors and suppliers and the consistent messaging is that payment on their prepetition claims is a necessary condition for their willingness to provide goods and services postpetition.

51. Moreover, there are no alternative vendors who could supply these essential goods and/or services in the same quantities, with the same quality standards, and with the same efficiency and cost as the Critical Vendors. These vendors either supply niche products that are not readily available in the Corporate Debtors' geographic location and reach and/or have been chosen because they are the lowest cost provider. In addition, given that the general planting season is well underway, the ability of the Corporate Debtors to find not only the goods services needed elsewhere but at a lower price in the time available to it is exceedingly limited.

52. And even if the Corporate Debtors were able to find alternative vendors, changing the supply chain would result in a significant interruption in and likely devastate the Corporate Debtors' operations.

53. Consequently, the Corporate Debtors seek authorization to pay prepetition amounts owed to critical vendors up to a maximum of $400,000 on an expedited basis. If the relief is granted the Corporate Debtors will work with its advisors to identify which vendors are absolutely necessary and will (a) aggressively negotiate with those vendors to minimize the required payments; and (b) require that those suppliers and vendors provide services to the Corporate Debtors on the same or better terms than what was provided prior to the Petition Date.

## V. MOTION TO MAINTAIN DIP ACCOUNTS AND CASH MANAGEMENT SYSTEM

54. As part of the requested relief, the Corporate Debtors also are asking the Court to authorize the Corporate Debtors to open and maintain DIP Account(s) with East and West Bank as well as the continued use of the Corporate Debtors' existing cash management systems (the

"Cash Management Motion") on an expedited basis. The relief is requested to assist in preserving business continuity and avoiding the disruption and delay in the Corporate Debtors' performance. Any interruption in the Corporate Debtors' operations would damage their relationships with customers and vendors, undermine employee confidence, and further impair the Corporate Debtors' going concern value.

## VI. PAYMENT OF PREPETITION WAGES AND BENEFITS

55. The Partnership seeks authority to (a) pay prepetition wages to employees that, absent the bankruptcy filings, would be paid to employees in the ordinary course of business; (b) maintain funding of employee benefit contributions, including contributions to insurance and related programs, in the ordinary course of business; and (c) have the applicable financial institutions receive, honor and pay any and all checks drawn to the extent those checks or transfers relate to any of the foregoing and provided that sufficient funds are immediately available and on deposit in the applicable accounts.

56. As of the Petition Date, the Partnership owes employees $67,043.37 for unpaid gross wages, commissions, benefits, salaries, payroll taxes, and reimbursements, (collectively, "Prepetition Wages"). The Partnership employ approximately eighteen people in its operations. Wage and salary payments are paid twice a month on the 1st and 15th of every month. Employees were most recently paid on May 1, 2026, and the first post-petition payroll will be on May 15, 2026.

57. The Partnership will only pay Pre-Petition Wages to or on behalf of any individual employee up to $17,150.00 which I understand is a limit set forth in the Bankruptcy Code.

58. Accordingly, the Partnership request authorization to: (a) withhold amounts from employee paychecks necessary to satisfy third-party requirements, including taxes, Social Security and Medicare; employee contributions toward benefit plans and other benefits; and other deduction

programs, including garnishment and child support or other similar orders; (b) honor obligations to employees to pay amounts necessary to provide employees with health benefits, including medical and dental insurance; (c) reimburse employees for expenses relating to travel and related items when employees are working away from their normal location; and (f) honor the Partnership's obligations with respect to paid time off in accordance with Minnesota's Earned Sick and Safe Time law, subject to the Partnership's oversight and approval.

59. Employee morale and retention will be critical to complete the restructuring process. Both will likely falter if employees do not receive timely payments for their work. Moreover, it is my understanding that the employees at issue would qualify for a priority in payment in any event such that the only question raised by the motion is the timing of payment of employee claims. Many of the Partnership's employees have demonstrated a heartfelt commitment to its success, have endured uncertainty over the course of the past several months and bear no responsibility for the Partnership's financial challenges. The bankruptcy filings are themselves destabilizing to the work force; employees should not be forced to shoulder the additional burden of having to wait to be paid wages and benefits they have earned.

60. Cause exists to grant the wages and benefits motion on an expedited basis. If the motion is not granted expeditiously, the Partnership's payroll processing will be disrupted, potentially preventing the Partnership from timely meeting their wage and benefit obligations. If that occurs, there is a risk that a large number of employees will stop working and seek employment elsewhere, with potentially devastating effects on the Partnership's restructuring efforts, to the detriment of the Partnership, its estates and creditors.

## VII. APPLICATION FOR AUTHORIZATION TO PAY INSURANCE PREMIUMS AND MAINTAIN INSURANCE POLICIES

61. The Corporate Debtors are in the farming industry, an industry which carries with it certain inherent risks. As a result, they carry necessary insurance to protect it against those risks. In the course of their business, the Corporate Debtors maintain multiple insurance policies with various insurance carriers, compiled and organized by various risk management agencies (collectively, the "Insurers").

62. The Corporate Debtors' insurance agreements with the Insurers (collectively, the "Insurance Agreements") covers the Debtors' owned real estate and the improvements located thereon (the "Real Property"), including its warehouses, grain elevators and a fertilizer plant, as well as the Debtors' crops and cattle, its farming equipment and vehicles as well as its workers compensation (collectively, the "Insured Property"). The Insured Property is instrumental to Corporate Debtors' day-to-day operations and are necessary to a successful reorganization.

63. The Corporate Debtors maintain these Insurance Policies in amounts and form in accordance with state and local laws governing the jurisdictions in which the Corporate Debtors operate and as deemed necessary in the Corporate Debtors' business judgment to adequately insure the Corporate Debtors' assets and risk.

64. For all of the foregoing coverage pursuant to the Insurance Policies, the Debtors pay premiums (the "Insurance Premium"). to procure and maintain their insurance coverage.

65. The Debtors owe approximately $230,985.37 (the "Outstanding Prepetition Insurance Premiums") in Insurance Premiums that were due and payable as of the Petition Date. The following summarizes the Outstanding Prepetition Insurance Premiums:

| Insurer | Insurance Policy | Prepetition Premium Due | Primary Insured Debtor |
|---|---|---|---|
| Rain and Hail Insurance | 2025 Livestock Risk Protection | $99,944.00 | Red Rock Cattle |
| First Insurance Funding | 2025-2026 Campbell Elevator General Liability, Excess Liability and Commercial Property Coverage for grain elevator | $49,314.82 | Raguse Family Partnership |
| Auto Owner's Insurance | Automobile | $3,547.78 | Raguse Family Partnership |
| Prairie Lakes Mutual Insurance | Farm | $29,460.39 | Raguse Family Partnership |
| RAM Mutual Insurance | Umbrella | $5,785.00 | Raguse Family |
| Auto Owner's Insurance | Farmowner's Package | $933.38 | Raguse Family Partnership |
| Agrisure Insurance | Worker Compensation | $42,000.00 | Raguse Family Partnership |

66. The Corporate Debtors and their creditors will suffer irreversible and irreparable harm if it is not authorized to pay Insurance Premiums in order to maintain Insurance Policies.

## VIII. APPLICATION TO EMPLOY LAKESHORE FOOD ADVISORS, LLC AS INVESTMENT BANKERS AND FINANCIAL ADVISORS

67. The Corporate Debtors seek the Court's approval to employ Lakeshore Food Advisors, LLC ("Lakeshore") (a) as financial advisors, to assist the Corporate Debtors in the performance of its management, budgeting, accounting and financial reporting obligations under the Bankruptcy Code, and (b) as investment bankers to assist the Corporate Debtors in designing and implementing a process for securing needed financing.

68. Lakeshore's services are necessary to assist the Corporate Debtors in the Chapter 11 process. Such services will include, but will not be limited to: assisting and advising the Corporate Debtors in preparing the 13-week cash flow needed to determine capital needs; assisting in all aspect of securing and managing debtor-in-possession financing. The Corporate Debtors

also requires Lakeshore's assistance in finding investors for recapitalization aimed at maximizing value for creditors.

69. Due to its prepetition engagements on behalf of the Corporate Debtors, Lakeshore has a firm command of the Corporate Debtors' businesses. I expect Lakeshore's familiarity will prove invaluable in the post-petition process.

70. I believe that the Corporate Debtors' motion to employ Lakeshore should be addressed on an expedited basis as there is an immediate need for Lakeshore's assistance in devising a coherent strategy for implementing the essential tasks noted above to ensure that the restructuring process helps the Corporate Debtors achieve their objectives.

## IX. MOTION TO ESTABLISH PROCEDURES REGARDING ADEQUATE ASSURANCE OF FUTURE PERFORMANCE FOR UTILITIES

71. In connection with the operation of its business, the Corporate Debtors obtain utility services for electricity, natural gas, water, sanitation services, and telephone services (the "Utility Services") from the utility service providers listed on an exhibit to the Corporate Debtors' motion for an order establishing procedures regarding adequate assurance of future performance for utilities; the exhibit to said motion also shows the current amounts owed to each of the utilities. The Corporate Debtors owe approximately $24,692.85 for Utility Services as of the Petition Date. Pursuant to Debtor's 13-Week short term financing plan, the Corporate Debtors intend to pay each Utility approximately 10% of the amount currently outstanding, for a total of $2,500.00.

72. Uninterrupted Utility Services are essential to the Corporate Debtors' ongoing operations. Should any Utility Service be interrupted or discontinued, even for a brief period, the Corporate Debtors' operations will be severely disrupted. The impact of this disruption on their business operations and revenue would be extremely harmful and would jeopardize the Corporate Debtors' efforts to reorganize and maximize value for all parties in interest.

73. I believe that the Corporate Debtors' motion relating to utility services must be addressed on an expedited basis in order to avoid potential cessation of services, which would cause immediate and irreparable harm to Debtor.

## X. POST-PETITION FINANCING/USE OF CASH COLLATERAL

74. The Corporate Debtors seek interim approval to enter into a post-petition financing arrangement with East West Bank (the "DIP Lender") in accordance with the terms of that Term Sheet dated as of May 14, 2026 (the "Term Sheet"), and that certain proposed *Interim Order (I) Granting Expediated Hearing, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Authorizing Use of Cash Collateral, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* (the "Interim Order" and together with the Term Sheet, the "DIP Loan Documents") and also seeks authorization to use cash collateral.

75. The Corporate Debtors have an urgent and immediate need to use cash in order to, among other things operate its business, fund payroll, make lease payments, pay utilities, and pay other critical and ordinary course vendors. The Corporate Debtors presently have no access to cash collateral. Put simply, the Corporate Debtors cannot continue to exist as an ongoing enterprise without the DIP Funding.

76. The Corporate Debtors are unable to obtain financing on more favorable terms than those offered by the DIP Lender. The Corporate Debtors contacted dozens of potential financing parties. No party would extend financing to the Corporate Debtors on an unsecured basis or through the granting of an administrative expense claim. And only the DIP Lender would provide financing secured only by assets presently unencumbered or where the current first priority lienholder has consented to the priming of their lien over that collateral. Every other potential lender would have required that they prime all other lenders. The terms propose by the DIP Lender

present the best financing package available to the Corporate Debtors under the circumstances and present the only viable financing option.

77. In addition, the DIP Financing also will send a strong signal to the Corporate Debtors' employees, vendors, and other parties in interest regarding the viability of the Corporate Debtors' operations. If approved, the DIP Financing will preserve and enhance the value of the Corporate Debtors' estates.

78. The DIP Financing is the product of robust, good faith and at arms' length negotiations and represents a sound exercise of the Corporate Debtors' business judgment. Access to the liquidity afforded under the DIP Loan Agreement will help to ensure that there are minimal disruptions to business operations and help ensure a successful chapter 11 outcome.

79. The DIP Financing also provides for the Corporate Debtors' use of cash collateral with such use governed by the DIP Loan Documents, including the use of a 13-week budget. These use parameters are fair, reasonable and also the product of arm's-length negotiations.

## XI. MOTION TO PAY PREPETITION REAL ESTATE TAXES

80. As of the Petition Date, the Corporate Debtors and the individual debtors were delinquent on Prepetition Real Property Taxes for those pieces of real estate listed on Exhibit A to the Motion and upon which the Corporate Debtors' farming operations occur. (the "Property"). The Property houses fixtures, residential homes, and the farm land through which the Corporate Debtors produce crops and raise cattle and thus serve as the backbone of the Commercial Debtors' operations.

81. Because of the critical importance of the Property, cause exists to hear this matter on an expedited basis to avoid further delay in payment and the requested relief should be granted.

## XII. MOTION FOR JOINT ADMINISTRATION

82. Finally, the Corporate Debtors request that their cases as well as the cases of the above-captioned individuals be jointly administered for procedural purposes only.

83. The debtors are a group of related individuals and entities with substantially overlapping ownership, management, and business operations. Joint administration of these cases will avoid unnecessary duplication of effort, reduce administrative costs, and promote the efficient administration of the debtors' estates.

84. Joint administration is warranted for, among other reasons, the debtors have common ownership and control, joint administration will present significant administrative convenience and cost savings, and not affect any parties substantive rights.

For the reasons stated above, and all additional reasons set forth in the Corporate Debtors' First Day Motions, the Corporate Debtors respectfully requests that its First Day Motions be granted.

I swear that the foregoing is true and accurate to the best of my knowledge and belief.

Dated: May 14, 2026

*/s/ Truman Raguse*
Truman Raguse