**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

| | |
|---|---|
| RAGUSE FAMILY PARTNERSHIP, et al., | Lead Case No. 26-60308, et al. (Jointly Administered) |
| DAVID RAGUSE and SUSAN RAGUSE, | Case No. 26-60312 |
| TRUMAN RAGUSE, | Case No. 26-60313 |
| Debtors. | |

# FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, GRANT LIENS, PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND USE CASH COLLATERAL, (II) MODIFYING THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion") of Raguse Family Partnership and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 503(b), 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Bankruptcy Local Rules for the District of Minnesota (the "Local Rules"), seeking entry of this final order (together with all exhibits hereto, the "Final Order" and together with the Interim Order,[1] the "DIP Orders") that, among other things:

i. authorizes the Debtors, jointly and severally, to obtain a non-amortizing, super-priority senior secured postpetition credit facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $12,500,000 of which, upon entry of the Interim Order and subject to the terms and conditions thereof, (a) up to $8,000,000 (the "Interim Amount") was made available to, and was drawn by, the Debtors and (b) upon entry of this Final Order and subject to the terms and conditions hereof, the remaining $4,500,000 (the "Final Amount"), subject to the maximum aggregate amount of the DIP Commitments (as defined in the DIP Credit Agreement, and as used in the DIP Orders, the "DIP

[1] The term "Interim Order" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 43] entered by this Court on May 19, 2026, including all exhibits thereto.

Commitments"), will be available through additional draws, in each case, subject to the terms and conditions set forth in the *Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement* among the Debtors, as Borrowers, and East West Bank, as Lender (together with its designees and assignees, the "DIP Lender"), which shall be substantially in the form attached hereto as **Exhibit 1** (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "DIP Credit Agreement"[2] and, together with any ancillary, collateral, or related documents and agreements, including, without limitation, the DIP Orders, in each case, as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "DIP Documents");

ii. approves the terms of the DIP Credit Agreement and the other DIP Documents, and authorizes the Debtors to execute, deliver, and perform under the DIP Documents;

iii. authorizes the Debtors, on a final basis to incur and guarantee the DIP Loans and all other obligations, of any kind, to or for the benefit of the DIP Lender under the DIP Documents (including, without limitation, all loans, notes, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, premiums, Exit Fee, and any other fees payable pursuant to the DIP Documents) (collectively, the "DIP Obligations"), and to perform such other acts as may be required or appropriate in connection therewith;

iv. authorizes the Debtors, on a final basis, to use the proceeds of the DIP Facility and the Cash Collateral (as defined below) solely in accordance with the DIP Documents and this Final Order to (a) fund the working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents; (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in the Interim Order and the other DIP Documents; (c) pay interest and other amounts payable under the DIP Facility and the DIP Documents; and (d) pay the allowed administrative costs and expenses of the Chapter 11 Cases, in each case, solely in accordance with the DIP Documents, the Approved Budget (as defined below), subject to the Permitted Variance, and the DIP Orders;

v. authorizes and approves, on a final basis, the Debtors' grant to the DIP Lender of valid, enforceable, non-avoidable, and automatically and fully perfected and priming security interests, liens, and superpriority claims, including, without limitation, (a) allowed superpriority administrative expense claims pursuant to sections 364(c)(1) of the Bankruptcy Code, subject to only the Carve-Out (as defined below), and (b) liens in the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral," as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") pursuant to sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, to secure all DIP Obligations, subject to only the Carve-Out;

vi. authorizes the DIP Lender to take all commercially reasonable actions to implement and effectuate the terms of this Final Order, the DIP Credit Agreement, and the other DIP Documents;

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the DIP Credit Agreement, as applicable.

vii. authorizes, as applicable, payment of the DIP Fees (as defined below) at the times and in the amounts set forth in the DIP Documents;

viii. subject to the terms hereof, waives (a) the Debtors' right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise; and (b) the equitable doctrine of "marshaling" and other similar doctrines with respect to any collateral;

ix. modifies the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtors and the DIP Lender to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders, and authorizes the DIP Lender to deliver any notices and exercise rights and remedies, as contemplated in the DIP Orders and the other DIP Documents;

x. waives any applicable stay (including, without limitation, under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

This Court, having considered the relief requested in the Motion, the exhibits attached thereto, the First Day Declaration (as defined in the Motion), the *Declaration of Truman Raguse in Support of Chapter 11 Petitions and First Day Motions* (the "Raguse Declaration") and the *Supplemental Declaration of Truman Raguse in Support of Chapter 11 Petitions and First Day Motions* (the "Supplement Declaration" and together with the Raguse Declaration, the "Declarations"), the DIP Term Sheet, the DIP Credit Agreement, the other papers filed with this Court, the evidence submitted and arguments made at the interim hearing held before this Court on May 19, 2026 (the "Interim Hearing") and the final hearing held before this Court on June 9, 2026 (the "Final Hearing" and together with the Interim Hearing, the "Hearings"); and due and sufficient notice of the Final Hearing appearing to have been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c), and (d) and all applicable Local Rules; and the Final Hearing having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors and their estates, necessary to avoid immediate and irreparable harm to the Debtors and their estates, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors'

assets; and it appearing that the Debtors' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE FINAL HEARING:** [3]

A. **Petition Date**. On May 14, 2026 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, commencing these Chapter 11 Cases.

B. **Debtors in Possession**. The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C. **Jurisdiction and Venue**. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and Local Rule 1070-1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Notice**. The Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). Notice of the Motion has been provided in a manner which appears to be sufficient under the circumstances and no other or further notice of the Motion or the entry of this Final Order shall be required.

E. **Interim Order**. On May 19, 2026, this Court entered the Interim Order, pursuant to which this Court, *inter alia*, (i) authorized the Debtors to obtain postpetition secured financing

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

from the DIP Lender, on an interim basis, under the terms and condition set forth therein and in the DIP Documents, and (ii) approved the DIP Term Sheet (as defined in the Interim Order).

F. **Committee Formation**. On May 28, 2026, the United States Trustee for the District of Minnesota (the "U.S. Trustee") appointed an official committee of unsecured creditors in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Committee") consisting of Archer-Danield-Midland Company, CT Sibson Gravel & Crushing, Inc., and Innovative Sales Solutions, Inc.

G. **No Credit Available on More Favorable Terms**. Given their current financial condition, financing arrangements, and capital structure, and the circumstances of the Chapter 11 Cases as demonstrated at the Hearings, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtors are unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtors are also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims, in each case, subject and subordinate to only the Carve-Out, as set forth herein and in the DIP Documents.

H. **Good Faith**. Based upon the papers filed and the proceedings of record in these Chapter 11 Cases, (i) the extension of credit and financial accommodations (including, without limitation, the use of Cash Collateral) under the DIP Facility, as provided by the DIP Documents, are fair, reasonable, in good faith, negotiated at arm's length, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; (iii) the liens, claims, and

other covenants and payments as set forth in the DIP Orders and the other DIP Documents, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical, and essential components of the DIP Facility provided by the DIP Lender; and (iv) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, and all terms, conditions, and relief set forth in and otherwise approved by the DIP Orders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that any of the DIP Orders or any provision thereof or hereof is vacated, reversed, or modified, on appeal or otherwise.

I. **Good Cause**. Good cause has been shown for the entry of this Final Order, and the entry of this Final Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The relief requested in the Motion is fair and reasonable and in the best interest of the Debtors and their estates, and essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets.

J. **Need for Postpetition Financing and Use of Cash Collateral**. The Debtors do not have sufficient and reliable sources of working capital to continue to operate their business in the ordinary course without the financing requested in the Motion. The financing provided pursuant to the DIP Orders and the other DIP Documents and the authority to use Cash Collateral granted herein will permit the Debtors to, among other things, (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Cases; (ii) preserve and maintain the value of their assets and provide for the well-being of their livestock; (iii) fund any obligations benefiting from the Carve-Out; (iv) continue the orderly continuation of the operation of their business for the benefit of all their stakeholders; (v) maintain business relationships with customers, vendors, and suppliers; (vi) make payroll for their employees; and (vii) satisfy other working capital and operational needs.

K. **Willingness to Provide Financing**. The DIP Lender has committed to provide financing to the Debtors subject to: (i) entry of the DIP Orders; (ii) approval of the terms and conditions of the DIP Facility, the DIP Credit Agreement, and the other DIP Documents; (iii) satisfaction of the closing conditions set forth in the DIP Credit Agreement and the other DIP Documents; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtors pursuant to the DIP Orders and the other DIP Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to the DIP Orders and the other DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

L. **Approved Budget**. The Debtors have prepared and delivered to the DIP Lender and its advisors an initial budget, a copy of which was attached was an exhibit to the Interim Order (together with any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Documents, the "Initial DIP Budget"). The Initial DIP Budget reflected, among other things, for the thirteen-week period commencing on or around the week of entry of the Interim Order, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each one-week period covered thereby. The Initial DIP Budget may be modified, amended, extended, and updated from time to time in accordance with the DIP Credit Agreement, and such modified, amended, extended, and/or updated budget, once approved (or deemed approved) by the Debtors and the DIP Lender, in consultation with the Committee, shall modify, replace, supplement or supersede, as applicable, the Initial DIP Budget for the periods covered thereby (the Initial DIP Budget and each subsequent approved budget (including any additional line-item or other detail and supplements as may be provided pursuant to the terms of the DIP Credit Agreement) shall constitute, without duplication,

an "Approved Budget"). The Approved Budget for purposes of this Final Order is attached hereto as Exhibit 2. The Approved Budget has been prepared by the Debtors, their management, and their advisors. The Debtors believe that the Approved Budget is reasonable under the circumstances. The DIP Lender is relying, in part, on the Debtors' agreement to comply with the Approved Budget (subject only to the Permitted Variance) and the terms of this Final Order and the other DIP Documents in determining to enter into the DIP Facility and to consent to the use of Cash Collateral provided for herein.

M. **Use of Cash Collateral and DIP Facility Proceeds**. As a condition to the Debtors' entry into the DIP Credit Agreement and the other DIP Documents and the extension of credit under the DIP Facility, including the use of Cash Collateral, the Debtors have agreed that the proceeds of the DIP Facility and Cash Collateral shall be used solely in accordance with the terms and conditions of this Final Order, the DIP Documents, and the Approved Budget (subject to the Permitted Variance). Except as otherwise set forth in the DIP Orders, all of the Debtors' cash, including, without limitation, the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the DIP Collateral or deposited into the Debtors' banking, checking, or other deposit accounts as of the Petition Date, and the proceeds of any of the foregoing, wherever located, is the DIP Lender's Cash Collateral.

N. **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that the DIP Liens and DIP Superpriority Claims shall be subject to payment of only the Carve-Out, the DIP Lender is entitled to (i) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral and the DIP Obligations in favor of the

DIP Lender; and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code with respect to the DIP Collateral to the extent permitted by law.

O. **Requisite Authority**. Subject to entry of the DIP Orders, each Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Credit Agreement and the other DIP Documents to which it is a party and to perform its obligations thereunder.

P. **Immediate Entry**. Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules. Consummation of the DIP Facility and the permitted use of DIP Collateral in accordance with this Final Order and the other DIP Documents are, therefore, in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion, and the record before this Court, and after due consideration, and this Court having found good and sufficient cause therefor,

**IT IS HEREBY ORDERED THAT:**

1. **Motion Granted**. The relief sought in the Motion is GRANTED on a final basis as set forth herein. Entry into the DIP Credit Agreement and, as applicable, the other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, on a final basis and subject to the terms and conditions set forth in this Final Order and in the DIP Documents, including the Approved Budget (subject to the Permitted Variance). All objections to the Motion and this Final Order to the extent not withdrawn, waived, settled, or resolved are hereby denied and overruled on the merits.

2. **Authorization of the DIP Facility**. The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Credit Agreement and the other DIP

Documents (in each case, to the extent not previously executed and delivered), and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of the DIP Orders, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for their performance under the DIP Documents, and the creation and perfection of the DIP Liens described in and provided for by the DIP Orders and the other DIP Documents. Each of the Debtors is hereby authorized to pay any principal, interest, fees, expenses, and other amounts subject to and in accordance with the DIP Orders and the other DIP Documents, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Credit Agreement), including, without limitation, the Exit Fee, as well as any documented fees and expenses of counsel to the DIP Lender (subject to paragraph 28 of this Final Order), as set forth herein and in the DIP Credit Agreement, and to take any other actions that may be necessary or appropriate under this Final Order and the other DIP Documents. Upon execution and delivery, the DIP Credit Agreement and, as applicable, the other DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against the Debtors and their estates in accordance with their terms. All provisions of the DIP Credit Agreement are incorporated herein and approved in their entirety. Each officer of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Credit Agreement and the other DIP Documents.

3. **DIP Obligations**. The DIP Orders and, upon execution and delivery thereof, the other DIP Documents shall constitute and evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their respective estates, and any successors thereto (the "Successors"),[4] including, without limitation, any trustee

[4] For the avoidance of doubt, the term "Successors" as used herein shall not include any buyer of the any of the Debtors' assets pursuant to an order of the Court.

appointed in any of the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceeding superseding or related to any of the foregoing (collectively, the "Successor Cases"). The DIP Obligations shall include, but not be limited to, (a) the payment by the Debtors of (i) the unpaid principal amount of and interest on the DIP Loans, as and when due in accordance with the DIP Documents, whether at maturity, by acceleration, or otherwise, and (ii) all other monetary obligations of the Debtors to the DIP Lender under the DIP Orders and the other DIP Documents, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtors to the DIP Lender under the DIP Orders and the other DIP Documents. The Debtors, their estates, and their Successors shall be jointly and severally liable for the DIP Obligations and the repayment of any funds provided pursuant to the DIP Documents. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Credit Agreement) or as otherwise set forth in the DIP Documents. No obligation, payment, transfer, or grant of collateral as security hereunder or under the DIP Documents (including, without limitation, any DIP Obligation or DIP Liens) to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4. **Authorization to Borrow**. The Debtors are hereby authorized to execute, deliver, enter into and, as applicable, comply with and perform all of their obligations, and to pay all fees, costs, expenses, indemnities, and other amounts contemplated, under the DIP Credit Agreement

(and any other DIP Documents) and to take such other and further acts as may be necessary, appropriate, or desirable in connection therewith. Upon entry of this Final Order, the Debtors are authorized to borrow up to aggregate amount of the Final Amount, and the Debtors are hereby authorized to provide a guaranty of payment and performance in respect of the DIP Obligations, in each case, in accordance with the DIP Credit Agreement, and the DIP Obligations are hereby approved (as and when such amounts become earned, due, and payable in accordance with the DIP Credit Agreement) without the need to seek further Court approval. The borrowing of DIP Loans under the DIP Orders, the DIP Credit Agreement, and the other DIP Documents shall permanently decrease the DIP Commitments and, once repaid, the DIP Loans incurred may not be re-borrowed.

5. **DIP Collateral**. The term "DIP Collateral" means, collectively, each Debtor's right, title, and interest in, to and under all of such Debtor's (and its estate's) assets and property, whether tangible, intangible, real, personal or mixed, whether now owned or existing or hereafter acquired and wherever located, whether arising before or after the Petition Date, including, without limitation, the following: (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims,

arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) the proceeds of any Avoidance Actions[5] and the recoveries related thereto, and property received or recovered on account thereof (collectively, the "Avoidance Action Assets"), subject to paragraph 33(b) of this Order. The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens, rights of recoupment enforceable in bankruptcy, and rights of setoff permissible under section 553 of the Bankruptcy Code, in each case except as otherwise agreed by the applicable creditor or lienholder, as

[5] The term "Avoidance Actions" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

applicable, in existence as of the Petition Date and permitted pursuant to the DIP Facility, if any. For the avoidance of doubt, other than the Avoidance Action Assets, the DIP Collateral shall not include the Debtors' right, title, and interest in, to and under, Avoidance Actions.

6. **Proceeds of Subsequent Financing**. If any Debtor, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases obtains financing, other credit, or incurs debt pursuant to section 364 of the Bankruptcy Code or otherwise in violation of the DIP Documents at any time (including subsequent to the confirmation of any chapter 11 plan with respect to any or all of the Debtors) before the DIP Obligations have been indefeasibly Paid in Full, then all the cash proceeds derived from such financing, other credit, or debt shall immediately be applied to the DIP Obligations in accordance with this Final Order and the other DIP Documents.

7. **DIP Liens**. To secure the DIP Obligations, the DIP Lender was granted, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order, continuing, effective, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the DIP Collateral (the "DIP Liens") as follows, in each case subject to only the Carve-Out:

a. **First Priority Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) (collectively, the "Unencumbered Property").

b. **First Priority Priming Liens Over 2026 Crops and Cattle**. Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority priming liens and security interests in the Debtors' crops growing, grown or to be grown; all harvested crops and all processed crops, whether or not produced by the Debtors either owned or acquired in

2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral.

c. **Junior DIP Liens**. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral that is subject to the Existing Liens or a Permitted Lien[6] (all such DIP Collateral, the "DIP Junior Collateral," all DIP Collateral that is not DIP Junior Collateral, collectively, the "DIP Senior Collateral"), which DIP Liens shall be subject and subordinate only to such Existing Liens or Permitted Liens and the Carve Out. For the avoidance of doubt, the Existing Liens include (i) the first and priority mortgage lien held by Citizens Alliance Bank in that certain real property owned by Truman Raguse and located in Richland County, North Dakota, which mortgage has the Recording Number of 378285, inclusive of all rights of recovery associated with such lien; and (ii) the mortgage liens of Cornerstone Bank on certain of Debtors' real property and all rights of recovery associated with such lien.

d. **Priming DIP Liens**. Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Liens in the DIP Senior Collateral shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Senior Collateral or security interest (including any such liens or security interests that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code), which DIP Liens shall be subject and subordinate only to the Carve Out.

8. **DIP Liens Senior to Other Liens**. Except to the extent expressly permitted hereunder, the DIP Liens and the DIP Superpriority Claims shall not be made subject or subordinate to or *pari passu* with (i) any lien, security interest or claim heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Case, including any lien, security interest or claim granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (ii) any lien or security interest that is avoided and preserved for the benefit of a

[6] The terms "Existing Liens" and "Permitted Liens" mean, for the purposes of this Final Order, the liens and security interest that are identified as such on Schedule 1 of the DIP Term Sheet as well as the lien of Citizens Alliance Bank.

Debtor and its estate under section 551 of the Bankruptcy Code or otherwise, (iii) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (iv) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.

9. **DIP Superpriority Claims**. Subject to and subordinate to only the Carve-Out, the DIP Lender was granted, effective immediately upon entry of the Interim Order and approved on a final basis by this Final Order, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate in the Chapter 11 Cases and any Successor Cases (without the need to file any proof of claim) for all DIP Obligations (collectively, the "DIP Superpriority Claims") with priority in payment over any and all priority and administrative expenses at any time existing or arising, of any kind or nature whatsoever, including the kinds set forth or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates all proceeds thereof, excluding only the Carve-Out.

10. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance or provide any other accommodation under the DIP Documents unless (a) all of the conditions precedent and other terms under this Final Order and the other DIP Documents have been satisfied in full or waived by the DIP Lender (in its sole discretion), and

(b) no Event of Default under the DIP Credit Agreement or the other DIP Documents has occurred and is continuing, or would occur if any such loan, advance, or accommodation is made.

11. **Use of DIP Facility Proceeds**. The Debtors shall be permitted to use loans, extensions of credit, and any other financial accommodations available under the DIP Facility only for the purposes specifically set forth in this Final Order and the other DIP Documents, and subject in all respects to the Approved Budget (subject to the Permitted Variance).

12. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and the DIP Lender may rely upon each Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Final Order and the other DIP Documents, including the Approved Budget (subject to the Permitted Variance).

13. **Authorization to Use Cash Collateral**. Subject to the terms and conditions of this Final Order and the other DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variance), the Debtors are authorized on a final basis to use Cash Collateral in accordance with the terms and conditions of this Final Order and the other DIP Documents.

14. **Modification of DIP Documents**. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement any non-material modifications of the DIP Credit Agreement without further notice, motion or application to, order of or hearing before, this Court. Any material modification or amendment to the DIP Credit Agreement shall only be permitted pursuant to an order of this Court, after being submitted to this Court upon three (3) business days' notice to the U.S. Trustee and the Committee; provided that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant, representation,

or any other agreement or (b) a default or an Event of Default, in each case under the DIP Credit Agreement or other DIP Documents, shall not require an order of this Court.

15. **DIP Facility Reporting**. Except as otherwise provided herein or approved by the DIP Lender, the proceeds from the DIP Facility shall be used only in compliance with the terms of the DIP Documents and in accordance with the Approved Budget (subject to the Permitted Variance). The Debtors shall comply with the reporting requirements and obligations set forth in the DIP Documents.

16. **Perfection of DIP Liens**. Each of the DIP Orders shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted therein and herein, including, without limitation, the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, without limitation, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted in the applicable DIP Order. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, deposit account control agreements, mortgages, notices of liens and other similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, validate, perfect, continue, or enforce the DIP Liens. The DIP Lender may, in its sole discretion, file an electronic copy or photocopy of either or both of the DIP Orders as a

financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. For the avoidance of doubt, any deposit account control agreements contemplated by the DIP Credit Agreement or the other DIP Documents shall automatically supersede any preexisting deposit account control agreements, without the necessity of any further action, including by the Debtors or the DIP Lender. Upon the request of the DIP Lender, each Debtor, without any further consent of any party, is authorized to take, execute, deliver, and file any such instruments contemplated by the DIP Credit Agreement or other DIP Documents to enable the DIP Lender to further validate, perfect, preserve, continue, and enforce the DIP Liens. To the fullest extent permitted by the Bankruptcy Code, any provision of any lease, license, contract or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest, or proceeds thereof or other collateral related thereto, shall have no force or effect with respect to the transactions granting the DIP Liens in any such fee, leasehold, interest, or other collateral, or in the proceeds of any assignment and/or sale thereof by the Debtors in favor of the DIP Lender in accordance with this Final Order and other DIP Documents.

17. **Modification of Automatic Stay**. The automatic stay of section 362 of the Bankruptcy Code is hereby modified to the extent necessary to permit the Debtors and the DIP Lender to accomplish the transactions contemplated by this Final Order and the other DIP Documents.

18. **Payments Held in Trust**. Except as expressly permitted in this Final Order, the DIP Documents, or otherwise ordered by this Court, including in respect of the Carve-Out, in the event that any person or entity other than the Debtors receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to the Payment in Full of the DIP Obligations and termination of the DIP Facility in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral, payment, or proceeds in trust and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with this Final Order or the other applicable DIP Documents.

19. **Restrictions on Granting Postpetition Liens**. Other than the Carve-Out, no claim having a priority superior or *pari passu* with those granted by the DIP Orders to the DIP Lender shall be granted or permitted by any order of this Court heretofore or hereafter entered in any Chapter 11 Case, while any portion of the DIP Facility (or refinancing thereof), or any other DIP Obligations are outstanding. Except as expressly permitted by the DIP Documents, the Debtors will not, at any time during the Chapter 11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364 of the Bankruptcy Code or otherwise.

20. **Maintenance of DIP Collateral**. Until the Payment in Full of the DIP Obligations, the Debtors shall: (a) continue to maintain and insure the DIP Collateral as required under the DIP Documents and applicable law; and (b) maintain the cash-management system consistent with the terms and conditions of that certain *Order* entered at Docket Number 44 in the Chapter 11 Cases authorizing, among other things, *(i)* the Debtors' maintenance and use of certain bank accounts as debtor-in-possession accounts (the "Cash Management Order") and the DIP Documents.

21. **Right to Credit Bid**. Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claim, in connection with any proposed sale of any, all, or substantially all of the Debtors' assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a Chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtors shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

22. **Effect of DIP Termination**.

a. **DIP Termination Event**. For purposes of this Final Order, the term "DIP Termination Event" shall mean: (i) the occurrence of the Maturity Date, (ii) the occurrence of any material breach under this Final Order by the Debtors or the occurrence of an Event of Default under the DIP Credit Agreement or the other DIP Documents, or (iii) the acceleration of the DIP Obligations or termination of the DIP Commitments in accordance with the terms of the DIP Credit Agreement or the other DIP Documents.

b. **Exercise of Remedies**. Upon the occurrence of a DIP Termination Event, of which written notice (including via email) of the occurrence of such DIP Termination Event is delivered by the DIP Lender to counsel for the Debtors, the U.S. Trustee, and counsel for the Committee (the "Remedies Notice" and such date, the "DIP Termination Declaration Date"), subject to the expiration of the Waiting Period (as defined below), the automatic stay provisions

of section 362 of the Bankruptcy Code shall be vacated and modified without further notice and upon expedited application to the Court for an order to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a Carve-Out Trigger Notice; (ii) declare the termination, reduction or restriction of any commitments under the DIP Facility (including the DIP Commitments) to the extent any such commitment remains; (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the Debtors; (iv) declare the termination, restriction or reduction of the DIP Facility and the DIP Credit Agreement as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; (v) charge default interest at the default rate set forth in the DIP Credit Agreement; and (vi) declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral.

c. **Waiting Period Procedures**. The Debtors or the Committee may seek an emergency hearing solely during the period beginning on the DIP Termination Declaration Date and prior to the expiration of the five (5) days following the DIP Termination Declaration Date (such period, the "Waiting Period"). If, notwithstanding the foregoing, a hearing cannot be scheduled prior to the expiration of the Waiting Period, the Waiting Period shall be deemed automatically extended until such time as the matter can be heard by the Court. At any hearing regarding a Remedies Notice, the Court may only consider whether an Event of Default has occurred or is continuing. During the Waiting Period, the Debtors shall continue to have the right to use DIP Collateral (including, without limitation, Cash Collateral) in accordance with the terms of this Final Order and the Approved Budget (subject to the Permitted Variance), solely to pay any expenses necessary to (i) preserve the Debtors' going-concern value or (ii) contest, in good faith,

the occurrence of the Event of Default (other than, for the avoidance of doubt, the occurrence of the Maturity Date under the DIP Credit Agreement); provided, however, that the professional fees and expenses of the Professional Persons (as defined below) shall be governed by paragraph 24 hereof and subject to the Approved Budget (subject to the Permitted Variance).

d. **Rights and Remedies Following Termination Date**. Following the expiration of the Waiting Period and, unless this Court has entered an order prior to the expiration of the Waiting Period finding that an Event of Default has not occurred or is not continuing, the DIP Lender shall be entitled to exercise all rights and remedies in accordance with this Final Order, the DIP Credit Agreement, the other DIP Documents, applicable law, and the automatic stay of section 362 of the Bankruptcy Code shall automatically, without further order of this Court, be lifted, to allow the DIP Lender to pursue all rights and remedies in accordance with this Final Order, the DIP Credit Agreement, the other DIP Documents, and applicable law.

23. **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Final Order, the DIP Credit Agreement, the other DIP Documents, applicable law, or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Credit Agreement, the other DIP Documents, or applicable law shall not constitute a waiver of any of its respective rights. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Final Order, the DIP Credit Agreement, the other DIP Documents, or applicable law shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consent required

hereunder or in any other DIP Document by the DIP Lender shall be implied, including by any inaction or acquiescence by the DIP Lender.

24. **Carve-Out**.

a. **Priority of Carve-Out**. The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to only the Carve-Out. The Carve-Out shall be senior to all other claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Final Order.

b. **Carve-Out**. The term "Carve-Out" shall mean the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate and all fees and expenses for services provided under section 156(c) of title 28 of the United States Code; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") or the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Approved Budget (subject to the Permitted Variance) and any other limits imposed by the terms of this Final Order; and (iv) allowed fees and expenses of Professional Persons (collectively, the "Professional Fees") in an aggregate amount not to exceed $750,000 incurred after the first business day following

delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "Carve-Out Cap"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.

c. **Carve-Out Account**. As soon as reasonably practicable following the entry of this Final Order, and each week thereafter, the Debtors shall transfer cash on hand or cash proceeds from the DIP Facility (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to the amount of fees and expenses reflected in the Approved Budget (subject to the Permitted Variance) for each Professional Person for such week into a segregated account not subject to control of the DIP Lender (the "Carve-Out Account"). The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amounts in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Persons that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. Until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Account and all allowed Professional Fees have been paid in full pursuant to a final order of

the Court; provided, in no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise). Notwithstanding anything contained herein to the contrary, funds transferred to the Carve-Out Account (i) shall be held in trust exclusively for the benefit of the Professional Persons, including with respect to obligations arising under the Carve-Out, and (ii) shall not be subject to any liens or claims granted to the DIP Lender or any other creditors and shall not constitute DIP Collateral; provided, however, that, until the DIP Obligations are Paid in Full, the DIP Lender shall have a reversionary interest in the funds held in the Carve-Out Account, if any, after all amounts included in the Carve-Out have been funded into the Carve-Out Account and all allowed fees of Professional Persons have been paid in full pursuant to a final order of the Court. All funds in the Carve-Out Account shall be used to pay all obligations set forth in the definition of Carve-Out until such obligations are paid in full. The DIP Lender shall not sweep or foreclose upon any cash on hand or subsequent cash of the Debtors (including cash received as a result of the sale or other disposition of any assets) until the Carve-Out Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as required hereunder and all allowed Professional Fees have been paid in full pursuant to a final order of the Court.

d. **Carve-Out Trigger Notice**. For purposes of this Final Order, "Carve-Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Committee, which notice may be delivered following the Waiting Period, stating that the Post-Carve-Out Trigger Notice Cap has been invoked (the "Trigger Date"). The Carve-

Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to transfer to the Carve-Out Account an amount of cash equal to the remaining unfunded portion of the Carve-Out (less any retainers held by Professional Persons). Any Carve-Out Trigger Notice shall be deemed a consent by the DIP Lender to authorize the Debtors to deposit Cash Collateral or proceeds of the DIP Facility into the Carve-Out Account in an amount equal to the unfunded portion of the sum of the Post-Carve-Out Trigger Notice Cap and any budgeted amounts reflected in the Approved Budget (subject to the Permitted Variance) through the date of the Carve-Out Trigger Notice that have not already been deposited in the Carve-Out Account.

e. **Carve-Out Draw**. Subject to exhaustion of the DIP Commitments and the applicable terms of the DIP Documents, the Debtors shall be permitted to draw on the DIP Facility in the amount of any remaining unfunded portions of the Carve-Out, notwithstanding any default, Event of Default, or the occurrence of a Trigger Date.

f. **Payment of Allowed Professional Fees Prior to the Trigger Date**. Any payment or reimbursement made prior to the occurrence of the Trigger Date in respect of any allowed Professional Fees shall not reduce the Carve-Out.

g. **Restricted Use**. The Carve-Out shall not include, apply to or be available for any party in connection with any Restricted Use (as defined in the DIP Credit Agreement).

25. **Resolution of Minn-Dak Farmers Cooperative Objection**. On June 1, 2026, Min-Dak Farmers Cooperative (the "Co-Op") filed its *Objection to Debtor's Motion to Use Cash Collateral* [Dkt. 63] (the "Co-Op Objection"). To fully resolve the Co-Op Objection, the parties hereby agree to the following:

a. Debtor RFP is party to a certain Patron Agreement with the Co-Op (as amended, the "Patron Agreement"), which governs, *inter alia*, RFP's rights and obligations in respect of its patronage

capital, patron payments, program payments, and other amounts that may from time to time be due and owing or otherwise payable to RFP thereunder (collectively, the "Co-Op Receivables").[7]

b. The DIP Liens granted to DIP Lender in the DIP Orders and the other DIP Documents shall attach to RFP's rights to, and interest in, the Co-Op Receivables; provided, however, that nothing in the DIP Orders or the other IDP Documents shall prime or otherwise impair the Co-Op's rights, including, without limitation, its setoff and recoupment rights, under the Patron Agreement and applicable law.

26. **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**. The DIP Lender shall not be obligated, liable, or in any way responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Final Order, the other DIP Documents, or otherwise shall be construed to obligate the DIP Lender in any way to pay compensation to, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their estates has sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees and/or expenses of Professional Persons of any of the Debtors, the Committee, if any, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of the DIP Lender to object to the allowance and payment of any such fees and expenses. Notwithstanding anything contained herein to the contrary, neither the Carve-Out nor the Approved Budget shall constitute

[7] As set forth in the Co-Op Objection, the Debtor RFP owes the Co-Op: (a) $312,733 for 2025 seed purchases; (b) $166,011 for 2025 crop year fixed costs (estimate after set-off of final payment); and (c) $107,156 for 2026 beet seed invoices. Notwithstanding anything to the contrary in this paragraph 25, the DIP Lender reserves its rights to the extent the foregoing amounts are different than the actual amount of the Co-Op Receivables.

a cap or limitation on the amount of Professional Fees that may be allowed by the Court and due and payable by the Debtors.

27. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, the Exit Fee, and the documented fees and expenses of the DIP Lender in connection with the DIP Facility (all such fees, together, the "DIP Fees"). The DIP Fees shall be part of the DIP Obligations. The Exit Fee was approved on a final basis upon entry of the Interim Order and was deemed to be allowed, fully earned, non-refundable, and payable in accordance with the terms of the DIP Credit Agreement and any other applicable DIP Documents without the need for any further order of this Court.

28. **DIP Lender's Professionals' Fees**. Professionals for the DIP Lender (the "DIP Lender Professionals") shall provide copies of any invoices in summary form only (and shall not be required to contain individual time entries, and may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) with: (a) a summary of the work performed during the relevant compensation period; (b) the name of, hourly rate (if applicable) of, and number of hours worked by each professional and paraprofessional who worked on the matter during the relevant compensation period; and (c) the total fee amount being requested) by electronic mail to the U.S. Trustee and counsel to the Committee contemporaneously with the delivery of such fee and expense statements to the Debtors. At the conclusion of the Review Period (as defined below) the DIP Lender or the

Debtors, as requested, shall promptly pay in full all such invoiced fees and expenses of the DIP Lender Professionals, other than the Disputed Invoiced Fees (as defined below), directly to the applicable DIP Lender Professional, and such amount shall be added to the DIP Obligations. Any objections raised by the Debtors, the U.S. Trustee, or the Committee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least ten (10) business days' prior written notice by the submitting party of any hearing on such motion or other pleading). Notwithstanding the foregoing, on or about the date of entry of this Final Order, the DIP Lender or the Debtors, as requested, shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. Notwithstanding the foregoing, on or about the date of entry of this Final Order, the Debtors shall pay fees and expenses of the DIP Lender Professionals incurred prior to such date, without the need for any DIP Lender Professional to first deliver a copy of its invoice as provided for herein and such amounts shall be added directly to the balance of the DIP Obligations. No DIP Lender Professionals shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

29. **Indemnification**. The DIP Lender (and its affiliates and respective officers, directors, employees, advisors, and agents, solely in such capacity) (each such person, an "Indemnitee") will have no liability for, and will be indemnified and held harmless by the Debtors and their estates against, any losses, claims, damages, liabilities or expenses incurred in

respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence, bad faith or willful misconduct of the relevant Indemnitee (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of any Indemnitee under the DIP Documents or (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an Indemnitee against another Indemnitee. The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of any of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

30. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the Chapter 11 Cases or Successor Cases, the Interim Order was deemed to constitute a timely filed proof of claim, and this Final Order shall be deemed to constitute a timely and valid amendment of such proof of claim. Any order entered by this Court in relation to the establishment of a bar date (a "Bar Date Order") for any claim (including, without limitation, administrative claims) in the Chapter 11 Cases or Successor Cases shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) one or more proofs of claim (including master or aggregate proofs of claim) in the Chapter 11 Cases for any claim allowed herein or that the DIP Lender otherwise has or may have in respect of the Debtors.

31. **Limitations on Use of DIP Proceeds, Cash Collateral, the Carve-Out and Other Funds**. Except as otherwise permitted in the DIP Documents (including, without limitation, the DIP Orders) and the Approved Budget, the DIP Facility, the DIP Collateral, the Cash Collateral, the Carve-Out, and any portion of the foregoing shall not be used, directly or indirectly, by any of the Debtors, the Committee, any other official or unofficial committee, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any Successor Cases) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith) in connection with any Restricted Use (as defined in the DIP Credit Agreement), including, without limitation, (a) preventing, hindering, or delaying any of the DIP Lender's enforcement or realization upon any of the DIP Collateral; (b) except as permitted by the DIP Documents or order of this Court, using or seeking to use Cash Collateral or any insurance proceeds constituting DIP Collateral without the permission of the DIP Lender; (c) except as permitted by the DIP Documents or order of this Court, selling or otherwise disposing of DIP Collateral without the prior written consent of the DIP Lender (not to be unreasonably withheld); (d) seeking to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders or the DIP Documents, as applicable, including, without limitation, seeking to use Cash Collateral or DIP Collateral on a contested basis; (e) the investigation, initiation or prosecution of any claims, causes of action adversary proceedings, litigation, challenge, objection or other proceeding against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens or DIP Superpriority Claims; (f) litigating, objecting to, challenging or contesting in any manner in any way the DIP Liens, DIP Obligations, DIP Superpriority Claims, DIP Collateral (including, without limitation, Cash Collateral) or any other

claims held by or on behalf of the DIP Lender; (g) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, or any other liens or interests of the DIP Lender; (h) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations; or (i) any other prohibited or otherwise restricted use of proceeds as set forth in the DIP Documents.

32. **Releases**. In addition to the releases granted in the Interim Order, upon entry of this Final Order, the Debtors, on their own behalf and on behalf of their estates only, forever and irrevocably: (a) release, discharge, and acquit the DIP Lender and each of its respective former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest, in each case solely in their capacity as such (each a "Released Party"), from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation of and entry into the DIP Documents; and (b) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations; provided, however, that nothing contained herein shall release (i) any claims against a Released Party for liabilities that a court of competent jurisdiction determines pursuant to a final, non-appealable order results from the bad faith, fraud, gross negligence, or willful misconduct of such Released Party, or (ii) the DIP Lender from its commitments and obligations hereunder and under the DIP Documents.

33. **Waivers**.

a. **Limitation on Charging on Expenses**. No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against the DIP Lender with respect to the DIP Collateral pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

b. **No Marshaling**. In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Final Order and the other DIP Documents; provided, however, notwithstanding anything contained in this paragraph, the DIP Orders or the DIP Documents to the contrary, prior to seeking payment or satisfaction of any DIP Obligations from Avoidance Action Assets, the DIP shall first use commercially reasonable efforts to satisfy such obligations from all DIP Collateral other than Avoidance Action Assets and shall only avail itself of Avoidance Action Assets if the DIP Obligations are not paid in full in cash from the other DIP Collateral after such commercially reasonable efforts.

34. **No Lender Liability**. In determining to make any loan or accommodation of any kind (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtors or their respective creditors, shareholders, or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors by virtue of making the DIP Loans. Furthermore, nothing in the DIP Orders or the other DIP Documents shall impose or allow the imposition upon the DIP

Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates, if any (as defined in section 101(2) of the Bankruptcy Code).

35. **Limitation of Liability**. Nothing in the DIP Orders, the other DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (a) any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts, or (b) any fiduciary duties to the Debtors or their respective creditors, shareholders, or estates. The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person and all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

36. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, including, without limitation, with respect to the Carve-Out, this Final Order does not create any rights for the benefit of any Professional Person, third party, creditor, landlord, lessor, equity holder, or any direct, indirect, or incidental beneficiary.

37. **Insurance Proceeds and Policies**. Within thirty (30) days after entry of this Final Order, the DIP Lender shall be (and shall be deemed to be, without any further action or notice, to the extent allowable under the applicable insurance policies) named as an additional insured and loss payee on each insurance policy maintained by or for the benefit of the Debtors that in any way relates to the DIP Collateral until the Payment in Full of the DIP Obligations (notwithstanding anything to the contrary in the DIP Documents); provided, however, that such thirty (30) day

period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the agreed insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions).

38. **No Waivers or Modifications of Final Order**. The Debtors have agreed not to and shall not seek any modification or extension of this Final Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

39. **Binding Effect of this Final Order**. Immediately upon entry of this Final Order, the terms and provisions of this Final Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Lender, all other creditors of any of the Debtors, the Committee, and all other parties in interest and their respective Successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed in the Chapter 11 Cases, any Successor Cases, or upon dismissal of any of the Chapter 11 Cases or any Successor Cases; provided that the DIP Lender shall not have any obligation to permit the use of DIP Collateral (including, without limitation, Cash Collateral) by or extend any financing to any receiver, administrator, Chapter 7 trustee, Chapter 11 trustee or similar responsible person appointed for any of the Debtors or their respective estates.

40. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the Payment in Full of the DIP Obligations has occurred, on or before the effective date of such confirmed plan.

41. **Survival**. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any Chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing the Chapter 11 Cases or Successor Cases. The terms and provisions of the applicable DIP Orders, including, without limitation, the claims, liens, security interests and other protections granted to the DIP Lender, the Carve-Out, or otherwise approved or set forth in the DIP Orders and the other DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of any of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by the applicable DIP Orders until, in respect of the DIP Facility, the Payment in Full of the DIP Obligations, pursuant to the applicable DIP Orders and the other DIP Documents (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms).

42. **Necessary Actions**. The Debtors are authorized and directed to take such actions as are reasonable or appropriate to implement the terms of this Final Order and the other DIP Documents.

43. **Payments Free and Clear**. Any and all payments or proceeds remitted to the DIP Lender or the DIP Lender Professionals shall be irrevocable, received free and clear of any claims, charge, assessment, or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors provided the proceeds are from the DIP Collateral and not in violation of the rights of

other secured parties.

44. **Joint and Several Liability**. Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents, respectively.

45. **Enforceability**. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), or 7062, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

46. **Final Order Controls**. In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order and the other DIP Documents, the terms and provisions of this Final Order shall govern and control to the extent of such conflict or inconsistency.

47. **Headings**. All paragraph headings used in this Final Order are for ease of reference only and shall not affect the construction or interpretation hereof.

48. **Retention of Jurisdiction**. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of the DIP Documents or this Final Order.

49. **Miscellaneous**.

a. Notice of the Motion as provided therein is hereby deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Local Rules are satisfied by such notice.

b. All time periods set forth in this Final Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

c. No later than two business days after the date of this Final Order, the Debtors shall serve on the Notice Parties a copy of this Final Order and shall file a certificate of service no later than 24 hours after service.

Dated: *June 11, 2026*

s/ William J. Fisher

William J. Fisher
United States Bankruptcy Judge

# EXHIBIT 1

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN, GUARANTY, AND SECURITY AGREEMENT**

**by and among**

**RAGUSE FAMILY PARTNERSHIP,**

**as Borrower and Borrower Representative,**

**THE OTHER BORROWERS PARTY HERETO,**

**as Borrowers and Guarantors,**

**THE OTHER LOAN PARTIES PARTY HERETO,**

**as Guarantors**

**and**

**EAST WEST BANK**
**as Lender**

**Dated as of June __, 2026**

# TABLE OF CONTENTS

**Page**


1. DEFINITIONS AND CONSTRUCTION .......... 2
   - 1.1 Definitions .......... 2
   - 1.2 Accounting Terms .......... 19
   - 1.3 UCC .......... 20
   - 1.4 Construction .......... 20
   - 1.5 Schedules and Exhibits .......... 20
   - 1.6 Timing of Payment or Performance .......... 21
2. LOAN AND TERMS OF PAYMENT .......... 21
   - 2.1 Agreement to Lend; Delayed Draw; and Loan Documents. .......... 21
   - 2.2 Borrowing Procedures .......... 22
   - 2.3 Payments; Reductions of the Commitments; Prepayments. .......... 22
   - 2.4 Interest Rates, Payments and Certain Calculations. .......... 24
   - 2.5 Crediting Payments; Clearance Charge .......... 25
   - 2.6 Designated Account .......... 25
   - 2.7 Statements of Obligations .......... 25
   - 2.8 Fees. .......... 25
   - 2.9 Borrower Representative; Assumptions .......... 26
3. CONDITIONS; TERM OF AGREEMENT .......... 26
   - 3.1 Conditions Precedent to the Effective Date .......... 26
   - 3.2 Conditions Precedent to All Advances .......... 27
   - 3.3 Maturity .......... 29
   - 3.4 Effect of Maturity .......... 29
4. REPRESENTATIONS AND WARRANTIES .......... 29
   - 4.1 Organization; Powers; Filing Information .......... 29
   - 4.2 Authorization; Enforceability .......... 30
   - 4.3 Permits; No Conflicts .......... 30
   - 4.4 Properties .......... 31
   - 4.5 Environmental and Labor Matters. .......... 31
   - 4.6 Compliance with Laws; Litigation; Commercial Tort Claims .......... 31
   - 4.7 No Fraudulent Transfer .......... 32

4.8 Indebtedness ..... 32
4.9 Taxes ..... 32
4.10 Approved Budget ..... 33
4.11 Insurance ..... 33
4.12 ERISA ..... 33
4.13 Foreign Assets Control Regulations ..... 33
4.14 Federal Reserve Regulations; Investment Company Act ..... 34
4.15 Anti-Corruption Laws and Sanctions ..... 34
4.16 Financial Condition; No Material Adverse Change ..... 34
4.17 Material Contracts ..... 34
4.18 Select Bankruptcy Matters ..... 35
4.19 No Default ..... 35
4.20 Disclosure ..... 35

5. AFFIRMATIVE COVENANTS ..... 35
5.1 Notice of Certain Events ..... 35
5.2 Reporting; Budget; Conference Calls and Bankruptcy Matters. ..... 36
5.3 Existence ..... 37
5.4 Maintenance of Properties; Permits ..... 37
5.5 Taxes ..... 37
5.6 Insurance ..... 37
5.7 Inspection ..... 38
5.8 Environmental ..... 38
5.9 Compliance with Laws ..... 39
5.10 Disclosure Updates ..... 39
5.11 Approved Budget ..... 39
5.12 Professional Fee Account ..... 39
5.13 Deposit Account Control Agreements; Further Assurances ..... 40
5.14 Material Contracts; Sale Offers ..... 40
5.15 Supplement to Commercial Torts Schedule ..... 40
5.16 Citizenship ..... **Error! Bookmark not defined.**
5.17 Subsequent Proceedings ..... 40

6. NEGATIVE COVENANTS ..... 41
6.1 Indebtedness ..... 41

6.2 Liens....................................................................................................43
6.3 Restrictions on Fundamental Changes....................................................43
6.4 Disposal of Assets....................................................................................43
6.5 Change Name...........................................................................................43
6.6 Nature of Business ...................................................................................43
6.7 Material Leases or Contracts; Amendments ............................................43
6.8 Change of Control....................................................................................43
6.9 Accounting Methods................................................................................44
6.10 Transactions with Affiliates.....................................................................44
6.11 Use of Advances ......................................................................................44
6.12 Limitation on Capital Expenditures.........................................................44
6.13 Chapter 11 Cases......................................................................................44
6.14 Certain Transactions ................................................................................44
6.15 Acquisitions, Loans, or Investments........................................................44
6.16 Payments on Indebtedness .......................................................................46
6.17 Distributions or Redemptions ..................................................................46
6.18 Formation of Subsidiaries........................................................................46

7. GUARANTY ...................................................................................................46
7.1 Guaranty...................................................................................................46
7.2 Unconditional Obligations.......................................................................46
7.3 Reinstatement...........................................................................................48
7.4 Subrogation; Subordination .....................................................................48
7.5 Remedies..................................................................................................48
7.6 Continuing Guaranty................................................................................48
7.7 General Limitation on Guaranty Obligations ..........................................48
7.8 Release of Guarantors...............................................................................48
7.9 Right of Contribution................................................................................49

8. EVENTS OF DEFAULT..................................................................................49
8.1 Event of Default.......................................................................................49
8.2 Rights and Remedies................................................................................53
8.3 Application of Proceeds upon Event of Default .....................................54
8.4 Remedies Cumulative ..............................................................................54

9. COLLATERAL SECURITY .......... 55
9.1 Grant of Security Interest in the Collateral; Superpriority Claims .......... 55
9.2 Representations and Warranties in Connection with Security Interest .......... 55
9.3 Superpriority Nature of Obligations and Liens .......... 56
9.4 Power of Attorney .......... 56
9.5 Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral .......... 56
9.6 Filing of Financing Statements .......... 56
9.7 No Discharge; Survival of Claims .......... 57

10. WAIVERS; INDEMNIFICATION .......... 57
10.1 Demand; Protest .......... 57
10.2 Lender's Liability for Collateral .......... 57
10.3 Indemnification .......... 57

11. NOTICES .......... 58

12. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER .......... 59

13. AMENDMENTS; WAIVERS; SUCCESSORS .......... 60
13.1 Amendments and Waivers .......... 60
13.2 No Waivers; Cumulative Remedies .......... 60
13.3 Successors .......... 60

14. GENERAL PROVISIONS .......... 60
14.1 Effectiveness .......... 60
14.2 Section Headings .......... 61
14.3 Interpretation .......... 61
14.4 Severability of Provisions .......... 61
14.5 Debtor-Creditor Relationship .......... 61
14.6 Counterparts; Electronic Execution .......... 61
14.7 Revival and Reinstatement of Obligations .......... 61
14.8 Integration .......... 62

15. JOINT AND SEVERAL OBLIGATIONS ..... 62

16. ADDITIONAL LOAN PARTIES ..... 62

17. TREATMENT OF CERTAIN INFORMATION ..... 62

Exhibits

Exhibit A – Form of Compliance Certificate
Exhibit B – Approved Budget
Exhibit C – Reporting Requirements
Exhibit D – Form of Borrowing Notice
Exhibit E – DIP Term Sheet

Schedules

Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule B – Designated Account and Designated Account Bank
Schedule 4.1(b) – Loan Parties, Equity Ownership and UCC Filing Information
Schedule 4.1(c) – Organizational Chart
Schedule 4.3(a) – Permits
Schedule 4.4(a) – Liens
Schedule 4.6(b) – Litigations and Proceedings
Schedule 4.6(c) – Commercial Tort Claims
Schedule 4.8 – Indebtedness
Schedule 4.9 – Taxes
Schedule 4.11 – Insurance Policies
Schedule 4.17 – Material Contracts
Schedule 6.1 – Permitted Indebtedness

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN, GUARANTY, AND SECURITY AGREEMENT**

**THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN, GUARANTY, AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of June __, 2026 (the "Effective Date"), by and among RAGUSE FAMILY PARTNERSHIP, a Minnesota partnership ("RFP"), the other borrowers party hereto (together with RFP, collectively, jointly and severally, "Borrowers" and each, a "Borrower"), the guarantors from time to time party hereto (collectively, "Guarantors" and each, a "Guarantor," and together with Borrowers, jointly and severally, "Loan Parties" and each, a "Loan Party"), and EAST WEST BANK, a California state bank, as lender (together with its successors and assigns, "Lender"). Capitalized terms used, but not defined, in the preamble and recitals to this Agreement shall have the meanings ascribed to such terms in Section 1.1 hereof unless otherwise stated.

**WHEREAS**, on May 14, 2026 (the "Petition Date"), Borrowers and Guarantors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota (collectively with any appellate court having jurisdiction over the Chapter 11 Cases from time to time, the "Bankruptcy Court"), which (a) with respect to the Borrowers are being jointly administered under the lead Case No. 26-60308 filed by RFP, (b) with respect to Guarantors David Raguse and Susan Raguse are being administered under Case No. 26- 60312, and (c) with respect to Guarantor Truman Raguse is being administered under Case No. 26-60313 (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases");

**WHEREAS**, Borrowers and Guarantors remain in possession of their respective businesses and manage their respective properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrowers have requested that Lender provide a non-amortizing, super-priority senior secured term loan facility to Borrowers, pursuant to sections 105, 363, 364(c), and 364(d) of the Bankruptcy Code, in a total aggregate principal amount of up to twelve million five hundred thousand Dollars ($12,500,000), consisting of (a) eight million Dollars ($8,000,000) (the "Interim Term Loan"), which was previously made available to, and drawn by, Borrowers pursuant to the Interim Order, and (b) the remaining balance of the DIP Commitments upon entry of the Final Order (the "Delayed Draw Term Loan") and subject to the terms and conditions hereof and in the other Loan Documents;

**WHEREAS**, Lender has indicated its willingness to fund the Loans to Borrowers on the terms and conditions set forth herein and in the other Loan Documents and in accordance with sections 105, 363, 364(c), and 364(d) of the Bankruptcy Code, so long as all of the Obligations are
(a) secured by, *inter alia*, (i) first priority senior secured Liens (subject to only the Carve-Out) on the DIP Collateral that is Unencumbered Property, (ii) first priority, priming, senior secured Liens in 2026 Crops and Cattle, and (iii) certain other Liens granted by Borrowers and other Loan Parties, in each case, as provided herein and in the other Loan Documents, including the DIP Orders, and (b) given superpriority status as provided in the DIP Orders, and each Loan Party has agreed, *inter alia*, to grant the Liens as set forth in this Agreement and in the other Loan Documents and that

Lender shall have Superpriority Claims in the Chapter 11 Cases for the repayment of the Obligations pursuant to the DIP Orders; and

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION

1.1 **Definitions**. As used in this Agreement, the following terms shall have the meanings set forth below:

"2026 Crops and Cattle" means the Loan Parties' crops growing, grown or to be grown; all harvested crops and all processed crops, whether or not produced by the Loan Parties either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral.

"Acceptable Plan" means a plan of reorganization or liquidation, in form and substance acceptable to Lender, for any or all of the Chapter 11 Cases that is either (a) approved by Lender in its discretion before same is filed with the Bankruptcy Court, or (b) provides for (i) Payment in Full, through sources acceptable to Lender in its discretion, in exchange for full discharge thereof, on or prior to the effective date of such plan as a condition to the effectiveness thereof, and (ii) full releases and indemnification for Lender to the maximum extent permitted by applicable law.

"Acceptable Sale" means a Sale of all or substantially all of Borrowers' assets pursuant to section 363 of the Bankruptcy Code, in accordance with a Sale Order, or otherwise where either (a) the Sale, by itself or with one or more related transactions, (i) provides for Payment in Full; (ii) each purchaser has demonstrated that it has (A) cash or cash equivalents in the amount of the purchase price set forth in any purchase agreement or other applicable transaction document(s), (B) a signed commitment to lend, acceptable to Lender in its discretion, from a recognized lender in the amount of such purchase price, or (C) a combination thereof, necessary to consummate any purchase agreement or other applicable transaction document(s); and (iii) the closing of the Sales shall occur on or prior to the Maturity Date; or (b) Lender provides its prior written consent to such Sale before same is approved by the Bankruptcy Court, which consent cannot unreasonably be withheld.

"Additional Documents" has the meaning set forth in Section 5.13(b).

"Advance" has the meaning set forth in Section 2.1.

"Adverse Action" has the meaning set forth in Section 8.1(x).

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a manager, director, or officer (i) of such Person, (ii) of any Subsidiary of such

Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Effective Date) of ten percent (10%) or more of any class of the outstanding Voting Equity Interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Loan Parties or any of their respective Subsidiaries from time to time concerning or relating to bribery or corruption.

"Approved Budget" means, as applicable, (a) the initial budget, prepared by Borrowers, for a 13-week period commencing on the Petition Date that sets forth in reasonable detail all of Borrowers' projected (i) Cash Receipts, (ii) Cash Operating Disbursements, and (iii) non-operating bankruptcy-related cash disbursements on a weekly basis, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance acceptable to Lender, and is attached hereto as Exhibit B and (b) an amended or otherwise modified budget adopted with the written consent of Lender in its sole discretion; provided that the total amount of Loans provided pursuant to such amended Approved Budget shall not exceed the total amount of the Commitments authorized under the this Agreement.

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from the Loan Parties to Lender.

"Avoidance Action Assets" has the meaning set forth in the Final Order.

"Avoidance Actions" has the meaning set forth in the Final Order.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Borrower Representative" has the meaning set forth in Section 2.9.

"Borrowers" has the meaning set forth in the preamble to this Agreement.

"Borrowing Notice" has the meaning set forth in Section 2.2.

"Budget Variance" has the meaning set forth in Section 5.2(c).

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve-Out" has the meaning set forth in the Final Order.

"Carve-Out Account" has the meaning set forth in the Final Order.

"Carve-Out Advance" has the meaning set forth in Section 2.1(b).

"Carve-Out Cap" has the meaning set forth in the Final Order.

"Carve-Out Trigger Notice" has the meaning set forth in the Final Order.

"Cash Collateral" has the meaning set forth in the Final Order.

"Cash Operating Disbursements" means cash operating disbursements of Borrowers.

"Cash Receipts" means the cash receipts of Borrowers.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party of any casualty insurance proceeds or condemnation awards in respect of any equipment, fixed assets, or real property (including any improvements thereon) to replace, restore or repair, or compensate for the loss of, such equipment, fixed assets, or real property.

"Cause of Action" means any action, cause of action, claim, counter-claim, cross-claim, defense, account, objection, challenge, offset, setoff, demand, liability, responsibility, dispute, remedy, indebtedness, obligation, guaranty, right, interest, indemnity, assertion, allegation, suit, controversy, proceeding, loss, damage, injury, reimbursement obligation, attorneys' fees, costs, expenses or judgments of every type, whether known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, whether assertable directly or derivatively, including, without limitation, all legal and equitable theories of recovery, arising under the Bankruptcy Code or applicable non-bankruptcy law, whether local, state of federal U.S. or foreign common law, statute, law, rule, regulation, or by contract, of every nature or description whatsoever.

"Change of Control" means except with respect to the consummation of an Acceptable Plan or an Acceptable Sale, the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (a) the beneficial ownership, directly or indirectly, of 50% or more of the Voting

Equity Interests of any Loan Party or (b) all or substantially all of the assets of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, except as permitted in this Agreement.

"Chapter 11 Case" and "Chapter 11 Cases" have the meanings set forth in the recitals to this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means, collectively, (a) all of the "DIP Collateral" as defined in the DIP Orders (including, without limitation, the 2026 Crops and Cattle) and all proceeds thereof, and (b) each other Loan Party's right, title, and interest in, to and under all of such Loan Party's (and, as applicable, its estate's) assets and property, whether tangible, intangible, real, personal or mixed, whether now owned or existing or hereafter acquired and wherever located, whether arising before or after the Petition Date, including, without limitation, the following: all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods (including, without limitation, 2026 Crops and Cattle), vehicles, inventory, furniture, fixtures, documents, commercial tort claims, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable), limited liability company interests, and investment property (including, without limitation, all of the issued and outstanding capital stock of each such Loan Party's current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by such Loan Party, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the UCC).

"Commitment Fee" means the fee equal to two percent (2.00%) of the aggregate amount of the Commitments (*i.e.*, $12,500,000), which fee was fully earned, non-refundable, and allowed upon entry of the Interim Order and indefeasibly paid in full in cash out of the proceeds of the Interim Term Loan pursuant to the Interim Order.

"Commitments" means the commitments of Lender (including the Interim Term Loan Commitment and the Delayed Draw Term Loan Commitment) to fund the Loans hereunder. The aggregate amount of Lender's Commitments is the principal amount of up to twelve million five-hundred thousand Dollars ($12,500,000), subject to the terms of this Agreement and the other Loan Documents.

“Committee” means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

“Compliance Certificate” means a certificate substantially in the form of Exhibit A delivered by the Authorized Person of the Borrower Representative to Lender.

“Daily Balance” means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

“Debtor” or “Debtors” means each debtor or all debtors, as applicable, in the Chapter 11 Cases in their respective capacities as a debtor and debtor in possession.

“Default” means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

“Default Rate” has the meaning set forth in Section 2.4(b).

“Delayed Draw Term Loan” has the meaning set forth in the recitals to this Agreement.

“Delayed Draw Term Loan Commitment” means the commitment of Lender to fund, after entry of the Final Order, Advances under the Delayed Draw Term Loan in an aggregate principal amount of four million five-hundred thousand Dollars ($4,500,000), subject to the terms of this Agreement and the other Loan Documents.

“Deposit Account Control Agreement” means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to Borrowers and Lender that (a) is entered into among Lender, the financial institution or other person at which such Deposit Account is maintained, and such Borrower maintaining such Deposit Account, and (b) is effective for Lender to obtain “control” (within the meaning of Articles 8 and 9 of the UCC) of such Deposit Account.

“Designated Account” means the Deposit Account of Borrowers at the Designated Account Bank identified on Schedule B, which shall be an account existing within Borrowers’ cash-management system as of the Petition Date.

“Designated Account Bank” has the meaning set forth in Schedule B.

“DIP Orders” means the Interim Order and the Final Order, as applicable.

“DIP Termination Event” has the meaning set forth in the Final Order.

“DIP Term Sheet” means that certain term sheet, together with the exhibits and schedules thereto, attached as an exhibit to the *Motion for Interim and Final Orders (I) Granting Expedited Hearing, (II) Approving Postpetition Financing, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Authorizing Use of Cash Collateral, and (V) Modifying Automatic Stay, and (VI) Granting Related Relief* filed at Docket No. 3 in the Chapter 11 Cases. For the Parties’ convenience, a true and correct copy of the DIP Term Sheet is attached hereto as Exhibit E.

"Dollars" or "$" means United States dollars.

"Effective Date" has the meaning set forth in the preamble to this Agreement.

"Environmental Action" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial, or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral, (b) from adjoining properties or businesses of any real properties that constitute Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"Environmental Law" means any applicable federal, state, provincial, foreign, or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree, or judgment, in each case, to the extent binding on any Borrower, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"Environmental Liabilities" means all liabilities, monetary obligations, losses, damages, costs, and expenses (including all reasonable fees, disbursements, and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"Environmental Lien" means any Lien in favor of any Governmental Authority for Environmental Liabilities.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under section 414(b) or (c) of the Code or section 4001(14) of ERISA or, solely for purposes of section 302 of ERISA and section 412 of the Code, is treated as a single employer under section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30 day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in section 412 of the Code or section 302 of ERISA), whether or not waived; (c) the filing pursuant to section 412(c) of the Code or section 302(c) of ERISA of an application for a waiver of the

minimum funding standard with respect to any Plan; (d) the incurrence by a Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by a Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by a Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal of a Loan Party or any of its ERISA Affiliates from any Plan or Multiemployer Plan; or (g) the receipt by a Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition upon a Loan Party or any of its ERISA Affiliates of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning set forth in Section 8.1.

"Excluded Accounts" means, as to any Loan Party, all deposit accounts or securities accounts that are used solely to hold cash, cash equivalents and other assets comprised solely of Trust Funds.

"Excluded Property" means the following property of any Loan Party, whether now owned or hereafter acquired or arising (a) any governmental licenses or state, foreign or local franchises, charters and authorizations that prohibits the creation of a Lien thereon, but only, with respect to such prohibition, to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the DIP Orders, any other order of the Bankruptcy Court, the UCC or any other legal requirement; (b) intent-to-use trademark applications prior to the filing of a "statement of use" with respect thereto, to the extent and for so long as creation by any Loan Party of a security interest therein would result in the abandonment, invalidation or unenforceability thereof; (c) Trust Funds and any Excluded Accounts; and (d) pledges and security interests prohibited by applicable law, rule, or regulation which is not overridden by the DIP Orders or any other order of the Bankruptcy Court; provided that notwithstanding anything contained above to the contrary, Excluded Property shall not include the proceeds of such Excluded Property; provided, further, that at such time as any of the foregoing property (or the proceeds thereof) no longer constitutes Excluded Property, such property and the proceeds thereof shall immediately and automatically constitute Collateral and a Lien on and security interest in and to all of the right, title and interest of the applicable Loan Party in, to and under such property shall immediately attach thereto as provided herein.

"Existing Liens" has the meaning set forth in the Final Order.

"Exit Fee" means the fee equal to five percent (5.00%) of the aggregate amount of the Commitments (*i.e.*, $12,500,000), which was fully earned, non-refundable, and allowed upon the entry of the Interim Order, and will be payable in accordance with this Agreement.

"Extension Order" has the meaning set forth in Section 5.16.

"Facility" has the meaning set forth in the recitals to this Agreement.

"Fees" means all fees payable to Lender under this Agreement, any Loan Document, or the DIP Orders, including, but not limited to, the Commitment Fee, the Work Fee, and the Exit Fee.

"Final Order" means the *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* (including all exhibits thereto) entered at Docket No. ___ in each of the Chapter 11 Cases.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, as in effect from time to time.

"Governmental Approvals" has the meaning set forth in Section 4.3(b).

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guaranteed Obligations" has the meaning set forth in Section 7.1.

"Guarantor" or "Guarantors" have the meanings set forth in the preamble to this Agreement.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity"; (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources; (c) any flammable substances or explosives or any radioactive materials; and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations; (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products; (c) all obligations as a lessee under Capital Leases; (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed; (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the Ordinary Course of Business and repayable in accordance with customary trade practices); (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products; or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other

Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning set forth in Section 10.3.

"Indemnified Person" has the meaning set forth in Section 10.3.

"Information" has the meaning set forth in Section 17.

"Initial Advance" means the funding of the first Advance under the Facility (*i.e.*, the Interim Term Loan pursuant to the Interim Order).

"Interim Order" means the *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Claims and Use Cash Collateral, (II) Modifying the Automatic Stay, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (including all exhibits thereto) entered at Docket No. 43 in the Borrowers' Chapter 11 Cases.

"Interim Term Loan" has the meaning set forth in the recitals to this Agreement.

"Interim Term Loan Commitment" means the commitment of Lender to fund an Advance under the Interim Term Loan in an aggregate principal amount of eight million Dollars ($8,000,000), subject to the terms of this Agreement and the other Loan Documents.

"Junior Collateral" means the "DIP Junior Collateral" as that term is defined in the Final Order.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means all of its reasonable and documented out-of-pocket costs and expenses (a) incurred in connection with the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, the administration of the transactions contemplated hereby and thereby, including the fees and disbursements and other charges of Norton Rose Fulbright US LLP; and (b) incurred in connection with the protection or enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in this clause (b) (including all such costs and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning Loan Parties (including the Chapter 11 Cases and the administration thereof) or in exercising rights or remedies under the foregoing documents), including the documented fees and disbursements of Norton Rose Fulbright US LLP, as counsel to Lender and, if necessary, a single firm of local counsel per material jurisdiction as may reasonably be necessary.

"Lender Related Person" means Lender, together with its officers, directors, members, managers, shareholders, employees, attorneys, advisors, professionals, consultants, representatives, and agents.

"Lender's Liens" means the Liens granted by the Loan Parties in and to the Collateral in favor of Lender.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Account" means the loan accounts maintained by Lender in the name of the Borrower Representative (on behalf of itself and the other Borrowers) in which shall be recorded the date and amount of each Loan made by Lender and the amount of each payment in respect thereof.

"Loan Documents" means this Agreement, the DIP Orders, Assignments of Insurances, the Additional Documents, and any other notes, account control agreements, financing statements, or security agreements executed by the Loan Parties (or any of them) in connection with this Agreement in favor of Lender, any other agreement entered into, now or in the future, by the Loan Parties (or any of them) and Lender in connection with this Agreement and designated a Loan Document, and all amendments, modifications, renewals, substitutions, and replacements of any of the foregoing; provided that, for the avoidance of doubt, all Loan Documents shall be in form and substance acceptable to Lender and the Loan Parties party thereto.

"Loans" has the meaning set forth in the recitals to this Agreement.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Change" means, other than the commencement of the Chapter 11 Cases and the sale transactions contemplated by the Parties, the occurrence or existence of any event, condition, contingency, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any Loan Document.

"Material Contract" means each contract or agreement to which any Loan Party is party as to which the breach, nonperformance, cancellation, termination, loss, expiration, or failure to renew by any party thereto that has resulted in, or would reasonably be expected to result in, a Material Adverse Change.

"Maturity Date" means the earliest of (a) March 31, 2027; (b) the effective date of any chapter 11 plan with respect to Borrowers; (c) the consummation of any sale or other disposition of all or substantially all of the assets of Borrowers pursuant to section 363 of the Bankruptcy Code; (d) the date of the acceleration of the Loans and the termination of the Commitments following the occurrence and during the continuation of an Event of Default in accordance with this Agreement and/or the other Loan Documents; and (e) dismissal of any Chapter 11 Case or conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case.

"Measuring Period" has the meaning set forth in Section 5.2(c).

"Multiemployer Plan" means a multiemployer plan as defined in section 4001(a)(3) of ERISA.

"Net Cash Proceeds" means with respect to any sale or disposition of the Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) solely as to the disposition of Junior Collateral, the outstanding obligations, if any, to the extent such obligations are secured by valid, perfected, non-avoidable Liens in favor of the applicable secured party that are senior to the Lender's Liens; (b) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition; and (c) Taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction.

"Obligations" means all loans, including, without limitation, the Loans, the Advances, debts, principal, interest, contingent reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations (including indemnification obligations), Fees (including the Commitment Fee, the Work Fee, and the Exit Fee), Lender Expenses, premiums, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute, or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants, and duties of any kind and description owing by the Loan Parties (or any of them) to Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments, or agreements and, in each case, irrespective of whether for the payment of money, of the Loan Parties (or any of them) to Lender under the Loan Documents and the Final Order, and including all interest not paid when due and all other expenses or other amounts that the Loan Parties (or any of them) are required to pay or reimburse by the Loan Documents, by law, or otherwise in connection with the Loan Documents including, without limitation, in connection with the collection or enforcement of or preservation of rights of Lender under the Loan Documents.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed as a result of the filing of the Chapter 11 Cases.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; and (d) any agreement between a Loan Party and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of such Loan Party.

"Payment Account" means the Deposit Account of Lender identified on Schedule A-2, or otherwise identified to the Borrower Representative in writing by Lender.

"Payment in Full" and, as applicable, "Paid in Full," means the irrevocable and indefeasible payment in full in cash of all Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

"Permits" means any license, lease, power, permit, franchise, certificate, authorization, or approval issued by a Governmental Authority.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Liens" means (a) all Liens created by the Loan Documents and the Final Order (including the Carve-Out); (b) the Permitted Senior Liens, and (c) the following liens, which, in the aggregate, shall not exceed one-hundred-fifty thousand Dollars ($100,000):

(i) Liens for Taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP as in effect from time to time and any other Taxes to the extent not required to be paid not required to be paid pursuant to Section 5.5;

(ii) statutory or common law Liens of landlords and liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other like liens imposed by law or pursuant to customary reservations or retentions of title arising in the Ordinary Course of Business;

(iii) (A) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and

(B) pledges and deposits of cash securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party;

(iv) liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment, the consignment or bailment of goods to a Borrower on equipment

of the Loan Parties granted in the Ordinary Course of Business to a client or supplier at which such equipment is located;

(v) non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business that does not materially interfere with the ordinary conduct of the business of the Loan Parties, individually, or taken as a whole;

(vi) normal and customary rights relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions and securities intermediaries;

(vii) (A) any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the Ordinary Course of Business of the Loan Parties, individually, or taken as a whole, (B) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by any Governmental Authority, statutory or regulatory authority, developer, landlord or other third party on property over which a Loan Party has easement rights or on any leased property with respect to which a Loan Party or its Subsidiary is the tenant and subordination or similar arrangements relating thereto and (C) any condemnation or eminent domain proceedings affecting any real property;

(viii) Liens securing Indebtedness incurred pursuant to Section 6.1(vii); provided that (A) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, replacements thereof and additions and accessions to such property and the proceeds thereof and (B) such Liens do not at any time extend to or cover any assets (except for additions and accessions to such assets and the proceeds thereof) other than the assets subject to, or acquired, constructed, repaired or improved with the proceeds of such Indebtedness; provided that, in each case, individual financings provided by one lender may be cross collateralized to other financings provided by such lender or its Affiliates;

(ix) any other interest or title (and any encumbrances on such interest or title) of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or subleases (other than capitalized leases) or licenses or sublicenses, in each case entered into by a Loan Party in the Ordinary Course of Business;

(x) pledges and deposits to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the Ordinary Course of Business; and

(xi) liens or rights of setoff against credit balances of the Loan Parties with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to such Loan Party in the Ordinary Course of Business.

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), Taxes (other than payroll taxes or Taxes that are the subject of a United States federal tax lien), or rental payment, provided, that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required

under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith, and (c) Lender is satisfied in its discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of Lender's Liens or the Obligations.

"Permitted Senior Liens" means, solely with respect to the Junior Collateral, any valid, perfected, non-avoidable Liens securing the Existing Secured Party Obligations pursuant to the Existing Secured Facility Documents as of the Petition Date.

"Permitted Transfers" means (a) dispositions of inventory and other assets in the Ordinary Course of Business; (b) sale of worn-out or obsolete Equipment that is, in the reasonable judgment of the Loan Parties, no longer economically practicable to maintain or useful in the Ordinary Course of Business; (c) dispositions of accounts receivable in connection with the collection or compromise thereof in the Ordinary Course of Business; (d) non-exclusive licenses and sublicenses of intellectual property and other assets entered into in the Ordinary Course of Business; (e) the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the Loan Documents; (f) the abandonment, transfer, cancellation or lapse of immaterial intellectual property that is, no longer economically practicable to maintain or useful in the Ordinary Course of Business; (g) leases and subleases of real or personal property in the Ordinary Course of Business; (h) dispositions and investments permitted pursuant to Section 6.15; (i) dispositions of property that constitute a Casualty Event;
(j) the granting of Permitted Liens, subject to and in accordance with the Loan Documents; and (k) any other dispositions expressly set forth in the Approved Budget (including any Permitted Variances).

"Permitted Variances" means a Budget Variance of no greater than fifteen percent (15%).

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or section 412 of the Code or section 302 of ERISA, and in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under section 4069 of ERISA be deemed to be) an "employer" as defined in section 3(5) of ERISA.

"Plan Asset Regulations" means 29 CFR § 2510.3-101 *et seq.*, as modified by section 3(42) of ERISA, as amended.

"Post-Carve-Out Trigger Notice Cap" has the meaning set forth in the Final Order.

"Proceeding" shall mean, with respect to any Person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such Person or its property or creditors in such capacity; (b) proceeding for any liquidation, dissolution or other winding-up of such Person, voluntary or involuntary, whether or not involving

insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise; (c) assignment for the benefit of creditors of such Person; or (d) other marshalling of the assets of such Person.

"Professional Fees" has the meaning set forth in the Final Order.

"Professional Persons" has the meaning set forth in the Final Order.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Regulation T" means Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Released Parties" means Lender and its respective Representatives that received releases pursuant to the Final Order.

"Remedial Action" means one or more actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Remedies Notice" has the meaning set forth in the Final Order.

"Representatives" means, with respect to a Person, such Person's current, former and future affiliates, subsidiaries, funds or managed accounts, officers, directors, managers, members, equity holders, partners, principals, employees, representatives, agents, attorneys, advisors, consultants and other professionals, and the predecessors in interest, successors and assigns of each of the foregoing.

"Required Lien Priority" means, with respect to any Lien on the Collateral in favor of Lender, the priority set forth in the Final Order, as applicable.

"Restricted Use" means the use of Loans, Collateral, or the proceeds of the foregoing:

(a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding:

(i) against Lender or its predecessors-in-interest, successors, assigns, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the

foregoing in respect of the Obligations, Lender's Liens, Superpriority Claims, or any other term, condition, or aspect of the Facility; or

(ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the Obligations and/or the liens, claims, rights, or security interests granted under the DIP Orders, or the Loan Documents, including, in each case, without limitation, for lender liability or pursuant to sections 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;

(b) to prevent, hinder, or otherwise delay Lender's enforcement or realization on, as applicable, the Obligations, the Collateral, and the liens, claims, and rights granted it under the DIP Orders, provided, however, that this shall not apply to a challenge to whether an Event of Default has occurred or is continuing in accordance with the DIP Orders and/or the propriety of Lender's termination and/or acceleration of the Obligations or calculation of the amounts owed thereunder;

(c) to use or seek to use the Collateral or sell or otherwise dispose of the Collateral without the consent of Lender;

(d) to seek to modify any of the rights and remedies granted to Lender under the DIP Orders (other than with the consents contemplated thereunder), the Loan Documents, or applicable law; or

(e) to apply to the Bankruptcy Court or other court for authority to approve claims or grant liens (other than the Carve-Out) or security interests in the Collateral or any portion thereof that are senior to, or on parity with, Lender's Liens or the Superpriority Claims, unless permitted under the Loan Documents or all Obligations and claims granted to Lender under the DIP Orders have been refinanced with Lender's consent or have been Paid in Full in cash or as otherwise agreed to in writing by Lender in its sole discretion.

"RFP" has the meaning set forth in the preamble to this Agreement.

"Sale" means one or more sale(s) or transaction(s) that, when taken together, result in the sale of all or substantially all of the assets of any Loan Party to one or more Persons, including Lender or any of its Affiliates, pursuant to an Acceptable Sale or pursuant to an Acceptable Plan.

"Sale Order" means each order approving an Acceptable Sale or any other sale of a Borrower's assets pursuant to section 363 of the Bankruptcy Code or otherwise, which order shall be in form and substance acceptable to Lender.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other

relevant sanctions authority; (b) any Person operating, organized or resident in a Sanctioned Country; (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b); or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Securities Collateral" shall have the meaning assigned to such term in the applicable Loan Documents.

"Security Documents" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, Deposit Account Control Agreements, documents or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement, the DIP Orders, or any other Loan Document, as same may be amended, modified, restated or supplemented from time to time.

"Senior Collateral" means the "DIP Senior Collateral" as that term is defined in the Final Order.

"Site Lease" means a lease pursuant to which each location operated by a Loan Party or a Subsidiary of a Loan Party has been leased to such Person.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claims" means the "DIP Superpriority Claims" as that term is defined in the Final Order.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Testing Date" means the third (3rd) week following the Initial Advance and every other week thereafter, for the period beginning as of the first day of the first full week following the Initial Advance and ending the last day of the week prior to the week on which compliance is measured.

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions and accommodations, and the use of the proceeds thereof; (b) the commencement of the Chapter 11 Cases; and (c) the payment of all fees and expenses in connection with consummation of any and all transactions contemplated, and all performance, under the Loan Documents.

"Transferred Guarantor" has the meaning set forth in Section 7.8.

"Trust Funds" means cash, cash equivalents and other assets comprised solely of (a) funds used for payroll and payroll taxes and other employee benefit payments to any pledgor's officers, directors, employees or consultants, and (b) all Taxes required to be collected, remitted or withheld (including, without limitation, federal, state and foreign withholding taxes), including, without limitation, the employer's share thereof.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"Unencumbered Property" means any property that is not subject to a valid, perfected, non-avoidable lien or security interest (including any such lien or security interest that is perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

"United States" means the United States of America.

"U.S. Trustee" means the Office of the United States Trustee for the Eastern District of Louisiana.

"Variance Report" has the meaning set forth in Section 5.2(c).

"Voidable Transfer" has the meaning set forth in Section 14.7.

"Voting Equity Interests" means, with respect to any Person, the outstanding Equity Interests of a Person having the power, directly or indirectly, to designate the board of directors (or other similar governing body) of such Person.

"Waiting Period" has the meaning set forth in the Final Order.

"Work Fee" means the fee in the amount of two-hundred fifty thousand Dollars ($250,000), which fee was fully earned and non-refundable, and approved on a final basis, upon entry of the Interim Order and such fee was indefeasibly paid in full in cash by Borrowers out of the proceeds of the Interim Term Loan pursuant to the Interim Order.

1.2 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided that, if Borrowers notify Lender that Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after

the Effective Date in GAAP or in the application thereof on the operation of such provision (or if Lender notifies Borrowers that Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then Lender and Borrowers hereby agree that they will negotiate, in good faith, amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of Lender and Borrowers after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendment has been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change becomes effective. When used herein, the term “financial statements” shall include the notes and schedules thereto. Whenever the term “Borrower” is used in respect of a financial covenant or a related definition, it shall be understood to mean “Borrower” on a consolidated basis, unless the context requires otherwise.

1.3 **UCC**. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4 **Construction**. Unless the context of this Agreement or the Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms “includes” and “including” are not limiting, and the term “or” has, except as otherwise indicated, the inclusive meaning represented by the phrase “and/or.” The words “hereof,” “herein,” “hereby,” “hereunder,” and similar terms in this Agreement or the Loan Documents refer to this Agreement or such other Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other Loan Document, as the case may be. “Section,” “subsection,” “clause,” “Schedule,” and “Exhibit” references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words “asset” and “property” shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any provision in this Agreement or any other Loan Document that contemplates or otherwise permits Lender consent or approval shall require prior written consent that expressly identifies the matter for which Lender consent or approval is sought or required and no such consent or approval shall be implied from any other action, inaction, or acquiescence of Lender. Any reference herein to any Person shall be construed to include such Person’s successors and permitted assigns. Any requirement of a writing contained herein or in any Loan Document shall be satisfied by the transmission of a Record.

1.5 **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.6 **<u>Timing of Payment or Performance</u>**. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on (or before) a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

## 2. LOAN AND TERMS OF PAYMENT

2.1 **<u>Agreement to Lend; Delayed Draw; and Loan Documents</u>**.

(a) Lender funded the Interim Term Loan pursuant to the Interim Order on May [•], 2026 and, upon entry of the Final Order and subject to the terms and conditions of the DIP Orders, this Agreement, and the satisfaction or waiver of the conditions precedent in <u>Sections 3.1</u> and <u>3.2</u>, Lender agrees to fund under the Delayed Draw Term Loan (each funding under the Facility, the DIP Term Sheet, this Agreement, and the Loan Documents, an "<u>Advance</u>" and collectively, the "<u>Advances</u>") to the Borrower Representative in one or more Advances the aggregate amount up to the Delayed Draw Term Loan Commitment; <u>provided</u> that in no event shall the outstanding Loans exceed the Commitment. Each Advance shall be made in an aggregate minimum amount of two million Dollars ($2,000,000), and multiples thereof, upon three (3) business days' written notice (or such lesser notice as agreed by Lender in its sole discretion), up to the aggregate amount of the undrawn Delayed Draw Term Loan Commitment at any time prior to three (3) Business Days before the Maturity Date.

(b) Notwithstanding <u>clause (a)</u> above, so long as there is availability under the Delayed Draw Term Loan Commitment, the Borrower Representative shall be permitted to request one or more Advances (or portions thereof), and Lender shall fund any such Advance (or portion thereof) (each, a "<u>Carve-Out Advance</u>"), in an aggregate amount of up to the Carve-Out Cap, less any amounts maintained in the Professional Fee Account, all in accordance with the Final Order. Any Carve-Out Trigger Notice shall be deemed a consent by Lender to Borrowers depositing Cash Collateral or proceeds of the Carve-Out Advances into such account in an amount not to exceed the Carve-Out Cap less the existing balance in such account, if any; <u>provided</u>, <u>however</u>, that notwithstanding Lender's agreement to fund any Carve-Out Advance in accordance with the terms of this Agreement and the Final Order, nothing herein shall create any obligation on the part of Lender to satisfy any allowed Professional Fees, which allowed Professional Fees shall remain the sole obligation of Borrowers, and Lender shall not be obligated to lend more than the Commitments under any circumstances.

(c) Each Advance hereunder is subject to the satisfaction or waiver of the conditions precedent in the Final Order and in <u>Sections 3.1</u> and <u>3.2</u>, as applicable. Each Advance shall permanently decrease the Commitments, and any Loans, or portion thereof, that are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(d) The Loans shall be secured by the Collateral as set forth in the Final Order, this Agreement, and the other Loan Documents. For the avoidance of doubt, on the Effective Date, and subject to entry of the Final Order, the Interim Term Loan shall become subject to the terms and conditions of this Agreement and the other Loan Documents.

(e) The Loan Parties promise to irrevocably and indefeasibly pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full in cash (including, as applicable, the Commitment Fee, the Exit Fee, and any other Fees) on or before the Maturity Date.

2.2 **Borrowing Procedures**. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as Exhibit D (each such written request, a "Borrowing Notice") executed by an Authorized Person of the Borrower Representative, accompanied by a Compliance Certificate, and delivered to Lender no later than three (3) Business Days prior to the requested funding date in the case of each Advance (or such shorter period as Lender may permit in its sole discretion), but in no event later than three (3) Business Days before the Maturity Date; provided that, (a) the Borrower Representative shall submit such requests only after entry of the Final Order, and (b) the aggregate amount of all such Advances, including any Carve-Out Advance, shall not exceed the Commitments. Upon satisfaction or waiver by Lender (in its sole discretion) of the conditions precedent set forth herein, Lender shall fund the Advance to the Borrower Representative on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

2.3 **Payments; Reductions of the Commitments; Prepayments**.

(a) Payments by Borrowers. Except as otherwise expressly provided herein, all payments by Borrowers shall be made to the Payment Account for the account of Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Prevailing Eastern time) on the dates set forth in this Section 2.3. Any payment received by Lender later than 4:00 p.m. (Prevailing Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b) Application of Payments and Proceeds. Subject to Section 8.3, all payments remitted to Lender and all proceeds of the Collateral received by Lender shall be applied as follows (unless otherwise directed by Lender):

(i) first, to pay any Lender Expenses (including costs and expenses) then owed to Lender or any Lender Related Person, or indemnities then due to Lender under the Loan Documents, until indefeasibly paid in full in cash;

(ii) second, to pay any Fees then due to Lender under the Loan Documents until Paid in Full;

(iii) third, to pay interest due in respect of the Loans until Paid in Full;

(iv) fourth, to pay the principal of all Loans until Paid in Full;

(v) fifth, to pay any other Obligations until Paid in Full; and

(vi) sixth, to Borrowers (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.3(b) and any other provision contained in any Loan Document (except for the DIP Orders), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.3(b) shall control and govern. Notwithstanding the foregoing, to the extent there is any conflict between any provisions of the Final Order and this Agreement or any Loan Document, the Final Order shall control and govern to the extent of such conflict.

(c) Optional Prepayments. Upon notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time without premium or penalty; provided, that (i) the aggregate principal amount being prepaid shall be an amount not less than one million Dollars ($1,000,000) (and multiples of five-hundred thousand Dollars ($500,000) in excess thereof) unless such lower amount being prepaid represents the balance outstanding under this Agreement; (ii) such prepayment includes the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment, and (iii) any such prepayments under this Section 2.3(c) shall be applied in the order set forth in Section 2.3(b).

(d) Mandatory Prepayments.

(i) **Dispositions**. Within one (1) Business Day of the date of receipt by any Loan Party or any of its Subsidiaries of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of Collateral (other than the disposition of Collateral in the Ordinary Course), such Loan Party shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee. Nothing contained in this Section 2.3(d)(i) shall permit the Loan Parties to sell any Collateral other than in accordance with Section 6.4. In no event shall any amount paid to Lender under this Section 2.3(d)(i) exceed the outstanding amount of the Obligations.

(ii) **Indebtedness**. Within one (1) Business Day of the date on which any Loan Party or any of its Subsidiaries receives proceeds of any Indebtedness (other than Permitted Indebtedness), such Loan Party shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.3(b) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee. The provisions of this Section 2.3(d)(ii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.4 **Interest Rates, Payments and Certain Calculations**.

(a) Interest Rate. Except as provided in Section 2.4(b), all Advances shall bear interest on the Daily Balance thereof at a rate equal to eleven percent (11.00%) per annum. For the purpose of calculating interest under this Section 2.4(a), the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(b) Default Rate. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.00%) plus the then-applicable interest rate (the "Default Rate") upon notice from Lender of its election to impose interest at the Default Rate. Any such notice may impose interest at the Default Rate retroactively to the date of the occurrence of the related Event of Default. For the purpose of calculating interest under this Section 2.4(b), the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder.

(c) Payment. Except to the extent provided to the contrary herein or as provided for in the Final Order, interest, all Fees payable hereunder or under any of the other Loan Documents, and all costs, and expenses payable hereunder or under any of the other Loan Document shall be due and payable in cash, in arrears, on the first (1st) Business Day of each month at any time that Obligations or the Loans are outstanding and shall be paid to the Payment Account. Borrowers hereby agree that Lender has all rights of setoff and bankers' lien provided by applicable law on account of any accounts maintained at Lender. Subject to the Final Order and without affecting Borrowers' continuing obligation to pay all Obligations hereunder when due, in the event that any amounts are due hereunder and remain unpaid when due (with any such failure constituting an Event of Default hereunder), Borrowers shall be deemed to have made a request for an Advance in such amount and Lender shall charge the Loan Account in an amount equal to the aggregate principal amount of such Advance and thereafter such Advance shall constitute Obligations hereunder and shall accrue interest at the rate then applicable to Obligations (including the Default Rate) until the Payment in Full of the Obligations. Subject to the applicable provisions of the DIP Orders, each Borrower shall pay any and all Lender Expenses promptly after written demand therefor by Lender or its counsel and each Borrower hereby agrees that all such Obligations shall survive Payment in Full of all other Obligations.

(d) Computation. All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e) Intent to Limit Charges to Maximum Lawful Rate. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Loan Parties and Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, the Loan Parties are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the

Loan Parties in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.5 **Crediting Payments; Clearance Charge**. The receipt of any payment item by Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Payment Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then the Loan Parties shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (Prevailing Eastern time). If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (Prevailing Eastern time) on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

2.6 **Designated Account**. Borrowers hereby agree to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrowers and made by Lender hereunder in such Designated Account.

2.7 **Statements of Obligations**. Lender shall maintain true, correct, and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Loan Parties to Lender, in which Lender will record in the Loan Account (a) the amount of all Advances made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from the Loan Parties to Lender under this Agreement, and (c) all amounts received by Lender under this Agreement from Borrowers.

2.8 **Fees**.

(a) Work Fee. Borrowers paid the Work Fee in full in cash on or about May [•], 2026 from the proceeds of the Initial Advance.

(b) Commitment Fee. Following the entry of the Interim Order, Borrowers paid to Lender the Commitment Fee in full in cash from the proceeds of the Initial Advance.

(c) Exit Fee. The Exit Fee shall be due and payable upon the earliest of (i) the Maturity Date, (ii) payment in full of the Loans, and (iii) on a *pro rata* basis for any voluntary prepayment of the Loans; provided, however, that, if the Maturity Date has occurred solely as a result of the occurrence and continuation of an Event of Default under this Agreement or any other Loan Document, then the Exit Fee shall not be payable until the Obligations have been accelerated by Lender. The Exit Fee shall be payable even if Borrowers do not request an Advance under the Delayed Draw Term Loan.

(d) Other Fees. The Loan Parties agree to pay to Lender such fees in the amounts and at the times separately agreed upon between the Loan Parties and Lender, including, without limitation, fees in respect of certain amendments, extensions, consents, waivers, and/or as otherwise agreed between the Parties.

Except as otherwise expressly set forth herein, in the DIP Orders, or in any of the other Loan Documents, the Fees payable to Lender under this Agreement or the other Loan Documents (including the DIP Orders) shall not be subject to proration and shall be allowed (on a final basis), non-refundable, and non-avoidable obligations of the Loan Parties and shall be paid by the Loan Parties in full in cash, or deducted from the applicable Advance, as the case may be.

2.9 **Borrower Representative; Assumptions**. As of the Effective Date, RFP (a) is hereby designated and appointed by each Loan Party as its representative and agent on its behalf (the "Borrower Representative") and (b) accepts such appointment as the Borrower Representative, in each case, for the purposes of issuing Borrowing Notices, delivering certificates including Compliance Certificates, giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants, but without relieving any other Loan Party of its joint and several obligations to pay and perform the Obligations) on behalf of any Loan Party or Loan Parties under the Loan Documents. Lender may regard any notice or other communication pursuant to any Loan Document from the Borrower Representative as a notice or communication from all Loan Parties. Each warranty, covenant, agreement, and undertaking made on behalf of a Borrower or other Loan Party by the Borrower Representative shall be deemed for all purposes to have been made by such Borrower or other Loan Party and shall be binding upon and enforceable against such Borrower and other Loan Party to the same extent as if the same had been made directly by such Borrower or Loan Party.

## 3. CONDITIONS; TERM OF AGREEMENT

3.1 **Conditions Precedent to the Effective Date**. The effectiveness of this Agreement and the agreements of Lender hereunder shall be subject to the satisfaction of the conditions set forth below (unless waived in writing by Lender in its sole discretion):

(a) The parties shall have executed and delivered this Agreement as a condition to the Effective Date and in connection with the transactions contemplated by this Agreement.

(b) Lender shall have received evidence acceptable to Lender that all UCC financing statements necessary, or, in the opinion of Lender, desirable to provide Lender, upon entry of the Final Order and as set forth therein, with valid, perfected (i) priming security interests in the Senior Collateral and (ii) junior security interests in the Junior Collateral, and (iii) other Liens granted by the Loan Parties under the Loan Documents have been filed or will be filed by Lender promptly upon the Effective Date.

(c) The Bankruptcy Court shall have entered the Final Order not later than June 11, 2026, in form and substance acceptable to Lender in its discretion and no order shall have been entered reversing, amending, staying, vacating, terminating or otherwise modifying the Final Order or any material provision thereof in any manner without Lender's prior written consent. The Loan Parties and Lender shall be entitled to rely in good faith upon the Final Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

(d) Lender shall have received copies of UCC searches.

(e) Lender shall have received from Borrowers an Approved Budget, acceptable to Lender in its sole discretion, attached hereto as Exhibit B.

(f) [Reserved].

(g) Each Borrower shall be a debtor and debtor in possession in the Chapter 11 Cases.

(h) All accrued and unpaid Lender Expenses for which invoices have been presented (and such invoices shall contain information only to the extent required by Paragraph 11 of the Final Order), required to be paid on or before the Effective Date, if any, shall have been paid or shall be paid with the proceeds of the Advance to occur on the Effective Date.

(i) The following statements shall be true and correct: (i) the representations and warranties of the Loan Parties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the Effective Date, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would immediately result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

3.2 **Conditions Precedent to All Advances**. In addition to the conditions set forth in Section 3.1 above, and subject to Section 2.1, Lender shall not be required to fund any Loans or fund any Advances unless and until all of the conditions set forth below shall have been satisfied or waived in writing by Lender in its sole discretion; provided that clauses (a) and (b) below must be satisfied as determined by Lender in its sole discretion for any Advances to be made under any circumstances (including a Carve-Out Advance):

(a) The DIP Orders shall have been entered by the Bankruptcy Court in the each of the Chapter 11 Cases and remain in full force and effect, and no DIP Order or any material provision thereof shall have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without Lender’s prior written consent in its sole discretion (other than an amendment or modification acceptable to Lender in its sole discretion).

(b) (i) No trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party’s business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than Borrowers exercising control over their assets, and (ii) no Person other than a Loan Party or Lender shall have been granted control over the Collateral by the Bankruptcy Court in any Chapter 11 Case.

(c) The representations and warranties of the Loan Parties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that

already are qualified or modified by materiality in the text thereof) on and as of the date of such Advance, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(d) No Default or Event of Default under any of the Loan Documents (including the occurrence of a DIP Termination Event) shall have occurred and be continuing on the date of such Advance, nor shall either result from the making thereof.

(e) No injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the extending of such credit shall have been issued and remain in force by any Governmental Authority against Borrowers, the other Loan Parties, or Lender.

(f) No action, proceeding, investigation, regulation, or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain, or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's reasonable judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents; provided that any objection to a Sale made by a Governmental Agency shall not preclude the satisfaction of this condition unless such objection is sustained or otherwise resolved in a manner adverse to Lender's rights under the DIP Orders or the other Loan Documents.

(g) Lender shall have received a fully executed and delivered Borrowing Notice and Compliance Certificate from the Borrower Representative in accordance with Section 2.2.

(h) Lender shall have received in advance, or will receive from the proceeds of such Advance, (i) all Fees required to be paid upon or before the date of any such Advance, and (ii) all Lender Expenses (including the fees and expenses of legal counsel), subject to the DIP Orders. All such amounts shall be reflected in the funding instructions annexed to the relevant Borrowing Notice delivered in accordance with Section 2.2.

(i) Since the Petition Date, there shall not have occurred any event, condition, circumstance or contingency that, individually or in the aggregate, constitutes, or would reasonably be expected to constitute or result in, a Material Adverse Change.

(j) Within thirty (30) days after the entry of the Final Order, the Loan Parties shall use commercially reasonable efforts to have all applicable material non-retail property and general liability insurance policies maintained by a Loan Party, to the extent allowable under the applicable insurance policies, name Lender as additional insured and loss payee; provided, however, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if the Loan Parties are using commercially reasonable efforts to obtain the applicable insurance endorsements (and, for the avoidance of doubt, Lender may agree in writing to additional extensions).

(k) Lender shall have received from Borrowers an updated Approved Budget (acceptable to Lender in its sole discretion) to the extent required to be delivered by Section 5.2(b) on or before the making of such Advance, which such updated Approved Budget shall be subject to Section 5.2(b) and the Final Order.

3.3 **Maturity**. This Agreement shall continue in full force and effect until the Obligations are Paid in Full. All Obligations including, without limitation, the outstanding unpaid principal balance, all accrued and unpaid interest, and all Fees (including, without limitation, the Exit Fee) on the Loans shall be due and payable on the Maturity Date (or such earlier date to the extent expressly provided in the Loan Documents, including the Final Order).

3.4 **Effect of Maturity**. On the Maturity Date, Lender's obligation to provide any additional credit or other accommodations under the Loan Documents shall automatically terminate and all Obligations (other than continuing Obligations with respect to indemnification) shall immediately become due and payable without notice or demand. No termination of Lender's obligations (other than the Payment in Full of the Obligations) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any Loan Document and Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) have been Paid in Full. When all of the Obligations (other than continuing Obligations with respect to indemnification) have been Paid in Full, Lender will, at Loan Parties' expense, execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are necessary to evidence and confirm the Obligations have been Paid in Full and to release, as of record, Lender's Liens and all notices of security interests and Liens previously filed by Lender with respect to the Obligations.

## 4. REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Agreement, each Loan Party hereby makes the following representations and warranties to Lender. Each Loan Party hereby further represents that such representations and warranties shall be true, correct, and complete, in all respects, as of the Effective Date, and shall be true, correct, and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of the date of the making of each Advance made thereafter, as though made on and as of the date of such Advance (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement until the Payment in Full of the Obligations:

4.1 **Organization; Powers; Filing Information**.

(a) Powers; Authority; Standing. Each Loan Party (i) is duly formed and existing under the laws of the jurisdiction of its formation, (ii) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, and (iii) subject to the entry of the DIP Orders, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted in accordance with this Agreement and the Approved Budget, to enter into the Loan Documents to which it is a party, and to carry out the transactions contemplated thereby. On the date hereof, there is no existing default under any Organizational Document of

any Loan Party or any event which, with the giving of notice or passage of time or both, would constitute a default by any party thereunder other than the commencement of the Chapter 11 Cases.

(b) Jurisdiction of Organization; Location of Chief Executive Office; Organizational; Identification Number. The name (within the meaning of section 9-503 of the UCC), primary-mailing address, jurisdiction of organization, type of entity, direct equity owner and, to the extent required to be set forth in a financing statement under the UCC, organizational identification number (if any) of each Loan Party is as set forth on Schedule 4.1(b) (as such Schedule may be updated from time to time by notice from the Borrower Representative to Lender).

(c) Organizational Chart. A complete, accurate organization chart, showing the ownership structure of Borrowers and the other Loan Parties and each of their respective Subsidiaries as of the Petition Date and on the date hereof, and after giving effect to the Transactions, is set forth on Schedule 4.1(c).

4.2 **Authorization; Enforceability**. Subject to the entry of the DIP Orders, the execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Loan Party and with respect to such Loan Party. Subject to the entry of the DIP Orders, each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and each such Loan Document is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.3 **Permits; No Conflicts**.

(a) Permits. Except as set forth on Schedule 4.3(a), each Loan Party has all Permits required for the operation of its business and for the execution, delivery, and performance by, and enforcement against, such Loan Party of each Loan Document, except to the extent the failure to have such Permit(s) would not result in, or would not reasonably be expected to result in, a Material Adverse Change. Except as set forth in Schedule 4.3(a), such Loan Party is not in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition, or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case results in, or could reasonably be expected to result in, a Material Adverse Change.

(b) No Conflicts. Subject to entry of the DIP Orders, the Transactions (i) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority (the "Governmental Approvals"), except such as have been, or will be by the time required, obtained or made and are, or will be by the time required, in full force and effect and except for any filings, registrations, endorsements, notarizations, stampings and/or notifications necessary to perfect Liens created pursuant to the Loan Documents; (ii) will not violate in any material respect any applicable material law or regulation or the charter, by-laws or other Organizational Documents of any Loan Party or any material order of any Governmental Authority binding upon any Loan Party or its assets; (iii) will not violate or result in a default under any

indenture, material agreement or other material instrument binding upon any Loan Party or its assets, or give rise to a right thereunder to require any payment to be made by any Loan Party, except, in the case of clauses (ii) and (iii), for any such violations, defaults or rights that could not reasonably be expected to result in a Material Adverse Change; (iv) will not result in the creation or imposition of any Lien on any asset of a Loan Party or any of its Subsidiaries, other than Liens created or permitted under the Loan Documents; and (v) do not result in a limitation of any licenses, permits or other Governmental Approvals applicable to the business, operations or properties of any Loan Party, except to the extent such limitation could not reasonably be expected to result in a Material Adverse Change.

4.4 **Properties**. Subject to Liens permitted pursuant to Section 6.2, each Loan Party has (i) good, sufficient, valid, and legal title to, and (ii) good and marketable title to, all of such Loan Party's right, title, and interest in the Collateral. Each Loan Party further represents and warrants that none of its assets and properties are subject to any Liens, security interests, or encumbrances as of the Petition Date other than those set forth on Schedule 4.4(a). All of the Collateral that is reasonably necessary for the operation of their businesses are in good working condition, ordinary wear and tear excepted, and are maintained in accordance with reasonable commercial business standards.

4.5 **Environmental and Labor Matters**.

(a) Except with respect to matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change, neither any Loan Party nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) is subject to any Environmental Liabilities or (iii) has received written notice of any claim with respect to any Environmental Liabilities.

(b) As of the date hereof, there are no strikes, lockouts or slowdowns against any Loan Party pending or, to the knowledge of any Loan Party, threatened. The hours worked by and payments made to employees of any Loan Party have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Change. All payments due from any Loan Party, or for which any claim may be made against any Loan Party, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Change. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party is bound where such termination or right of renegotiation could reasonably be expected to result in a Material Adverse Change.

4.6 **Compliance with Laws; Litigation; Commercial Tort Claims**.

(a) Compliance. Each Loan Party is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except (i) in instances in which such laws,

regulations or orders are being contested in good faith by appropriate proceedings diligently conducted (as reasonably determined by such Loan Party) or (ii) where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Change.

(b) Litigations and Proceedings. Other than the Chapter 11 Cases and, solely with respect to clause (ii) in this Section 4.6(b), (x) for litigation that is stayed by the commencement and continuation of the Chapter 11 Cases and (y) those items set forth on Schedule 4.6(b) hereof, there are no actions, suits, proceedings of any kind, claims, or disputes pending or threatened in writing, at law, in equity, in arbitration, or before any Governmental Authority, by or against any Loan Party or against any Loan Party's properties, revenues, or rights that (i) purport to affect or pertain to this Agreement, any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to such Borrower seeking authorization to enter into the Loan Documents and incur the Obligations under this Agreement), or (ii) either individually or in the aggregate, as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected to result in a Material Adverse Change.

(c) Commercial Tort Claims. As of the Effective Date, but subject to any supplements as contemplated by Section 5.15, Schedule 4.6(c) sets forth all of the commercial tort claims any Loan Party has against another Person.

4.7 **No Fraudulent Transfer**. No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of any Loan Party, or in exchange for less than reasonably equivalent value.

4.8 **Indebtedness**. Schedule 4.8 is a true and complete list of all material Indebtedness of each Loan Party outstanding as of the Petition Date (other than with respect to Indebtedness incurred in connection with equipment leases or to otherwise finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of any fixed or capital assets, as a lessee under Capital Leases, or Indebtedness assumed in connection with the acquisition of any such assets) and such Schedule accurately sets forth the aggregate principal amount of such Indebtedness as of such date.

4.9 **Taxes**. Except as provided on Schedule 4.9, or as would not, individually or in the aggregate, result in, or could not reasonably be expected to result in, a Material Adverse Change and subject to the terms of the applicable DIP Orders and any required approval by the Bankruptcy Court, all United States federal, state, and other material tax returns and reports of Loan Parties and their respective Subsidiaries, as applicable, required to be filed by the Loan Parties or their respective Subsidiaries, as applicable, with respect to the Collateral have been timely filed, and all Taxes due with respect to the period covered by such tax returns and all material assessments, fees, and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than Taxes that are the subject of a Permitted Protest. Each Loan Party and its Subsidiaries has made adequate provision in accordance with GAAP on its *pro forma* financial statements for all material Taxes not yet due and payable as of the date of such financial statements.

Each Loan Party and its Subsidiaries is unaware of any proposed or pending tax assessments, deficiencies, audits, or other tax matters that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Change.

4.10 **Approved Budget**. Attached to this Agreement as Exhibit B is a true and complete copy of the Approved Budget as of the Effective Date. The Approved Budget was prepared in good faith based on assumptions believed by Borrowers to be reasonable at the time made and upon information believed by the Borrowers to have been reasonable based upon the information available at the time such Approved Budget was furnished. The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures set forth in Section 5.2(b) of this Agreement; provided that, the total amount of Loans provided pursuant to the Approved Budget shall not exceed the total amount of the Commitments. On and after the delivery of any variance report in accordance with the DIP Orders and this Agreement, as applicable, such variance report fairly represents, in all material respects, the information covered thereby. To the knowledge of Loan Parties, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget (taking into account all Permitted Variances).

4.11 **Insurance**. Each Loan Party maintains, and has caused each Subsidiary to maintain, with insurance companies reasonably believed by such Loan Party to be financially sound and reputable, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations, and as required by all material governmental requirements, all material agreements and all other Loan Documents. All insurance maintained by the Loan Parties is in full force and effect, all premiums have been duly paid and no Loan Party has received notice of violation or cancellation thereof except, in such case, where the failure to so maintain such insurance could not reasonably be expected to have a Material Adverse Change. Schedule 4.11 sets forth a true, complete and correct summary description of all D&O insurance policies and all other insurance policies maintained by the Loan Parties as of the date hereof, which are applicable to, and/or provide coverage with respect to, any ongoing litigation brought by any Person against any Loan Party and/or other enforcement of claims by any Person against any Loan Party (including any settlement of the foregoing), in each case, as of the date hereof.

4.12 **ERISA**. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Change. No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of the Plan Asset Regulations), and neither the execution, delivery nor performance of the transactions contemplated under this Agreement, including the making of any Loan, will give rise to a non-exempt prohibited transaction under section 406 of ERISA or section 4975 of the Code.

4.13 **Foreign Assets Control Regulations**. No Loan Party is, or will be after the consummation of the Transactions and the application of the proceeds of the Loans, by reason of being a "national" of a "designated foreign country" or a "specially designated national" within the meaning of the Regulations of the Office of Foreign Assets Control, United States Treasury Department (31 C.F.R., Subtitle B, Chapter V), or for any other reason, in violation in any material

respect of, any United States Federal statute or Presidential Executive Order concerning trade or other relations with any foreign country or any citizen or national thereof or the ownership or operation of any property.

4.14 **Federal Reserve Regulations; Investment Company Act**.

(a) No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board of Governors of the Federal Reserve System of the United States, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the DIP Orders or the Security Documents does not violate such regulations.

(c) No Loan Party is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to registration under, the Investment Company Act of 1940, as amended.

4.15 **Anti-Corruption Laws and Sanctions**. Each Loan Party has implemented and maintains in effect policies and procedures reasonably designed to achieve material compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries, and, to the knowledge of such Loan Party, its officers, directors, employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) Loan Parties, any Subsidiary, or, to the knowledge of a Loan Party, any of their respective directors, officers or employees, or (b) to the knowledge of a Loan Party, any agent of a Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the Facility, is a Sanctioned Person. No Loan, use of proceeds or the other Transactions will violate any Anti-Corruption Law or applicable Sanctions.

4.16 **Financial Condition; No Material Adverse Change**.

(a) The Loan Parties have, as applicable, heretofore furnished to Lender certain financial statements and related information as requested by Lender. Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Loan Parties as of such dates and for such periods.

(b) Since the Petition Date, there has been no material adverse change in the business, assets, results of operations or financial condition of any Loan Party, taken as a whole.

4.17 **Material Contracts**. Schedule 4.17 sets forth a complete and correct list of all material agreements, leases, indentures, purchase agreements, obligations in respect of letters of credit, guarantees, joint venture agreements, and other instruments in effect or to be in effect as of the date hereof, in each case, providing for, evidencing, securing or otherwise relating to any Indebtedness of any Loan Party, in each case, in excess of five-hundred thousand Dollars ($500,000), and all obligations of any Loan Party to issuers of surety or appeal bonds in excess of

one-hundred thousand Dollars ($100,000) issued for account of any Loan Party, and such list correctly sets forth the names of the debtor or lessee and creditor or lessor with respect to the Indebtedness or lease obligations outstanding or to be outstanding and the property subject to any Lien securing such Indebtedness or lease obligation. To the extent requested by Lender, each Loan Party has heretofore delivered to Lender a complete and correct copy of all such material credit agreements, indentures, purchase agreements, contracts, letters of credit, guarantees, joint venture agreements, or other instruments, including any modifications or supplements thereto, as in effect on the date hereof.

4.18 **Select Bankruptcy Matters**. (a) Each of the Chapter 11 Cases was validly commenced on the Petition Date, (b) proper notice under the circumstances of the motion seeking approval of the Loan Documents and entry of each of the DIP Orders was given, (c) the hearing for the approval of the Interim Order and the Final Order has been held by the Bankruptcy Court, and (d) after entry of the Interim Order (and following entry thereof, the Final Order), the Obligations will constitute superpriority administrative expense claims against each of the Debtors and shall be secured by, *inter alia*, Lender's Liens in the Required Lien Priority granted under this Agreement and the other Loan Documents.

4.19 **No Default**. No Default or Event of Default has occurred and is continuing.

4.20 **Disclosure**. No representation, warranty, information, report, financial statement, certificate, Borrowing Notice, exhibit, schedule, or other written statement made or furnished by or on behalf of any Borrower or other Loan Party to Lender (including by or to, as applicable, their respective agents or representatives) in connection with this Agreement or any other Loan Document, or included therein or delivered pursuant thereto, taken as a whole and after giving effect to all supplements and updates thereto, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection or pro forma adjustment, each Loan Party represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule (it being understood that forecasts are subject to uncertainties and contingencies and that no representation or warranty is given that any forecast will be realized).

## 5. AFFIRMATIVE COVENANTS

Each Loan Party hereby covenants and agrees that, until the Payment in Full of the Obligations, it shall (and shall cause its Subsidiaries to) comply with each of the following, as applicable:

5.1 **Notice of Certain Events**. Loan Parties shall deliver to Lender (a) promptly, but in any event within three (3) Business Days, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; (b) promptly upon becoming aware of any litigation threatened in writing against any Loan Party or filed after the Petition Date (other than an adversary proceeding or other pleading filed in the Chapter 11 Cases) or any other event (other than an event in the Chapter 11 Cases), in each case, which has resulted in, or would reasonably

be expected to result in, a Material Adverse Change, notice of such litigation or event; (c) at the time a Borrowing Notice is furnished to Lender or its counsel in connection with any requested Advance, a Compliance Certificate; and (d) promptly upon becoming aware, but in any event within three (3) Business Days, of any existing or potential action by a Governmental Authority that results in, or would be reasonably likely to result in, a Material Adverse Change.

5.2 **Reporting; Budget; Conference Calls and Bankruptcy Matters**.

(a) Borrowers shall comply with the agreements, requirements, covenants, and applicable undertakings set forth in Exhibit C, in accordance with the terms thereof.

(b) Borrowers will, commencing on June 12, 2026, and every fifth Thursday thereafter, prepare and deliver to Lender a supplement to the initial Approved Budget (or the previously supplemented Approved Budget) updating or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least a 13-week period from the date of such initial Approved Budget or supplemental Approved Budget, as applicable, which supplemental Approved Budget shall be subject to Lender's approval in its sole discretion and without further order of the Bankruptcy Court. To the extent Lender provides written notice rejecting the updates (or any amendments) within five (5) Business Days after the delivery by Borrowers of any such update or amendment, the then existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as an update or amendment is approved by Lender in its sole discretion. In the event Lender does not provide written notice of its rejection of the supplemental Approved Budget within such five (5) Business Day period, such supplemental Approved Budget shall become effective as the Approved Budget.

(c) On a weekly basis, after the delivery of the first supplemental Approved Budget, Borrowers shall deliver to Lender a variance report for the eight (8) week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "Budget Variance"), between actual net operating cash flow (such term reflecting those line items illustrated in the Approved Budget) for such period to projected net operating cash flow for such period as set forth in the Approved Budget on a cumulative eight-week rolling basis (each a "Measuring Period") and explaining in reasonable detail all material variances (each such report, a "Variance Report," which shall be in a form reasonably acceptable to Lender).

(d) Borrowers shall participate in a conference call occurring every week, if requested by Lender or its counsel, commencing on the first week following the Effective Date regarding the Approved Budget, the Chapter 11 Cases, and other financial matters.

(e) Borrowers shall promptly furnish to Lender, as soon as available, all material information or reports provided by Borrowers or their counsel to any official or unofficial committee in the Chapter 11 Cases, the office of the U.S. Trustee, or any other significant party in interest with respect to the financial condition of Borrowers, any sale or disposition of Collateral outside of the Ordinary Course of Business, or any plan of reorganization or liquidation of Borrowers;

(f) Borrowers and the other Loan Parties shall deliver to Lender's counsel (i) copies of any pleadings or motions to be filed by or on behalf of any Borrower or other Loan

Party in the Chapter 11 Cases at least three (3) days before such filing (or as soon as is reasonably practicable under the circumstances), and (ii) all notices required to be given to all parties specified in any DIP Order.

5.3 **Existence**. At all times, each Loan Party shall (a) maintain and preserve in full force and effect its existence, (b) maintain its good standing in its jurisdiction or incorporation or formation, except where failure to do so would not result in, or would not reasonably be expected to result in, a Material Adverse Change, and (c) maintain all its rights and franchises, licenses and permits, except where the failure to be in good standing or maintain any such rights and franchises, or licenses and permits would not result in, or would not reasonably be expected to result in, a Material Adverse Change.

5.4 **Maintenance of Properties; Permits**. Each Loan Party shall (a) maintain and preserve the Collateral in good working order and condition, with ordinary wear, tear, and casualty excepted, subject to the Approved Budget and the Permitted Variances; (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless (i) such provisions are the subject of a Permitted Protest, (ii) such lease is a Site Lease that is rejected in the exercise of the Loan Parties' reasonable business judgment, or (iii) compliance is not permitted or contemplated by the Approved Budget or is otherwise excused by the provisions of the Bankruptcy Code or an order of the Bankruptcy Court; and (c) maintain, comply with, and keep in full force and effect its Permits with respect to the Collateral pledged by it, except where failure to so comply would not result in, or would not reasonably be expected to result in, a Material Adverse Change. Each Loan Party shall comply with and maintain, all Permits required for the operation of its business, except where failure to so comply would not result in, or would not reasonably be expected to result in, a Material Adverse Change.

5.5 **Taxes**. Except to the extent such payment is excused or otherwise prohibited by, the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, and (as to Borrowers) to the extent such Taxes are contemplated in the Approved Budget, Loan Parties shall pay in full or discharge all assessments and Taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency (giving effect to any extension period), except to the extent that any such assessments and Taxes shall be paid pursuant to a Sale Order or that are subject to a Permitted Protest.

5.6 **Insurance**. At Loan Parties' sole costs and expense, Loan Parties shall maintain, or cause to be maintained insurance with respect to the Collateral in which Loan Parties have any right, interest, or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with Loan Parties' insurance policies in effect on the Petition Date. Each Loan Party shall maintain property, general liability and director's and officer's liability insurance consistent with insurance policies in effect on the Petition Date or otherwise consistent with reasonable and sound business practices and applicable to such Loan Party. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as are carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located. Loan Parties shall use their commercially reasonable efforts to cause, to the extent allowable under the applicable material non-retail property and general liability

insurance policies within thirty (30) days following the Effective Date (provided, however, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if Loan Parties are using commercially reasonable efforts to obtain the applicable insurance endorsements (and, for the avoidance of doubt, Lender may agree in writing to additional extensions), all property insurance policies covering the Collateral in the name of a Loan Party to be made payable to Lender, in case of loss, pursuant to a standard lender loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Lender may reasonably require to fully protect Lender's interest in the Collateral and any payments to be made under such policies. Loan Parties shall use their commercially reasonable efforts to cause, to the extent allowable under the applicable material non-retail property and general liability insurance policies, within thirty (30) days following the Effective Date provided, however, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if Loan Parties are using commercially reasonable efforts to obtain the applicable insurance certificates (and, for the avoidance of doubt, Lender may agree in writing to additional extensions), all certificates of property and general liability insurance are to be delivered to Lender, with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of Lender and shall provide for not less than thirty (30) days (ten (10) days in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If Loan Parties fail to maintain the insurance required by this Section 5.6, Lender may arrange for such insurance, but at Loan Parties' sole cost and expense and without any responsibility on Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Loan Parties shall give Lender prompt notice of any loss covered by their casualty or business interruption insurance. Upon the occurrence and during the continuance of an Event of Default, Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt, and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise, or settlement of any claims under any such insurance policies.

5.7 **Inspection**. Each Loan Party shall permit Lender and each of its duly authorized representatives or agents, to visit any of its properties and inspect any of its Collateral or books and records, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees upon reasonable notice and at such reasonable times during regular business hours and intervals as Lender may require, in each case other than information subject to confidentiality obligations and/or attorney client or other privilege, provided, that all such visits and inspections shall be made in accordance with the standard safety, visit, and inspection procedures of such Loan Party and its tenants, as applicable, and no such visit or inspection shall unreasonably interfere with the normal business operation of such Loan Party and its tenants, and provided, further that, absent the existence of an Event of Default, Lender shall be limited to one such visit and/or inspection during the term of this Agreement.

5.8 **Environmental**. Each Loan Party shall:

(a) keep the Collateral owned or operated by it free of any Environmental Liens;

(b) comply with all applicable Environmental Laws, except where the failure to so comply has not resulted in, or would not reasonably be expected to result in, a Material Adverse Change;

(c) promptly notify Lender of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by such Loan Party that results in, or would reasonably be expected to result in, a Material Adverse Change; and

(d) promptly, but in any event within five (5) Business Days of its receipt thereof, provide Lender with written notice of any of the following: (i) the filing of an Environmental Lien against any of the Collateral, (ii) the commencement of any Environmental Action, or receipt of written notice that an Environmental Action will be filed, against such Borrower, and (iii) receipt of a written notice of a violation, citation, or other administrative order from a Governmental Authority concerning violations or alleged violations of Environmental Laws, which seeks to impose liability therefor or otherwise results in, or would reasonably be expected to result in, a Material Adverse Change.

5.9 **Compliance with Laws**. Each Loan Party shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually, has not resulted in, or would not reasonably be expected to result in, a Material Adverse Change.

5.10 **Disclosure Updates**. Each Loan Party shall promptly, but in any event within five (5) Business Days after obtaining knowledge thereof, notify Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about Loan Parties' industry or businesses, as applicable) furnished (after giving effect to any supplements thereto and when taken as a whole) to Lender that contained, at the time it was furnished, any untrue statement of a material fact or omitted any material fact necessary to make the statements contained therein (taken as a whole) not materially misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

5.11 **Approved Budget**. Each Loan Party shall comply with the Approved Budget (as updated and supplemented, subject to Lender's consent in accordance with this Agreement and the Final Order), subject to the Permitted Variances.

5.12 **Professional Fee Account**. Borrowers shall deposit and hold in a segregated account the amounts necessary to (a) fund the Professional Fee Account to pay such then unpaid allowed Professional Fees prior to any and all other claims and, as applicable and (b) satisfy the Carve-Out. The Professional Fee Account shall be funded by Borrowers in accordance with this Agreement, the Final Order, and as set forth in the Approved Budget (including any Permitted Variances).

5.13 **Deposit Account Control Agreements; Further Assurances**.

(a) The Loan Parties shall use commercially reasonable efforts to cause each relevant financial institution or other person at which each Deposit Account that constitutes Collateral is maintained to, enter into a Deposit Account Control Agreement with respect to such Deposit Account that is Collateral, in each case, promptly, and in no later than thirty (30) days (subject to an automatic 30-day extension if such Loan Party is using commercial reasonable efforts to obtain the relevant Deposit Account Control Agreements), following the request of Lender at any time after the Effective Date.

(b) Subject to the DIP Orders, as applicable, each Loan Party shall use commercially reasonably efforts to execute and/or deliver to Lender any and all Security Documents, financing statements, fixture filings, endorsements of certificates of title, deeds of trust, mortgages, trademark filings, copyright filings, and all other instruments or other documents (collectively, the "Additional Documents") that Lender or its counsel may reasonably request with respect to any Loan Party's businesses, assets, or other property, which Additional Documents shall be in form and substance acceptable to Lender, to more fully evidence, confirm, validate, create, perfect, continue, preserve, or enforce Lender's Liens or rights in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal), in each case, promptly, and in no later than thirty (30) days (subject to an automatic thirty (30) day extension if such Loan Party is using commercial reasonable efforts to execute and deliver the applicable Additional Documents), following the request of Lender or its counsel at any time after the Effective Date. Each of the Loan Parties will use commercially reasonable efforts to cooperate and assist advisors hired by or at the discretion of Lender to enable such advisors to perform the services for which they were engaged, including, without limitation, promptly providing such information and documents as such advisors may reasonably request.

5.14 **Material Contracts; Sale Offers**. Other than defaults existing as of the Effective Date that have already been disclosed to Lender in writing or events in the Chapter 11 Cases, Loan Parties shall deliver to Lender (a) promptly (but in any event within five (5) Business Days) of a Loan Party becoming aware of any default (other than the filing of the Chapter 11 Cases) or other material breach under any Material Contract to which any Loan Party is a party, notice of such defaults or breaches, and (b) subject to any bidding procedures approved by the Bankruptcy Court, prompt notification of any written offer to purchase all, substantially all, or a material portion of the assets of any Loan Party, its assets, or a segment thereof, or to purchase all, substantially all, or a material portion of the Equity Interests of any Loan Party or its any Subsidiary of a Loan Party, or otherwise explore or enter into a transaction to acquire a material portion of the assets or equity of any Loan Party or its Subsidiary outside the Ordinary Course of Business.

5.15 **Supplement to Commercial Torts Schedule**. Not later than June 30, 2026 (or such later date as agreed by Lender in its discretion), Loan Parties shall deliver to Lender an updated Schedule 4.6(c) with respect to the commercial tort claims each Loan Party has against another Person known to such Loan Party, which schedule shall be attached hereto and supplement Schedule 4.6(c) as delivered on the Effective Date.

5.16 **Subsequent Proceedings**. In the event that a Proceeding is filed or otherwise commenced with respect to a Loan Party, its assets, or its operations (including, without limitation,

if a Loan Party becomes a Debtor in the Chapter 11 Cases), such Loan Party (or the applicable representative of its estate) shall immediately seek entry of an order, in form and substance acceptable to Lender, applying the Final Order and other applicable DIP Documents to such Loan Party and its estate (any such order, an "Extension Order"), and such Extension Order shall (a) be entered by the applicable court within thirty (30) days of the filing of such Proceeding, (b) remain in full force and effect, and (c) not be reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without Lender's prior written consent in its sole discretion.

## 6. NEGATIVE COVENANTS

Each Loan Party hereby covenants and agrees that, until the Payment in Full of the Obligations, such Loan Party will (and will cause its Subsidiaries to) not do any of the following without the prior written consent of Lender:

6.1 **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for (a) Indebtedness evidenced by this Agreement, the Loan Documents (including the Carve-Out) and (b) the following Indebtedness (collectively, "Permitted Indebtedness"):

(i) Indebtedness outstanding as of the Petition Date and described on Schedule 6.1;

(ii) unsecured obligations (contingent or otherwise) of any Loan Party or any of its Subsidiaries existing or arising under any swap contract, provided, that (A) such obligations are (or were) entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view," and (B) such swap contract is not for speculative purposes;

(iii) obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the Ordinary Course of Business;

(iv) unsecured Indebtedness consisting of (A) the financing of insurance premiums or (B) take-or-pay obligations contained in supply arrangements, in each case, incurred in the Ordinary Course of Business;

(v) unsecured Indebtedness incurred by any Loan Party or any of its Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts, or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability, or other employee benefits or property, casualty, or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims;

(vi) Indebtedness in respect of surety bonds, performance bonds and other similar obligations incurred in the Ordinary Course of Business;

(vii) Indebtedness incurred to finance the acquisition, development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement of any fixed or capital assets, including real property, as a lessee under Capital Leases and any Indebtedness assumed in connection with the acquisition of any such assets; provided that such Indebtedness is incurred prior to or within 120 days after such acquisition or the completion of such development, construction, restoration, replacement, rebuilding, maintenance, upgrade or improvement; provided that aggregate principal amount of all such Indebtedness, together with any Indebtedness incurred pursuant to this Section 6.1(vii), shall not exceed five-hundred thousand Dollars ($500,000) (or such greater amount approved in writing by Lender in its sole discretion) at any time outstanding;

(viii) Indebtedness representing deferred compensation or similar arrangements to current, future or former officers, directors, employees, members of management, or consultants of Borrowers in the Ordinary Course of Business consistent with past practice;

(ix) Indebtedness representing any Taxes to the extent such Taxes are permitted to not be paid or discharged at such time in accordance with Section 5.5;

(x) other Indebtedness expressly permitted by the Approved Budget (including any Permitted Variances);

(xi) Indebtedness for (A) utilities, security deposits, leases, and similar prepaid expenses incurred in the Ordinary Course of Business and (B) trade accounts created, or prepaid expenses accrued, in the Ordinary Course of Business;

(xii) Indebtedness in respect of take-or-pay obligations contained in supply agreements entered into in the Ordinary Course of Business;

(xiii) Indebtedness constituting indemnification, deferred purchase price adjustments, earn-outs or other similar contingent payment obligations incurred in connection with any investment, acquisition, loan, disposition or transfer not prohibited hereunder (other than, in the case of a disposition or transfer, guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition), so long as the amount does not exceed the gross proceeds actually received by a Borrower or the applicable Subsidiary, as the case may be, in connection with any such disposition or transfer;

(xiv) all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (i) through (xiii) above; and

(xv) guarantees with respect to Indebtedness permitted under this Section 6.1.

6.2 **Liens**.

(a) Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for the Permitted Liens, which, for the avoidance of doubt, except for the Carve-Out and, solely with respect to the Junior Collateral, the Permitted Senior Liens, any such Lien shall be junior to Lender's Liens hereunder, under the DIP Orders, and under the other Loan Documents; or

(b) Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by (i) this Agreement or the DIP Orders or (ii) on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for the Carve-Out.

6.3 **Restrictions on Fundamental Changes**. Except in connection with an Acceptable Plan or Acceptable Sale approved by the Bankruptcy Court or otherwise with the prior written consent of Lender, no Loan Party shall: (a) enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its Equity Interests; (b) liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); or (c) suspend or close its business, or a substantial portion of its business, except for any suspensions or closures that would not have a material adverse impact on Borrowers or the other Loan Parties, taken as a whole.

6.4 **Disposal of Assets**. Except in connection with an Acceptable Plan or Acceptable Sale, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral pledged by any Loan Party, other than Permitted Transfers.

6.5 **Change Name**. Except in connection with an Acceptable Plan or Acceptable Sale, change any Loan Party's name, state of organization, or organizational identity.

6.6 **Nature of Business**. Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Loan Party from (a) engaging in any business that is reasonably related or ancillary to its business, subject to this Agreement and the Approved Budget (including any Permitted Variances), or (b) complying with any requirement of the Bankruptcy Code.

6.7 **Material Leases or Contracts; Amendments**. Except in connection with an Acceptable Plan or Acceptable Sale, amend, alter, change, or modify in any way (a) the material terms of any material lease or contract in connection with the Collateral except in a manner that does not result in, or would not reasonably be expected to result in, a Material Adverse Change, or (b) any of its Organizational Documents in a manner that is, or would reasonably be expected to be, adverse to Lender.

6.8 **Change of Control**. Except in connection with an Acceptable Plan or Acceptable Sale, cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9 **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10 **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party, except for transactions (a) that are in the Ordinary Course of Business of such Loan Party; (b) dividends and distributions permitted by Section 6.17; (c) acquisitions, loans or investments permitted by Section 6.15; (d) reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, or severance arrangements in the Ordinary Course of Business; (e) otherwise approved by the Bankruptcy Court pursuant to an order in form and substance acceptable to Lender; or (f) expressly permitted pursuant to the Approved Budget (including any Permitted Variances).

6.11 **Use of Advances**. Use the Advances and any other proceeds of the Facility for any Restricted Use or purpose other than to fund payments, subject in all respects to the Approved Budget and the Permitted Variances, related to the: (a) working capital and other general corporate purposes of Borrowers and their respective Subsidiaries, if applicable, but only if such Subsidiaries are Borrowers hereunder; (b) professional fees and expenses of administering the Chapter 11 Cases (including fees and expenses incurred prior to the Effective Date) in accordance with the Bankruptcy Code and applicable orders of the Bankruptcy Court; (c) fees and expenses payable under the Loan Documents, including, without limitation, the Commitment Fee, the Work Fee, the Exit Fee, and legal fees and expenses of Lender (including fees and expenses incurred prior to the Effective Date); and (d) interest and other amounts payable under the Loan Documents.

6.12 **Limitation on Capital Expenditures**. Except permitted by the Approved Budget (including any Permitted Variances), make or incur any Capital Expenditure.

6.13 **Chapter 11 Cases**. Directly or indirectly, seek, consent, or suffer to exist, without the prior written consent of Lender, (a) any modification, stay, vacation, or amendment to the DIP Orders; (b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind set forth in sections 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority of any claim of Lender in respect to the Collateral or otherwise, other than those permitted by the Final Order (including the Carve-Out); and (c) any Lien on the Collateral having a priority equal or superior to the Liens in favor of Lender in respect of the Obligations, other than the Carve-Out or as expressly permitted hereunder.

6.14 **Certain Transactions**. Propose or support any chapter 11 plan, or any sale or disposition of all, substantially all, or a material portion of any Loan Party's assets, which proposal, plan, or sale is not an Acceptable Plan or an Acceptable Sale; provided that this Section 6.14 shall not prohibit Permitted Transfers.

6.15 **Acquisitions, Loans, or Investments**. Make any material acquisition, advance, loan or any other investment of any kind or nature except for the following, which, in each case, shall be set forth in and subject to the Approved Budget and approved by Lender in writing:

(a) acquisitions of, and advances made in connection with, inventory, equipment, goods or services in the Ordinary Course of Business;

(b) intercompany loans and advances in the Ordinary Course of Business or consistent with past practice and investments among Borrowers;

(c) investments in negotiable instruments deposited or to be deposited for collection in the Ordinary Course of Business;

(d) investments received in settlement of amounts due or owing to any Borrower by an account debtor or pursuant to any plan of reorganization or liquidation, foreclosure or similar arrangement of such account debtor;

(e) investments in Equity Interests, obligations or securities received in settlement of debts owing to any Borrower or in satisfaction of judgments or pursuant to any chapter 11 plan or similar arrangement upon the bankruptcy or insolvency of a debtor;

(f) investments in receivables owing to any Borrower created or acquired in the Ordinary Course of Business and payable or dischargeable in accordance with customary trade terms; provided, however, that such trade terms may include such concessionary trade terms as any Borrower deems reasonable under the circumstances;

(g) investments in payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the Ordinary Course of Business consistent with past practice;

(h) deposits and guarantees of operating leases, utility obligations, or other obligations that do not constitute Indebtedness, in each case, in the Ordinary Course of Business;

(i) investments in swap contracts of the type permitted Section 6.01(ii);

(j) defined contribution pension scheme, unfunded pension fund, phantom equity, cash-settled equity-based awards and other employee benefit plan obligations and liabilities to the extent that they are permitted to remain unfunded under applicable laws;

(k) investments in any captive insurance subsidiary not to exceed the minimum amount of capitalization required pursuant to regulatory capital requirements;

(l) investments in, acquisitions of, and holding of cash and cash equivalents;

(m) investments consisting of prepayments to suppliers or extensions of trade credit, in each case in the Ordinary Course of Business;

(n) advances of payroll to employees in the Ordinary Course of Business;

(o) loans and advances to directors, employees and officers of the Loan Parties and the Subsidiaries for *bona fide* business purposes, in an aggregate amount not to exceed one-

hundred thousand Dollars ($250,000) at any time outstanding (calculated without regard to write-downs or write-offs thereof); and

(p) other investments permitted by the Approved Budget (including any Permitted Variances).

6.16 **Payments on Indebtedness**. Other than pursuant to the Approved Budget (including any Permitted Variances) or as otherwise set forth in the Loan Documents, make any payment with respect to any Indebtedness.

6.17 **Distributions or Redemptions**. Pay any dividends or distributions on, or make any redemptions of, any Equity Interest of any Loan Party or its Subsidiaries without Lender's prior written consent; provided that the foregoing shall not prevent any Subsidiary from making any distribution to its direct parent if such parent is a Debtor in the Chapter 11 Cases and a Borrower hereunder.

6.18 **Formation of Subsidiaries**. Except in connection with an Acceptable Plan or Acceptable Sale, form any direct or indirect Subsidiary or other entity, or acquire any direct or indirect Subsidiary, after the Effective Date, without the prior written consent of Lender in its sole discretion, unless such Subsidiary or other entity is joined as a Loan Party, in Lender's sole discretion, under this Agreement and such Subsidiary or other entity shall be jointly and severally liable for all Obligations.

## 7. GUARANTY

7.1 **Guaranty**. The Guarantors hereby, jointly and severally guarantee, as a primary obligor and not as a surety to Lender and its successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Loans made by Lender to the Borrowers, and all other Obligations from time to time owing to Lender by any Loan Party under any Loan Document in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "Guaranteed Obligations"). The Guarantors hereby, jointly and severally, agree that if any Borrower, Loan Party, or other Guarantor shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

7.2 **Unconditional Obligations**. The obligations of the Guarantors under Section 7.1 shall constitute a guaranty of payment and to the fullest extent permitted by applicable law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of the Borrowers and other Loan Parties under this Agreement, the Loan Documents, or any other agreement or instrument

referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(a) at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(b) any of the acts mentioned in any of the provisions of this Agreement, the Loan Documents, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(c) the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(d) any Lien or security interest granted to, or in favor of Lender as security for any of the Guaranteed Obligations shall fail to be perfected; or

(e) the release of any other Guarantor.

To the extent permitted by law, the Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Lender exhaust any right, power or remedy or proceed against the Borrowers or other Loan Parties under this Agreement, the Loan Documents, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. To the extent permitted by law, the Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by Lender upon this Guaranty or acceptance of this Guaranty, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guaranty, and all dealings between the Borrowers and Lenders shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guaranty. This Guaranty shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Lender, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by Lender or any other person at any time of any right or remedy against any Borrower, Loan Party, or any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guaranty shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns

thereof, and shall inure to the benefit of Lender and its successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

7.3 **Reinstatement**. The obligations of the Guarantors under this Section 7 shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Borrower or any other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

7.4 **Subrogation; Subordination**. Each Guarantor hereby agrees that until the payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments under this Agreement, it shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guaranty in Section 7.1, whether by subrogation or otherwise, against any Borrower, Loan Party, or other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party to another Loan Party permitted pursuant to Section 6.1 shall be subordinated to such Loan Party's Obligations.

7.5 **Remedies**. The Guarantors jointly and severally agree that, subject to the terms of the DIP Orders, as between the Guarantors and Lender, the obligations of the Borrowers under this Agreement and the Loan Documents, if any, may be declared to be forthwith due and payable as provided in Section 8 (and shall be deemed to have become automatically due and payable in the circumstances provided in said Section 8) for purposes of Section 7.1, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against the Borrowers and any other Loan Parties and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by the Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.1.

7.6 **Continuing Guaranty**. The guaranty in this Section 7 is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

7.7 **General Limitation on Guaranty Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.1 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.1, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

7.8 **Release of Guarantors**. If, in compliance with the terms and provisions of the Loan Documents, all or substantially all of the Equity Interests of any Guarantor owned by a Loan Party or property of any Guarantor are sold or otherwise transferred (a "Transferred Guarantor")

to a person or persons, none of which is a Borrower, a Loan Party, a Subsidiary or an Affiliate of a Loan Party, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be released from its obligations under this Agreement and its obligations to pledge and grant any Collateral owned by it pursuant to any Security Document and, in the case of a sale of all or substantially all of the Equity Interests of the Transferred Guarantor owned by a Loan Party (to a Person other than Borrower, a Loan Party, a Subsidiary or an Affiliate of a Loan Party), the pledge of such Equity Interests to Lender pursuant to this Agreement and the other Loan Documents, as applicable, shall be released, and Lender shall, upon receipt of a certificate of an Authorized Person stating that all conditions precedent to such release have been satisfied and that such transaction is permitted hereunder (upon which certificate Lender shall conclusively rely and shall be fully protected in relying upon), take such actions (without representation, warranty or recourse), as are reasonably requested by the Borrower Representative or such Guarantor to effect each release described in this Section 7.8 (including executing such documents as prepared by the Borrower Representative or such Guarantor to effect such release).

7.9 **Right of Contribution**. Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment. Each Guarantor's right of contribution shall be subject to the terms and conditions of Sections 7.4 and 7.7. The provisions of this Section 7.9 shall in no respect limit the obligations and liabilities of any Guarantor to Lender, and each Guarantor shall remain liable to Lender for the full amount guaranteed by such Guarantor hereunder.

## 8. EVENTS OF DEFAULT

8.1 **Event of Default**. Any one or more of the following events shall constitute an event of default upon giving any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a) any Loan Party shall fail to pay when due and payable, any principal (including, without limitation, pursuant to Section 2.3(d)), interest, Fees, Lender Expenses, or any other Obligations under this Agreement or any other Loan Document;

(b) any Loan Party shall fail to comply with its obligations under (i) Sections 5.1, 5.2(c), 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 5.10, 5.11, 5.13, 5.14, 5.15, 5.16, 6, 7, and/or 9, or (ii) Sections 5.2(a) and/or 5.2(b), and in the case of this clause (ii), such failure or breach shall continue for five (5) days after the earlier to occur of (x) the date on which such failure to comply or breach is known to any officer (including any chief restructuring officer or independent director) of such Loan Party and (y) the date on which Lender shall have notified in writing such Loan Party or its applicable representative of such failure;

(c) other than as set forth in any other subsection of this Section 8.1, any Loan Party shall directly or indirectly breach or otherwise fail to perform, or otherwise cause such breach or failure to perform, any of its covenants or obligations contained in this Agreement, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which such failure to comply is known to any officer (including any chief restructuring officer or independent

director) of such Loan Party, and (ii) the date on which Lender shall have notified such Loan Party or its applicable representative of such failure; provided, however, that such thirty (30) day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such thirty (30) day period;

(d) any representation or warranty made, or deemed made, by any Loan Party in this Agreement, any other Loan Document, or in any agreement, certificate, instrument, financial statement, or other statement delivered to Lender pursuant to or in connection with this Agreement or the other Loan Documents shall prove to have been incorrect in any material respect when made or deemed made and such inaccuracy is adverse to Lender;

(e) except upon Lender's prior written request or with Lender's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of Lender), any Loan Party shall directly or indirectly file, or cause to be filed, or otherwise consent to a motion with the Bankruptcy Court or any other court of competent jurisdiction seeking an order (or such order is otherwise entered), that by its terms modifies, reverses, revokes, stays, rescinds, vacates, or amends the DIP Orders (or any material provision thereof), this Agreement, any other Loan Documents, or the relief or transactions otherwise contemplated in the foregoing Loan Documents (or, in each case, purports to effect any of the foregoing);

(f) an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred (if any), could reasonably be expected to result in a Material Adverse Change;

(g) any Loan Party shall fail to comply with the Approved Budget, subject to the Permitted Variances;

(h) without the prior written consent of Lender, which consent cannot be unreasonably withheld, (i) any Loan Party shall (A) directly or indirectly file (or cause to be filed) or otherwise consent to, or the Bankruptcy Court shall otherwise order, grant, confirm, or approve (including any approval on an interim or conditional basis), as applicable, (1) any motion seeking approval of a sale of all, substantially all, or a material portion of a Loan Party's assets (including any amendment, modification or supplement to such sale) that is not an Acceptable Sale, or (2) any chapter 11 plan or related disclosure statement (including any amendment, modification or supplement to such plan or disclosure statement), that is not an Acceptable Plan, or (B) have sold or otherwise disposed of all or a material portion of the applicable Collateral; or (ii) any agreement in respect of an Acceptable Sale that is filed in the Chapter 11 Cases or otherwise entered into by any Loan Party is revoked, withdrawn, or terminated; or (iii) any Acceptable Plan that is filed in the Chapter 11 Cases or otherwise confirmed by the Bankruptcy Court is withdrawn;

(i) except with respect to the Carve-Out, any Loan Party shall directly or indirectly file (or cause to be filed) any motion or application, or the Bankruptcy Court allows or approves the motion or application of any other Person (which order is not stayed, vacated or withdrawn five (5) calendar days from entry thereof), which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens, and security interests granted to Lender under the DIP Orders, or with respect to the Collateral or any such

equal or senior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(j) one or more final non-appealable judgments (and the same shall have not been vacated, discharged, dismissed, stayed or bonded within forty five (45) consecutive calendar days) or orders for the payment of money exceeding seven-hundred-fifty thousand Dollars ($750,000) in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against any Loan Party or its assets, shall be subject to immediate collection and remain unsatisfied and shall result in a judgment lien or claim having priority over or ranking in parity with the Lender's Liens or claims or rights (subject to only the Carve-Out) under the Loan Documents;

(k) any damage to, or loss, theft or destruction of, any Collateral having a value in excess of seven-hundred-fifty thousand Dollars ($750,000) in the aggregate, to the extent not covered by insurance, so long as the insurance company has been notified of the occurrence of such event and has not denied coverage thereof and the claim has been settled within seventy-five (75) days (or such longer time as Lender may agree) of the occurrence of such event;

(l) the occurrence of any default or event of default (including the occurrence of a DIP Termination Event) under the DIP Orders and the continuance thereof after any applicable grace or cure period provided in the DIP Orders, if any, or granted by order of the Bankruptcy Court;

(m) the payment of or grant of adequate protection other than in accordance with the DIP Orders without Lender's consent and Bankruptcy Court approval;

(n) the entry of an order that is not stayed, vacated, or withdrawn three (3) calendar days appointing a receiver, trustee, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of Lender in its sole discretion;

(o) the entry of an order that is not stayed, vacated, or withdrawn three (3) calendar days which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, party in interest or Person, other than Lender (other than any creditor, party in interest, or Person having a Lien on specific equipment that is senior to Lender), to realize upon, or to exercise any right or remedy with respect to, any of the Collateral with a value, individually or in the aggregate, in excess of seven-hundred-fifty thousand Dollars ($750,000);

(p) the entry of any order or granting of relief that is not stayed, vacated, or withdrawn three (3) calendar days (i) surcharging any of the Collateral under the Bankruptcy Code (including sections 105 or 506(c)) or other applicable law, applying the "equities of the case" doctrine against Lender or the Collateral, or requiring marshaling of any Collateral; (ii) allowing

any lien or administrative-expense claim having priority over or ranking in parity with Lender's Liens, claims or rights (subject to only the Carve-Out and, solely as to the Junior Collateral, the Permitted Senior Liens) under the Loan Documents; or (iii) otherwise adversely impacting Lender's Liens, priority in the Collateral, or Lender's rights and remedies under the DIP Facility, or that is materially inconsistent with the Loan Documents;

(q) the conversion of any Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the dismissal of any Chapter 11 Case or any subsequent case under chapter 7 of the Bankruptcy Code, either voluntarily or involuntarily, and the Obligations are not Paid in Full at the time of such conversion or dismissal unless the order converting or dismissing the Chapter 11 Cases is stayed, vacated or withdrawn within three (3) days from entry thereof;

(r) the DIP Orders, or any material provision thereof, (i) cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court or (ii) are modified, reversed, revoked, remanded, stayed, superseded, rescinded, vacated, or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender (and no such consent shall be implied from any other authorization or acquiescence by Lender);

(s) any Loan Party directly or indirectly brings (or causes to be commenced or otherwise consents to) any action, or otherwise supports such action, to (i) challenge the rights and remedies of Lender under this Agreement or any other Loan Document in the Chapter 11 Cases, or acts in a manner inconsistent with the Loan Documents, or (ii) avoid, recover, or disgorge any amounts received in respect of the Obligations;

(t) any Loan Party shall directly or indirectly seek, or the Bankruptcy Court shall enter, an order authorizing any Loan Party to obtain financing of any kind from a Person other than Lender pursuant to section 364 of the Bankruptcy Code or otherwise, unless (i) Lender consents in writing to such financing, or (ii) the Obligations (to the extent they remain outstanding) are Paid in Full;

(u) any Loan Party shall make any material payments in respect of prepetition obligations other than (i) agreed to by Lender in writing before such payment is made or (ii) as permitted (A) by the DIP Orders, (B) by any "first day" or "second day" orders acceptable to Lender (and Lender acknowledges that all orders entered by the Bankruptcy Court as of the Effective Date are acceptable to it), (C) by any other order of the Bankruptcy Court acceptable to Lender, or (D) under this Agreement or any other Loan Documents in accordance with the Approved Budget (subject to Permitted Variances);

(v) the entry of an order by the Bankruptcy Court that is not stayed, vacated, or withdrawn three (3) calendar days terminating, shortening, or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of Lender;

(w) any Loan Party shall directly or indirectly seek, consent to, or support any other Person's motion, application, proceeding or other action to, in whole or in part, (i) disallow, subordinate, impair, alter, or otherwise compromise the Obligations, (ii) challenge the validity,

enforceability, or extent of Lender's Liens, claims, or other rights or remedies, or (iii) contest any provision or the validity or enforceability of this Agreement, any Loan Document;

(x) the consent, or failure to object by, of any of the Loan Parties to the standing of any party in interest or other Person, including the Committee, to pursue any claim or Cause of Action against any of the Released Parties, or other action, proceeding, or relief that could adversely affect Lender or its respective Liens, claims, or rights under the Loan Documents (collectively, an "Adverse Action");

(y) (i) the delivery of a written communication by any Loan Party threatening the commencement of a an Adverse Action, or the commencement of an Adverse Action by the Debtors or any other Loan Party, or (ii) if a Person (other than a Loan Party) files a motion or other pleading to obtain standing to pursue, or otherwise commences, an Adverse Action against any of the Released Parties and the Bankruptcy Court (or other court of competent jurisdiction) does not enter an order denying standing to such Person, requiring withdrawal or dismissal with prejudice, or otherwise denying the requested relief, as applicable, within forty-five (45) days of the earlier of the filing of a motion seeking standing or the commencement of the Adverse Action;

(z) any Loan Party or any of its Subsidiaries, Affiliates, or insiders shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against Lender;

(aa) a Loan Party shall fail to execute and deliver to Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments, or other documents that Lender may request from time to time (including pursuant to Section 5.13) to more fully evidence, confirm, validate, perfect, preserve and enforce Liens created in favor of Lender, subject to the time periods and terms set forth in the applicable Loan Documents;

(bb) the occurrence of a Material Adverse Change; or

(cc) the occurrence of a Change of Control.

8.2 **Rights and Remedies**.

Subject to the terms of the Final Order (including, as applicable, Borrowers' rights with respect to the Remedies Notice and the Remedies Notice Period), upon the occurrence and during the continuance of an Event of Default, and notwithstanding section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court of competent jurisdiction or the initiation of any further proceeding with the Loan Parties, in addition to taking any other action or exercising any other rights or remedies (including, without limitation, with respect to the Liens in favor of Lender) provided for hereunder or under any Loan Document (including the DIP Orders) or by the UCC or any other applicable law, Lender may do any one or more of the following:

(i) declare the Obligations, whether evidenced by this Agreement or by any Loan Document, are due and payable, and the Commitments are terminated, whereupon the Obligations shall become and be immediately due and payable, without

presentment, demand, protest, further notice, or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii) terminate, restrict, or reduce Borrowers' ability to use Cash Collateral as provided by the DIP Orders, as applicable;

(iii) charge interest at the Default Rate;

(iv) obtain and liquidate the Collateral, it being understood and agreed that (1) if notice of disposition of the Collateral is required by law, ten (10) days prior written notice by Lender to the Loan Parties designating the time and place of any public sale or the time after which any private sale or other intended disposition of the Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of section 9-611 of the UCC, and the Loan Parties hereby waive any other notice, (2) Lender may bid for and purchase the Collateral at any public sale and (3) Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v) exercise all voting and consensual rights and powers on account of any pledged securities;

(vi) require the Loan Parties to assemble all of the Collateral constituting personal property without judicial process pursuant to section 9-609 of the UCC;

(vii) take possession of all Collateral constituting tangible personal property without judicial process pursuant to section 9-609 of the UCC; and

(viii) exercise any of its other rights and remedies under the Loan Documents, any rights granted under the DIP Orders, and applicable law.

8.3 **Application of Proceeds upon Event of Default**. Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (a) first, to fund the Carve-Out (to the extent not fully funded by the Loan Parties at such time); (b) second, to the Lender Expenses consisting of documented out-of-pocket attorneys' fees and all documented expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for Taxes, and other expenses) incurred by Lender in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (c) third, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Exit Fee); (d) fourth, to the discharge of any accrued but unpaid interest on the Obligations; (e) fifth, to the outstanding principal balance of any Obligations; and (f) sixth, to pay any remaining surplus to the Loan Parties.

8.4 **Remedies Cumulative**. The rights and remedies of Lender under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all rights and remedies not inconsistent herewith or with the Final Order, as provided under the UCC, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and

no waiver by Lender of any Event of Default shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it.

## 9. COLLATERAL SECURITY

9.1 **Grant of Security Interest in the Collateral; Superpriority Claims**.

(a) Subject to the terms and conditions of, and entry of, the DIP Orders, to secure the payment and performance of the Obligations (i) each Borrower hereby (A) grants, collaterally pledges, and assigns to Lender the liens set forth in the DIP Orders, including a fully perfected first-priority senior priming lien on and security interest in all of each Borrower's right, title and interest in and to the Senior Collateral (subject to only the Carve-Out) and the proceeds thereof, and a fully perfected junior lien on and security interest in all of each Borrower's right, title and interest in and to the Junior Collateral and the proceeds thereof, and (B) grants to Lender Superpriority Claims in the Chapter 11 Cases for the repayment of the Obligations; and (ii) each other Loan Party hereby grants, collaterally pledges, and assigns to Lender legal, valid and enforceable Liens on, and security interests in, all of such Loan Parties' right, title and interest in and to the Collateral and the proceeds thereof.

(b) In the event any of the Collateral is transferred to any Loan Party, such transfer shall be subject in all respects to Lender's Liens.

(c) Nothing herein shall be construed to impair the ability of Lender to object on any grounds to the fees, expenses, reimbursement, or compensation described in the definition of the term Carve-Out in the DIP Orders.

9.2 **Representations and Warranties in Connection with Security Interest**. Each Loan Party represents and warrants to Lender as follows, that, subject to the entry of the applicable DIP Orders:

(a) the Loan Parties have full right and power to grant to Lender a perfected, priming security interest and Lien, in accordance with the Required Lien Priority, on Loan Parties' respective interests in the Collateral pursuant to this Agreement and the other Loan Documents;

(b) upon the execution and delivery of this Agreement, Lender will have valid and automatically perfected Liens and security interests in the Collateral granted by the applicable Loan Party, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than restrictions or Liens expressly permitted by Section 6.2; provided that, notwithstanding the automatic perfection and priority of Lender's Liens under the DIP Orders, as applicable, Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 9.6);

(c) as of the Effective Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by such Loan Party is on file in any public office except those on behalf of Lender, other than the filings in respect of Liens expressly permitted by Section 6.2; and

(d) as of the Effective Date, such Loan Party is not party or otherwise subject to any agreement, document or instrument that conflicts with this Section 9.2.

9.3 **Superpriority Nature of Obligations and Liens**. The Liens and Superpriority Claims referred to in Section 9.1 shall have the priority afforded to such Liens and Superpriority Claims in the applicable DIP Orders.

9.4 **Power of Attorney**. Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Loan Party (without requiring Lender to act as such) with full power of substitution to, do the following (which appointment is irrevocable and coupled with an interest): subject to the DIP Orders, as applicable, (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is or they or are obligated to give Lender under any of the Loan Documents; (b) do such other and further lawful acts and deeds in the name of such Person that Lender may deem necessary or desirable to perfect Lender's security interest or lien in any Collateral or (c) after the occurrence of an Event of Default which is continuing, (i) enforce an Account, (ii) exercise any voting or consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (iv) notify, or to require any Loan Party to notify, account debtors to make payment directly to Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of such Loan Party on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that, nothing herein contained shall be construed as requiring or obligating Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral. Notwithstanding the foregoing, the foregoing power of attorney is a right and not an obligation of Lender and neither Lender nor its officers, directors, employees, or agents shall be responsible to any Loan Party for failure to exercise any of the foregoing rights.

9.5 **Lender's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral**. Lender shall have the right, but not the obligation, to perform on Loan Parties' behalf, any or all of Loan Parties' obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account, and at the sole risk of such Loan Party.

9.6 **Filing of Financing Statements**. Each Loan Party irrevocably authorizes Lender without notice to such Loan Party to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect Lender's security interest in the Collateral, in all jurisdictions in which Lender believes in its sole opinion that such filing is appropriate. Each Loan Party also irrevocably authorizes Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in

either case in Lender's sole judgment, in order to perfect and to continue the perfection of Lender's security interests in the Collateral, unless prohibited by law.

9.7 **No Discharge; Survival of Claims**. Pursuant to section 1141(d)(4) of the Bankruptcy Code, each Loan Party hereby waives any discharge of the Obligations with respect to any chapter 11 plan that is not an Acceptable Plan.

## 10. WAIVERS; INDEMNIFICATION

10.1 **Demand; Protest**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Loan Party hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by Lender on which such Loan Party may in any way be liable.

10.2 **Lender's Liability for Collateral**. Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Loan Parties, except any thereof resulting from the gross negligence, actual fraud, or willful misconduct of Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

10.3 **Indemnification**. Each Loan Party shall pay, indemnify, defend, and hold any Lender Related Person (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fines, actions, judgement, and disbursements of any kind or nature whatsoever (including reasonable and documented out-of-pocket fees and disbursements of attorneys, experts, consultants, and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought)), at any time asserted against imposed upon, or incurred by any of them (a) in connection with, as a result of, or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of any Loan Party's compliance with the terms of the Loan Documents; (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto; and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities, or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, Loan Parties shall have no obligation to any Indemnified Person under this Section 10.3 with respect to any Indemnified Liability that the Bankruptcy Court or other court of competent jurisdiction determines pursuant to a final non-appealable order to have resulted from the actual fraud, gross negligence, or willful misconduct of

any Indemnified Person. This provision shall survive the termination of this Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which any Loan Party was required to indemnify the Indemnified Person receiving such payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by such Loan Party with respect thereto. **WITHOUT LIMITATION OF THE FOREGOING, THE INDEMNITY ABOVE SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON EXCEPT FOR ANY ACT OR OMISSION THAT CONSTITUTES ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNIFIED PERSON.**

## 11. NOTICES

All notices or demands relating to this Agreement or any Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrower Representative, or any other Loan Party:

Raguse Family Partnership
6867 740th Street
Wheaton, Minnesota 56296
Attention: Truman Raguse
Email: [•]@[•].com

with a copy to (which shall not constitute notice):

Taft Stettinius & Hollister LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Attn: James M. Jorissen
Landon Raiford

Email: jjorissen@taftlaw.com
lraiford@taftlaw.com

If to Lender:

East West Bank
535 Madison Ave., 8th Fl.
New York, NY 10022

Attn: Ted Hirshfield
Telephone: 917-513-1328
Email: ted.hirshfield@eastwestbank.com

with a copy to (which shall not constitute notice):

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York 10019
Attn: Robert M. Hirsh
Francisco Vazquez
Jamie Copeland
E-mail: robert.hirsh@nortonrosefulbright.com
francisco.vazquez@nortonrosefulbright.com
james.copeland@nortonrosefulbright.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Section 11, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; provided, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function.

**12. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**

(a) THE VALIDITY OF THIS AGREEMENT AND THE LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b) THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT. LOAN PARTIES AND LENDER HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN

EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASES REMAIN PENDING.

(c) **LOAN PARTIES AND LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. LOAN PARTIES AND LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. LOAN PARTIES AND LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

## 13. AMENDMENTS; WAIVERS; SUCCESSORS

13.1 **Amendments and Waivers**. No amendment, waiver, or other modification of any provision of this Agreement or any Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by Lender and Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

13.2 **No Waivers; Cumulative Remedies**. No failure by Lender to exercise any right, remedy, or option under this Agreement or any Loan Document, or delay by Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by Lender on any occasion shall affect or diminish Lender's rights thereafter to require strict performance by any Loan Party of any provision of this Agreement. Lender's rights under this Agreement and the Loan Documents will be cumulative and not exclusive of any other right or remedy that Lender may have.

13.3 **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties hereto; provided, that no Loan Party may assign this Agreement or any rights or duties hereunder without Lender's prior written consent (in its sole discretion) and such consent shall not, unless otherwise provided in such consent, release such Loan Party from its Obligations. Any assignment by such Loan Party not expressly permitted hereunder shall be void *ab initio*.

## 14. GENERAL PROVISIONS

14.1 **Effectiveness**. This Agreement shall be binding and deemed effective when executed by or on behalf of Loan Parties and Lender.

14.2 **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

14.3 **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or Loan Parties, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties hereto and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

14.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5 **Debtor-Creditor Relationship**. The relationship between Lender, on the one hand, and Loan Parties, on the other hand, is solely that of creditor and debtor, respectively. Lender has no (and shall not be deemed to have) fiduciary relationship or duty to Loan Parties arising out of or in connection with the Chapter 11 Cases, the Loan Documents, or the transactions contemplated thereby, and there is no agency or joint venture relationship between Lender, on the one hand, and Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

14.6 **Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.7 **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by the Loan Parties or the transfer to Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of Lender related thereto, the liability of the Loan Parties automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

14.8 **Integration**. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties hereto with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15. JOINT AND SEVERAL OBLIGATIONS

IN ADDITION TO, AND WITHOUT LIMITING ANY TERM OR PROVISION OF, THIS AGREEMENT, ALL OBLIGATIONS HEREUNDER AND UNDER THE LOAN DOCUMENTS OF EACH LOAN PARTY ARE JOINT AND SEVERAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGATIONS OF EACH LOAN PARTY SHALL NOT BE AFFECTED BY (A) THE FAILURE OF LENDER TO ASSERT ANY CLAIM OR DEMAND OR TO ENFORCE OR EXERCISE ANY RIGHT OR REMEDY AGAINST ANY OTHER LOAN PARTY UNDER THE PROVISIONS OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR OTHERWISE, (B) ANY RESCISSION, WAIVER, AMENDMENT OR MODIFICATION OF, OR ANY RELEASE FROM ANY OF THE TERMS OR PROVISIONS OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (C) THE FAILURE TO PERFECT ANY SECURITY INTEREST IN, OR THE RELEASE OF, ANY OF THE COLLATERAL OR OTHER SECURITY HELD BY LENDER.

## 16. ADDITIONAL LOAN PARTIES

In the event a Borrower or other Loan Party is added to this Agreement, all references herein to Borrowers (or any of them) shall also apply to any such additional Borrower or Loan Party, including, without limitation and to the extent applicable, the granting of a security interest in the Collateral and all representations, warranties, covenants and other obligations of Borrowers or Loan Parties (or any of them) hereunder.

## 17. TREATMENT OF CERTAIN INFORMATION

Lender agrees to comply with any existing confidentiality agreement between Lender and Loan Parties as of the date of this Agreement and agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all Information (as defined below); provided, however, that nothing herein shall limit the disclosure of any such Information (a) to any Lender Related Person as need to know such Information, (b) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, (c) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (d) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Agreement, (ii) becomes available to Lender on a confidential basis from a source other than any Loan Party or any of its Subsidiaries, so long as such source is not known by Lender to be bound by obligations of confidentiality with respect to such Information, or (C) was available to Lender on a non-confidential basis prior its disclosure to Lender by any Loan Party or any of its Subsidiaries, or any of their advisors, and (e) to the extent that any Loan Party shall have consented to such disclosure in writing.

For purposes of this Section, "Information" means all information received from a Loan Party or any Subsidiary relating to any Loan Party or its Subsidiaries or any of their respective businesses, other than any such information that is available to Lender on a nonconfidential basis prior to disclosure by a Loan Party or a Subsidiary (provided that if such information is furnished by a source known to Lender to be subject to a confidentiality obligation, such source, to the knowledge of Lender, is not in violation of such obligation by such disclosure). Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

[*Signatures on Following Pages*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**<u>BORROWER REPRESENTATIVE</u>:**

**RAGUSE FAMILY PARTNERSHIP**

By: ________________________________________
Name: ______________________________________
Title: ______________________________________

**<u>OTHER BORROWERS</u>:**
**R.A.G. HOLDINGS, LLC**
**TRU AG LLC**
**RED ROCK CATTLE, LLC**

By: ________________________________________
Name: ______________________________________
Title: ______________________________________

**<u>GUARANTORS</u>:**
**DAVID RAGUSE**

______________________________________
David Raguse

**SUSAN RAGUSE**

______________________________________
Susan Raguse

**TRUMAN RAGUSE**

______________________________________
Truman Raguse

**LENDER:**

**EAST WEST BANK**

By: ________________________________________
Name: Edward Hirshfield
Title: SVP-Head of DIP Lending and Distressed Situations

**Exhibit A**

**Form of Compliance Certificate**

Date: [•] [•], 202[•]

This Compliance Certificate (this "Certificate") is given to East West Bank, a California state bank (together with its successors and assigns, "Lender"), by Raguse Family Partnership, a Minnesota partnership (the "Borrower Representative"), for itself and on behalf of the other Loan Parties party to that certain Senior Secured, Super-Priority Debtor-In-Possession Loan, Guaranty, and Security Agreement dated as of June __, 2026 (as the same has been amended, restated, amended and restated, supplemented, or otherwise modified from time to time through the date hereof, the "Loan Agreement"), by and among the Borrower Representative, the other Loan Parties from time to time party thereto, and Lender. Capitalized terms used in this Certificate without definition shall have the same meanings herein as they have in the Loan Agreement. This Certificate constitutes a Loan Document.

The Borrower Representative, for itself and on behalf of each Loan Party, hereby certifies that:

(a) the representations and warranties of each Loan Party contained in the Loan Agreement and in the other Loan Documents are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of this Certificate, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(b) no Default or Event of Default shall have occurred and be continuing on the date of this Certificate, nor shall either result from the making of the Advance requested in connection with this Certificate;

(c) the DIP Orders remain in full force and effect on the date hereof and have not been, from the time of the entry of such order, modified or amended (unless otherwise approved by Lender), reversed, or stayed; and

(d) no injunction, writ, restraining order, or other order of any nature restricting or prohibiting, directly or indirectly, the Loans has been issued and remains in force by any Governmental Authority against any Loan Party.

[*Signature on following page*]

**IN WITNESS WHEREOF**, the Borrower Representative has caused this Certificate to be executed as of the date first written above.

**BORROWER REPRESENTATIVE:**

**RAGUSE FAMILY PARTNERSHIP**

By: ______________________________________
Name: ____________________________________
Title: _____________________________________

# <u>Exhibit B</u>

## Approved Budget

**Raguse Family Entities**
**13-Week Cash Flow Forecast**

6/9/2026 8:36

| *($ and volume in thousands)* | Actual | Actual | Actual | Actual | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | 6-Jun-26 4-Sep-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 15-May-26 | 22-May-26 | 29-May-26 | 5-Jun-26 | 12-Jun-26 | 19-Jun-26 | 26-Jun-26 | 3-Jul-26 | 10-Jul-26 | 17-Jul-26 | 24-Jul-26 | 31-Jul-26 | 7-Aug-26 | 14-Aug-26 | 21-Aug-26 | 28-Aug-26 | 4-Sep-26 | 13-Week |
| **Company Period** | May | May | May | May/Jun | June | June | June | Jun/Jul | Jul | Jul | Jul | Jul/Aug | Aug | Aug | Aug | Aug | Aug/Sept | Period |
| **Model Week** | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Wk 14 | Wk 15 | Wk 16 | Total |
| ***SALES*** | | | | | | | | | | | | | | | | | | |
| Net Sales | $ - | $ - | $ - | $ - | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ - | $ - | $ - | $ 3,000 |
| ***CASH FLOW SUMMARY*** | | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | | |
| Customer Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ 150 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 150 | $ 3,000 |
| Discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Government Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 200 | - | 200 |
| Crop Insurance Indemnity Payments | - | - | - | - | - | - | 153 | - | - | - | - | 435 | - | - | - | 1,135 | - | 1,722 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [] | | | | | | | | | | | | | | | | | | |
| **Net Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ 303 | $ 300 | $ 300 | $ 300 | $ 300 | $ 735 | $ 300 | $ 300 | $ 300 | $ 1,635 | $ 150 | $ 4,922 |
| **General Disbursements** | | | | | | | | | | | | | | | | | | |
| Crop Input Costs | $ - | $ 1,110 | $ 30 | $ 41 | $ 357 | $ 100 | $ 50 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ - | $ 597 |
| Cattle Input Costs | - | - | 571 | 834 | 1,081 | 557 | 552 | 7 | 7 | 7 | 7 | 7 | 9 | 9 | 9 | 9 | 9 | 2,271 |
| Land & Equipment | - | 1,027 | 94 | - | 4 | 520 | 1 | 19 | - | 200 | 1 | 18 | 1 | 109 | 1 | - | 19 | 894 |
| Labor & Benefits | - | 114 | 49 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | 350 |
| Insurance | - | - | - | 229 | - | 7 | - | 4 | - | 7 | - | 39 | - | - | 7 | - | 4 | 68 |
| Utilities | - | - | - | - | 15 | - | - | 15 | - | - | - | 15 | - | - | - | - | 15 | 60 |
| Other Operating Expenses | - | 106 | 0 | 30 | 46 | 36 | 31 | 17 | 8 | 8 | 8 | 13 | 10 | 10 | 10 | 10 | 97 | 307 |
| [] | | | | | | | | | | | | | | | | | | |
| Total General Disbursements | $ - | $ 2,357 | $ 744 | $ 1,133 | $ 1,553 | $ 1,220 | $ 685 | $ 72 | $ 76 | $ 233 | $ 77 | $ 102 | $ 80 | $ 138 | $ 87 | $ 29 | $ 194 | $ 4,548 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Critical Vendors | $ - | $ - | $ - | $ - | $ 50 | $ 50 | $ 50 | $ 50 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 200 |
| Capital Spending | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Payments | - | 160 | - | - | 165 | 40 | 358 | 409 | 300 | 300 | 300 | 996 | 300 | 300 | 300 | 1,726 | 255 | 5,750 |
| [] | | | | | | | | | | | | | | | | | | |
| Total Other Operating Disbursements | $ - | $ 160 | $ - | $ - | $ 215 | $ 90 | $ 408 | $ 459 | $ 300 | $ 300 | $ 300 | $ 996 | $ 300 | $ 300 | $ 300 | $ 1,726 | $ 255 | $ 5,950 |
| **Net Operating Cash Flow** | $ - | $ (2,517) | $ (744) | $ (1,133) | $ (1,768) | $ (1,310) | $ (790) | $ (232) | $ (76) | $ (233) | $ (77) | $ (364) | $ (80) | $ (138) | $ (87) | $ (120) | $ (300) | $ (5,575) |
| **Professional Fees** | $ - | $ 250 | $ - | $ - | $ 535 | $ 86 | $ 51 | $ 50 | $ 57 | $ 82 | $ 47 | $ 47 | $ 57 | $ 81 | $ 46 | $ 46 | 46 | $ 1,228 |
| **Total Disbursements** | $ - | $ 2,767 | $ 744 | $ 1,133 | $ 2,303 | $ 1,396 | $ 1,144 | $ 581 | $ 432 | $ 614 | $ 424 | $ 1,146 | $ 437 | $ 519 | $ 433 | $ 1,801 | $ 496 | $ 11,725 |
| **U.S. Trustee Expenses** | $ - | $ - | $ - | $ - | $ - | $ - | $ 75 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 75 |
| **Cash Flow** | $ - | $ (2,767) | $ (744) | $ (1,133) | $ (2,303) | $ (1,396) | $ (916) | $ (281) | $ (132) | $ (314) | $ (124) | $ (411) | $ (137) | $ (219) | $ (133) | $ (166) | $ (346) | $ (6,878) |
| Weekly Starting Cash | - | - | 5,233 | 4,489 | 3,356 | 1,053 | 1,656 | 740 | 2,959 | 2,827 | 2,512 | 2,389 | 1,978 | 1,841 | 1,622 | 1,489 | 1,323 | 3,356 |
| Change in Cash before DIP Draw | - | (2,767) | (744) | (1,133) | (2,303) | (1,396) | (916) | (281) | (132) | (314) | (124) | (411) | (137) | (219) | (133) | (166) | (346) | (6,878) |
| Net Cash before DIP Draw | - | (2,767) | 4,489 | 3,356 | 1,053 | (344) | 740 | 459 | 2,827 | 2,512 | 2,389 | 1,978 | 1,841 | 1,622 | 1,489 | 1,323 | 977 | (3,523) |
| Plus: DIP Draw | - | 8,000 | - | - | - | 2,000 | - | 2,500 | - | - | - | - | - | - | - | - | - | 4,500 |
| **Ending Cash** | $ - | $ 5,233 | $ 4,489 | $ 3,356 | $ 1,053 | $ 1,656 | $ 740 | $ 2,959 | $ 2,827 | $ 2,512 | $ 2,389 | $ 1,978 | $ 1,841 | $ 1,622 | $ 1,489 | $ 1,323 | $ 977 | $ 977 |
| Initial DIP Draw | $ - | $ 8,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other DIP Draw | - | | | | $ - | $ 2,000 | $ - | $ 2,500 | - | - | - | - | - | - | - | - | - | 4,500 |
| **Total DIP Drawn** | $ - | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 10,000 | $ 10,000 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 4,500 |

# Exhibit C

## Reporting Requirements

(a) **Financial Reports**. The Loan Parties shall furnish to Lender, which, subject to the following sentence, shall be in a form acceptable to Lender, as soon as available and in any event within 35 days after the end of each calendar month or, in the case of the last calendar month of each fiscal quarter, 45 days after the end of such calendar month, unaudited consolidated financial statements for such calendar month or quarter, as applicable, of the Loan Parties consisting of a balance sheet, and related statements of income, all of which shall be certified on behalf of the Loan Parties by an Authorized Person as being in compliance with this paragraph (a). Delivery of the monthly operating reports required to be filed in the Chapter 11 Cases as and when required thereunder shall satisfy the requirement of this paragraph (a) as to Borrowers.

All financial statements shall be prepared, and shall be complete and correct in all material respects, and fairly presenting in all material respects the financial position and results of operations of the Loan Parties on a consolidated basis and may be subject to normal year-end adjustments.

(b) **Other Materials**. The Loan Parties shall furnish to Lender (A) as soon as available and in any event within five (5) Business Days after the preparation, receipt, or issuance thereof or request therefor by Lender, copies of any material reports and management control letters provided by the Loan Parties' independent accountants and (B) promptly upon written request thereof, such additional information, documents, statements, and other materials as Lender may reasonably request from time to time and which is reasonably capable of being obtained, produced, or generated by the Loan Parties; provided, that in no event shall the Loan Parties be required to provide any information, documents, statements, and other materials that is subject to attorney-client or other privilege or that consists of attorney work product.

(c) **Notices**. Each Loan Party for itself, promptly, and in any event within five (5) Business Days after such Loan Party or any Authorized Person thereof obtains knowledge thereof, shall notify Lender in writing of:

(i) other than in connection with the Chapter 11 Cases, any pending or threatened (in writing) action, suit, proceeding, or investigation involving commencing after the Petition Date any Loan Party or any of its Subsidiaries, or any such Person's property to the extent the amount in controversy exceeds one million Dollars ($1,000,000) in the aggregate or any injunctive relief is sought;

(ii) other than in connection with the Chapter 11 Cases, (A) the receipt of any notice or request from any Governmental Authority regarding any liability or claim incurred or commencing after the Petition Date equal to or exceeding one million Dollars ($1,000,000) in the aggregate or (B) any material action taken or threatened (in writing) to be taken by any Governmental Authority (or any notice of any of the foregoing);

(iii) any notice regarding termination by the lessor of any lease of material real property (other than any such termination resulting from the scheduled expiration thereof, pursuant to the agreed upon terms in effect on the date of this

Agreement) or of any senior officer, or the loss or termination (other than any such termination resulting from the scheduled expiration thereof, pursuant to the agreed upon terms in effect on the date of this Agreement) of any Material Contract to which any Loan Party or its assets are bound; and

(iv) the filing, recording, or assessment of any federal, state, local, or foreign tax Lien against any Collateral (other than real estate taxes and municipal charges related to Collateral consisting of real property).

(d) **Updates**. The Loan Parties shall furnish to Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate (as determined by the Loan Parties in the good faith exercise of its business judgment); provided, that delivery or receipt thereof by Lender shall not constitute a waiver by Lender or a cure of any Default or Event of Default resulting therefrom.

(e) **Material Adverse Change**. Promptly upon any Loan Party or any Authorized Person of a Loan Party obtaining knowledge of any development or event pertaining to the Loan Parties (or any of them) that has resulted in, or would reasonably be expected to result in a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this Exhibit C, a certificate signed by an Authorized Person of the Loan Parties setting forth the details of such development or event and stating what action the Loan Parties have taken or propose to take with respect thereto; provided, that in no event shall the Loan Parties be required to provide any detail or action-related decision that is subject to attorney-client or other privilege or that consists of attorney work product.

(f) **Management Letters**. Promptly after the receipt thereof by any Loan Party, copies of any management letters and any reports as to material inadequacies in accounting controls of the Loan Parties (including reports as to the absence of any such inadequacies) submitted to any Loan Party by its independent accountants in connection with any audit of any Loan Party made by such accountants.

# **Exhibit D**

## **Form of Borrowing Notice**

East West Bank and/or its designees or its assignees,
as DIP Lender (as defined in the Final Order referred to below)
545 Madison Ave., 8th Floor
New York, NY 10022

Ladies and Gentlemen:

The undersigned Raguse Family Partnership ("RFP" or the "Borrower Representative"), refers to (a) that certain *Final Order (I) Authorizing The Debtors to Obtain Postpetition Financing, Grant Liens, Provide Superpriority Administrative Expense Status and Use Cash Collateral, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. •] (the "Final Order") and (b) the Senior Secured, Super-Priority Debtor-In-Possession Loan, Guaranty, and Security Agreement dated as of June __, 2026 (as the same has been amended, restated, amended and restated, supplemented, or otherwise modified from time to time through the date hereof, the "Loan Agreement") between the Loan Parties (as defined in the Loan Agreement) and East West Bank, a California state bank (together with its successors and assigns, "Lender"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Loan Agreement or, if not defined therein, the Final Order. This Borrowing Notice constitutes a Loan Document.

In accordance with the Final Order and the Loan Agreement, the undersigned hereby gives you notice of its request for an Advance in the amount of [•] Dollars ($[•]) to be funded on [•], 202[•] (the "Borrowing Date") by wire transfer of immediately available funds to the account of the Borrower Representative set forth on Annex A hereto. The Borrower Representative, for itself and on behalf of the other Loan Parties, acknowledges and agrees that the requested Advance shall be funded net of the unpaid fees and expenses Lender Expenses to the extent due pursuant to Section 2.4(c) and unpaid prior to the Borrowing Date (the "Netted Amounts" and the excess of the principal amount of the requested Advance and Netted Amounts, the "Net Proceeds"). For the avoidance of doubt, the funding of the Net Proceeds shall constitute the full funding of the requested Advance.

The Borrower Representative, for itself and on behalf of the other Loan Parties, hereby represents and warrants to Lender that: (a) as of the date of this Borrowing Notice, the sum of the outstanding principal of the Loans under the Loan Agreement (after giving effect to the Advance requested pursuant to this Borrowing Notice) plus the amount requested in any outstanding but unfunded Borrowing Notice, does not violate Section 2.1 of the Loan Agreement or any other provision in the Loan Documents; and (b) the Loan Parties are in compliance with the conditions precedent set forth in Section 3 of the Loan Agreement, as applicable.

[*Signature Page Follows*]

**BORROWER REPRESENTATIVE:**

**RAGUSE FAMILY PARTNERSHIP**

By: ________________________________________

Name: ______________________________________

Title: _______________________________________

Annex A

Wire Instructions and Verbal-Confirmation Contact

| **Wire Instructions** | |
|---|---|
| **Bank Name** | [•] |
| **Bank Address** | [•] |
| **Account Name** | [•] |
| **Account Number** | [•] |
| **ABA Number** | [•] |
| **Reference** | |

| **Verbal-Confirmation Contact** | |
|---|---|
| **Name** | [•] |
| **Work Telephone** | [•] |

# Exhibit E

## DIP Term Sheet

**May 19, 2026**

**Raguse Family Partnership, *et al.***
**$12,500,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, this "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement between the DIP Lender and Borrowers from and after, and subject to, the entry of the Interim Order with respect to the DIP Facility (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (in each case, as defined below), the terms of the DIP Orders (as defined below), as applicable, shall govern.**

**This Term Sheet is a binding and enforceable agreement, subject to entry of the Interim Order with respect to the Debtors, with respect to the subject matter contained herein, including an agreement to negotiate in good faith the DIP Documents by the parties hereto in a manner consistent with this Term Sheet, it being acknowledged and agreed that the funding or availability of the DIP Facility is subject to the applicable conditions precedent set forth in this Term Sheet.**

| | | |
|---|---|---|
| 1. | ***Borrowers and Guarantors*** | • Raguse Family Partnership, R.A.G Holdings, LLC, Tru Ag LLC and Red Rock Cattle, LLC (collectively, the "**Borrowers**," and each a "**Borrower**").<br>• All obligations under the DIP Facility will be unconditionally guaranteed by each Borrower and David Raguse, Susan Raguse and Truman Raguse (collectively, the "**Loan Parties**" and each a "**Loan Party**").<br>• The Borrowers are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases,**" and the Borrowers and their applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**") on or around May 13, 2026 (such filing date, the "**Petition Date**").<br>• For the purposes of this Term Sheet and the DIP Facility, Raguse Family Partnership (i) is hereby designated and appointed by each Loan Party as its authorized representative and agent to act on its behalf (the "**Borrower Representative**") and (ii) accepts such appointment as the Borrower Representative. |
| 2. | ***DIP Lender*** | • East West Bank ("**EWB**") and its designees or assignees (together with EWB, the "**DIP Lender**"). |

| | | |
|---|---|---|
| 3. | ***Type and Amount of the DIP Facility*** | • A non-amortizing, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $12,500,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**").<br><br>• The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed.<br><br>• Any Initial Draw shall be funded to the Debtors, through the DIP Bank Account (as defined below), to be used solely in accordance with the Budget, subject to the Permitted Variance (in each case, as defined below).<br><br>• Subsequent DIP Loan proceeds to be funded into a new segregated Bank Account to be opened or otherwise designated by a Borrower (the "**DIP Bank Account**") and the Borrowers shall obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 30 days after the entry of the Final Order subject to a 30-day cure period if the Borrowers are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the interim order approving the DIP Facility, in form and substance acceptable to the DIP Lender (the "**Interim Order**"). |
| 4. | ***Initial Availability*** | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of DIP Loans up to $8,000,000 (the "**Interim Amount**") and the Borrowers shall be entitled to make a draw of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the first draw under the DIP Facility, the "**Initial Draw**" and all draws before the entry of the Final Order, the "**Initial Draws**"). The closing of definitive DIP Documents (such date shall be referred to herein as the "**Closing Date**") shall occur as soon as reasonably possible after the entry of the Final Order, but in any event no later than two (2) business days thereafter unless the DIP Lender agrees otherwise. |
| 5. | ***Full Availability*** | • Upon (i) the Bankruptcy Court's entry of the Final Order and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**," and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | ***Draws*** | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (subject to the |

| | | |
|---|---|---|
| | | Permitted Variance), up to the amount of the undrawn DIP Commitments.<br>• Each Draw shall be made (in an aggregate minimum amount of [$2,000,000] (and multiples thereof) upon three (3) business days' written notice (or such shorter period as agreed to by the DIP Lender its sole discretion), up to the aggregate amount of the available undrawn DIP Commitments at any time prior to three (3) business days before the DIP Termination Date (as defined below); provided that the Initial Draw shall be in an amount up to the Interim Amount in accordance with the terms of the DIP Documents, and funded within two (2) business days following after the DIP Lender's receipt of a customary borrowing notice following entry of the Interim Order. |
| 7. | ***Maturity and Termination*** | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[1] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of (such earliest date, the "**DIP Termination Date**"):<br>i. March 31, 2027 (the "**Maturity Date**");<br>ii. the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**");<br>iii. the consummation of the sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code;<br>iv. the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default (as defined below and in the DIP Documents) in accordance with the DIP Documents;<br>v. dismissal of any Chapter 11 Case, conversion of any Chapter 11 Case into a case under chapter 7 of the Bankruptcy Code, or the appointment of a trustee or examiner in any Chapter 11 Case; and<br>vi. forty-five (45) days after the Petition Date (or such later date as agreed to by the DIP Lender), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.<br>• The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow under the DIP Facility and use any proceeds thereof (other than the Carve-Out), including Cash Collateral (as defined in the DIP Orders) and shall terminate the DIP Commitments and any |

[1] For purposes hereof, the term "**Payment in Full**" or, as applicable, "**Paid in Full**," means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

| | | |
|---|---|---|
| | | further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.<br><br>• For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the DIP Termination Date under the DIP Orders and the other DIP Documents. |
| 8. | ***Interest Rate*** | • The DIP Loans shall bear interest at a per annum rate equal to 11.0% payable in cash on the first business day of each month in arrears (the "**Non-Default Interest**").<br><br>• Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2.0%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | ***Commitment Fee, Work Fee, Exit Fee, and Other Fees*** | • **Commitment Fee**. The Borrowers shall pay to the DIP Lender a commitment fee totaling 2.0% of the DIP Commitments (the "**Commitment Fee**," which for the avoidance of doubt is $250,000), which Commitment Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The Commitment Fee shall be paid in cash to the DIP Lender promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand. For the avoidance of doubt, the Commitment Fee, to the extent earned, shall be payable even if the DIP Facility is never drawn.<br><br>• **Work Fee**. The Borrowers shall reimburse the DIP Lender its legal fees incurred through the Petition Date up to $250,000 (the "**Work Fee**"), which Work Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order. The Interim Order shall provide that the Work Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason. The Work Fee shall be paid in cash to the DIP Lender (or directly to its counsel) promptly after the Bankruptcy Court's entry of the Interim Order, but in no event shall the Commitment Fee be paid later than the date that is two (2) business days after the entry of the Interim Order in cash from the proceeds of the Initial Draw or cash on hand.<br><br>• If the Interim Order is not entered by the Bankruptcy Court within seven (7) days after the Petition Date (or such later date as agreed to by the DIP Lender in its discretion), this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect.<br><br>• **Exit Fee**. The Borrowers shall pay to the DIP Lender an exit fee totaling 5.0% of the DIP Commitment (the "**Exit Fee**," which for the avoidance of doubt is $625,000), which Exit Fee shall be approved on a final basis, fully earned and allowed, non-refundable and not be subject to reduction, setoff or recoupment for any reason upon entry of the Interim Order. The |

| | | |
|---|---|---|
| | | Exit Fee shall be due and payable in cash upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Mandatory Prepayment or Voluntary Prepayment of the DIP Obligations; provided, however, that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br>• The Commitment Fee , Work Fee, and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as set forth above as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court in the Interim Order and paid as set forth herein, this Term Sheet and any applicable DIP Documents shall automatically terminate and be of no further force and effect. |
| 10. | ***Use of Proceeds*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to (ii), (iii), and (iv) below, subject to the Budget and the Permitted Variance as set forth below:<br>i. working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable, if such subsidiaries are Loan Parties under the DIP Documents;<br>ii. professional fees and expenses of the Debtors' estates in administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Budget, the Bankruptcy Code, and any orders of the Bankruptcy Court, as applicable;<br>iii. fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee, the Work Fee, and professional fees and expenses of the DIP Lender (including legal fees and expenses incurred prior to the Closing Date); and<br>iv. interest and other amounts payable under the DIP Facility and the DIP Documents.<br>• All payments disbursements of DIP Facility proceeds shall be submitted to the Debtors' financial advisor, Lakeshore Foods on a weekly basis for confirmation that the requested disbursements are in accordance with the approved Budget. Following such approval, the approved signatory for RFP may initiate the payment.<br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in any Chapter 11 Case, or any trustee or examiner appointed in any Chapter 11 Case or any successor cases, including any chapter 7 cases, or any other Person, party or entity (each of the following, a "**Restricted Use**"): |

| | | |
|---|---|---|
| | | i. in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings, litigation, challenge, objection, or other proceeding:<br><br>a. against the DIP Lender, or its respective predecessors-in-interest, successors, assigns, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP Liens (as defined below), DIP Claims (as defined below), or any other term, condition, or aspect of the DIP Facility; or<br><br>b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim, or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under any of the DIP Orders, the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law, or otherwise;<br><br>ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the DIP Orders, each in accordance with the DIP Documents and the DIP Orders, as applicable; provided, however, that this shall not apply to a challenge to whether a DIP Termination Event has occurred or is continuing in accordance with the DIP Orders and/or the propriety of the DIP Lender's termination and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder;<br><br>iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the DIP Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or<br><br>iv. to apply to the Bankruptcy Court for authority to approve claims or grant liens (other than the Carve-Out) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the DIP Orders have been refinanced with the DIP Lender's consent or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | ***Voluntary and Mandatory Prepayments*** | • **Voluntary Prepayments**. Optional prepayments of the DIP Loans shall be permitted at any time, subject to (i) allocation of such payment to the ratable portion of the Exit Fee due thereon (which, for the avoidance of doubt, shall be deemed to be due and payable on the date of such voluntary |

| | | |
|---|---|---|
| | | prepayment), (ii) accrued interest on the amount prepaid, and (iii) in minimum amounts of at least $1,000,000 of principal.<br><br>• **Mandatory Prepayments**.<br><br>i. **Dispositions**. Within one (1) business day of the date of receipt by any Loan Party of the Net Cash Proceeds[2] of any disposition (whether through a voluntary or involuntary sale, the loss, destruction, or damage thereof or any actual condemnation, confiscation, requisition, seizure, or taking thereof or otherwise) of DIP Collateral (which, for the avoidance of doubt, shall exclude the disposition of other DIP Collateral in the ordinary course), such Loan Party shall prepay such portion of the outstanding amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds (including applicable insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Such Net Cash Proceeds shall be applied to the repayment of principal, accrued interest, and the allocable portion of the Exit Fee.<br><br>ii. **Indebtedness**. Within one (1) business day of the date on which a Loan Party receives proceeds of any indebtedness (other than permitted indebtedness set forth in any applicable DIP Documents), such Loan Party shall prepay the outstanding principal amount of the DIP Obligations in accordance with the applicable DIP Documents in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such indebtedness, plus the accrued interest and Exit Fee as applied to the principal amount of such prepayment.<br><br>• No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender. |
| 12. | ***Security*** | • As security for the DIP Obligations, subject to only the Carve-Out, and effective upon entry of the Interim Order, each Borrower shall grant to the DIP Lender (a) a first lien security interest on all of such Borrower's right, title and interest in, to and under all the Borrowers' assets that were unencumbered as of the Petition Date, (b) a first lien security interest on all of such Borrower's right, title and interest in, to and under the Borrowers' crops growing, grown or to be grown; all harvested crops and |

[2] For purposes hereof, the term "**Net Cash Proceeds**" means, with respect to any sale or disposition of the DIP Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are properly attributable to such transaction. Moreover, for the purposes hereof, the term "**Person**" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

| | | |
|---|---|---|
| | | all processed crops, whether or not produced by the Borrowers either owned or acquired in 2026; and all livestock either owned or acquired in 2026; and all entitlements, rights to payment, and payments (in whatever form received, including, but not limited to, payments in cash or in kind) under any current or future state or federal governmental programs, and all proceeds of the foregoing; all accounts receivable arising from the sale of such collateral or products of the collateral or from any contract for the sale of collateral or of products of the collateral; and (c) a junior lien on all of such Borrowers; right, title and interest in, to and under all the Borrowers' assets that are subject to valid and perfected security interests in favor of third parties as of the Petition Date, in each case, including, but not limited to, the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): (a) all Cash Collateral, all contracts, contract rights, licenses, general intangibles (including, without limitation, all payment intangibles), instruments (including, without limitation, promissory notes), equipment (including, without limitation, documents of title), accounts, documents, goods, vehicles, inventory, farm products (including, without limitation, crops growing, grown, or to be grown), furniture, fixtures, documents, cash, cash equivalents, accounts receivables, chattel paper, letters of credit and letter of credit rights, securities (whether or not marketable) and investment property (including, without limitation, all of the issued and outstanding capital stock of each of the Debtors' current and future subsidiaries, all securities accounts and security entitlements related thereto, and financial assets carried therein, and all commodity accounts and commodity contracts), guarantees, commercial tort claims, arbitration awards, money, rights to the payment of money (including, without limitation, tax refunds and any other extraordinary payments), insurance, receivables, receivables records, securities accounts, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, service marks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), and all substitutions, indemnification rights, all present and future intercompany debt, fee interests in real property owned by a Debtor, books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks, and other electronic storage media and related data processing software related to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing, including insurance proceeds or other proceeds (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York); (b) all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof; and (c) all Avoidance Actions[3] and |

[3] The term "**Avoidance Actions**" means any and all avoidance, recovery, subordination or other claims, actions or remedies that may be brought by or on behalf of the Debtors or their estates or other authorized parties in interest under the Bankruptcy Code or other applicable law, including, without limitation, actions or remedies under sections

| | | |
|---|---|---|
| | | any proceeds thereof, recoveries related thereto, and property received or recovered on account thereof.<br>• Negative pledge on all assets of the Borrowers subject to the Carve-Out and permitted liens, if any, under the DIP Documents.<br>• In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Borrowers shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, and deposit account control agreements) requested by DIP Lender. |
| 13. | ***Priority and Security*** | • Subject to only the Carve-Out, all obligations of the Borrowers under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Borrowers under the DIP Facility (the "**DIP Obligations**") shall be entitled to, as applicable, (i) a senior lien, (ii) junior secured liens, and (iii) superpriority claim status pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, with senior (or junior, as applicable) priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**").<br>• Subject to the Carve-Out, at a minimum, all DIP Obligations in respect of the DIP Facility shall be:<br>i. pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral);<br>ii. secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on all unencumbered assets of the Borrowers that are not subject to a valid and perfected lien on the Petition Date; and<br>iii. secured, pursuant to section 364(c)(3) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic junior lien on all assets of the Borrowers that are subject to an Existing Lien or Permitted Lien as of the Petition Date.<br>• The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the DIP Orders. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements or other agreements. |

544, 545, 547, 548, and 550 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, fraudulent transfer laws.

| | | |
|---|---|---|
| 14. | ***Remedies*** | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, the DIP Lender shall be entitled to exercise any and all remedies customarily available in the Chapter 11 Cases, including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, which shall include, without limitation, the right to (subject to the Carve-Out):<br>i. declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws;<br>ii. declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;<br>iii. charge interest at the default rate under the DIP Documents;<br>iv. subject to the Carve-Out, declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral; or<br>v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law.<br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the DIP Orders and the Loan Parties' right to seek an emergency hearing before the Bankruptcy Court with respect to the exercise of remedies by the DIP Lender. |
| 15. | ***Conditions Precedent to Initial Draws*** | • Entry of the Interim Order on or before three (3) business days after the Petition Date (or such later date as agreed to by the DIP Lender in its sole discretion), and no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner the Interim Order or the Final Order (if entered before the Initial Draw);<br>• Delivery of the Initial Budget (as defined below) acceptable to the DIP Lender in its sole discretion;<br>• All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet (including the Commitment Fee and the Work Fee), the DIP Documents, or the DIP Orders shall have been paid in accordance with this Term Sheet or the applicable DIP Documents;<br>• The representations and warranties of the Loan Parties under this Term Sheet and any other DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |

| | | |
|---|---|---|
| | | • No Material Adverse Effect (as defined below) shall have occurred and be continuing;<br>• The Debtors shall be in compliance in all material respects with the applicable DIP Documents (including the DIP Orders);<br>• No Event of Default shall have occurred and be continuing under this Term Sheet or the DIP Documents; and<br>• The Borrowers shall have delivered to the DIP Lender a customary borrowing notice in form and substance acceptable to the DIP Lender. |
| 16. | ***Conditions Precedent to Availability of Other Draws*** | • No DIP Order, or any material provision thereof, shall have been reversed, amended, stayed, vacated, terminated or otherwise modified in any manner without the DIP Lender's prior written consent in its sole discretion.<br>• In addition to the conditions set forth in Section 15 above, the DIP Documents shall contain conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:<br>i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise in form and substance mutually acceptable to the Loan Parties and the DIP Lender;<br>ii. delivery of any Budget or Updated Budget, acceptable to the DIP Lender in its sole discretion, as applicable;<br>iii. no trustee, examiner, or receiver shall have been appointed or designated with respect to any Loan Party or any Loan Party's business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a Person other than a Loan Party exercising control over its assets or operations;<br>iv. the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);<br>v. the Borrowers shall have delivered to the DIP Lender a customary borrowing notice in accordance with the DIP Documents;<br>vi. the Loan Parties shall be in compliance in all material respects with the DIP Orders;<br>vii. no default or event of default shall have occurred and be continuing under the DIP Documents;<br>viii. no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner |

| | | |
|---|---|---|
| | | any DIP Order or any material provision thereof (other than an amendment or modification acceptable to the DIP Lender in its sole discretion);<br>ix. since the Petition Date, other than the commencement of the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**");<br>x. within thirty (30) days after the entry of the Final Order, the Debtors shall have all applicable insurance policies maintained by Borrowers name, to the extent allowable under the applicable insurance policies, the DIP Lender as additional insured and loss payee; provided, however, that such thirty (30) day period shall be automatically extended for an additional thirty (30) days if the Debtors are using commercially reasonable efforts to obtain the applicable insurance endorsements (and, for the avoidance of doubt, the DIP Lender may agree in writing to additional extensions);<br>xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise required to be paid to the DIP Lender shall have been paid when due; and<br>xii. a granting to the DIP Lender of DIP Claims and DIP Liens to secure all DIP Obligations pursuant to the applicable provisions in sections 364(c) and 364(d) of the Bankruptcy Code shall have occurred and been approved by the Bankruptcy Court. |
| 17. | ***Documentation*** | • Definitive financing documentation with respect to the DIP Loans, including, without limitation, this Term Sheet, the DIP Orders, any DIP Loan agreement and all definitive guaranties, security agreements, and any documents executed pursuant hereto or thereto (the "**DIP Documents**") shall be mutually agreed upon by the Loan Parties, and in form and substance acceptable to the DIP Lender in its sole discretion. |
| 18. | ***Representations and Warranties*** | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties (with exceptions and thresholds to be agreed) as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender and the Loan Parties, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes or effects, |

| | | |
|---|---|---|
| | | title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility.<br><br>• Each Borrower represents and warrants that none of its assets and properties are subject to any valid, perfected liens, security interests or encumbrances as of the Petition Date, other than the Existing Liens set forth in **Schedule 1**. No liens, security interests, or encumbrances will be created on or after the Petition Date except, in each case, the Carve-Out and as expressly permitted under the DIP Documents. |
| 19. | ***Affirmative Covenants*** | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties (with baskets and thresholds to be agreed) in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties. For the avoidance of doubt, no audited financial statements shall be required. |
| 20. | ***Negative Covenants*** | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Loan Parties, including the following, with exceptions and baskets to be agreed: limitations on indebtedness, liens (other than the Carve-Out, the Existing Liens, and the Permitted Liens (as defined in Schedule 1)) subject to a $750,000 aggregate materiality threshold, investments, sale of assets, restricted payments, affiliate transactions, bankruptcy matters; provided that the DIP Documents will permit, among other things: (a) the Debtors to pursue one or more sale processes for, in the aggregate, all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for and require the Payment in Full of the DIP Obligations; (b) the ability to reject or modify contracts; (c) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (d) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers, and in all respects subject to the Budget (subject to the Permitted Variance); and (e) provide for any adequate protection in accordance with the Budget and acceptable to the DIP Lender in its sole discretion. |
| 21. | ***DIP Budget / Variance Reporting*** | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**").<br><br>• The Budget shall be updated and provided to the DIP Lender on the fifth Thursday (or, if later, the fourth business day of such week) following the prior Budget's approval and every fifth Thursday (or, if later, the fourth business day of such week) thereafter, with such updated Budget |

| | | |
|---|---|---|
| | | extending the term thereof and the DIP Lender, in its sole discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within five (5) business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender in its sole discretion. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five (5) business day period, such Updated Budget shall become effective as the Budget.<br>• On a weekly basis after the delivery of the first Budget, the Borrowers shall deliver to the DIP Lender a variance report for the eight-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating disbursements for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative eight-week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Cash Flow Variance (as defined below) solely with respect to net operating Cash Flow that exceed 15.0% in the aggregate in the Measuring Period shall be material and shall constitute and Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably acceptable to the DIP Lender). For the avoidance of doubt, net operating disbursements shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases.<br>• For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative four-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Cash Flow Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15.0% for Budget Variances in the aggregate in the Measuring Period with respect to the Net Operating Cash Flow Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, the Loan Parties, and any Committee, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Cash Flow Variance calculation. |
| 22. | ***DIP Orders*** | • The interim order (the "**Interim Order**") and the final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**") approving the DIP Facility, which, in each case, shall be in form and substance acceptable to the DIP Lender in its sole discretion, shall, among other things, authorize and approve, in each case on a final basis: |

| | | |
|---|---|---|
| | | i. the DIP Facility;<br>ii. the making of the DIP Loans in accordance with the DIP Documents;<br>iii. the granting of the superpriority claims and liens against the Debtors, their estates, and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br>iv. the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described in Section 25 of this Term Sheet (provided that the Commitment Fee and the DIP Lender's legal fees and expenses incurred as of the date of the Initial Draw (including the Work Fee) shall be paid out of the proceeds of the Initial Draw);<br>v. the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order as set forth above; and<br>vi. the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | ***Carve-Out*** | • The liens on and security interests in the DIP Collateral and the superpriority administrative expense claims shall be subject and subordinated only to the Carve-Out.<br>• As used herein, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses incurred by Persons or firms retained by the Borrowers pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "**Debtor Professionals**") or the Official Committee of Unsecured Creditors (the "**Committee**"), if any, pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice, and subject to the fees and expenses set forth in the Budget (subject to the Permitted Variance), applicable transaction fees and any other limits imposed by the amount set forth in the DIP Orders; and (iv) allowed fees and expenses of Professional Persons in an aggregate amount not to exceed [$750,000] incurred after the first |

| | | |
|---|---|---|
| | | business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**" and, together with the amounts set forth in clauses (i) through (iii) but less any retainers held by such Professional Persons, the "**Carve-Out Cap**"); provided that nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described above on any grounds.<br>• Immediately upon the delivery of a Carve-Out Trigger Notice (as defined below), and prior to the payment of any DIP Obligations, the Borrowers shall be required to deposit into a separate account not subject to control of the DIP Lender (the "**Carve-Out Account**") cash (which disbursement shall be deemed approved under the DIP Documents) in an amount equal to difference between the Carve-Out Cap and the balance held in the Carve-Out Account as of the date on which a Carve-Out Trigger Notice is received by the Debtors. The amounts in the Carve-Out Account shall be available only to satisfy allowed fees and expenses of the Professional Persons and other amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for allowed fees and expenses of the Professional Person that are accrued and paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out. The DIP Lender shall have a reversionary interest, up to the Payment in Full of the DIP Obligations, in the funds held in the Carve-Out Accounts, if any, after all amounts included in the Carve-Out have been funded into the applicable Carve-Out Accounts and all allowed Professional Fees have been paid in full pursuant to a final order of the Bankruptcy Court.<br>• For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by mail, courier, or email (or other electronic means) by the DIP Lender or its counsel to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.<br>• The Carve-Out shall not include, apply to, or be available for any Person or party in connection with any Restricted Use.<br>• The DIP Orders, as applicable, shall provide that the foregoing provisions with respect to the Carve-Out shall be subject to the occurrence of the Initial Draw. |
| 24. | ***Events of Default*** | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor- |

| | | |
|---|---|---|
| | | in-possession financing facilities of this type (with exceptions and thresholds to be agreed), including, without limitation:<br><br>i. payment, non-compliance with covenants set forth in the DIP Documents, judgments in excess of $750,000, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature;<br><br>ii. the entry of the Interim Order shall have not occurred on or before May 20, 2026, or the Interim Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender;<br><br>iii. the entry of the Final Order shall have not occurred on or before the date that is forty-five (45) days after the Petition Date, or the Final Order or any material provision thereof shall have been stayed, amended, modified, reversed, vacated, or in any way altered, in each case, to the extent not consented to by the DIP Lender;<br><br>iv. the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;<br><br>v. non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the DIP Orders;<br><br>vi. the entry of an order appointing a receiver, trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee examiner) in any of the Chapter 11 Cases, or the Bankruptcy Court or other court shall have entered an order providing for such appointment;<br><br>vii. the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure or other enforcement against any assets of the Loan Parties the aggregate fair market value of which exceeds $750,000;<br><br>viii. the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens, claims, or priority in the DIP Collateral as set forth in this Term Sheet or the DIP Documents; |

| | | | |
|---|---|---|---|
| | | ix. | any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility; |
| | | x. | entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364 of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations and the DIP Obligations are Paid in Full upon the closing or initial funding under such financing; |
| | | xi. | the making of any material payments in respect of prepetition obligations other than (a) as permitted by the DIP Orders, (b) as permitted by any "first day" or "second day" orders of the Bankruptcy Court acceptable to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court acceptable to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget (subject to the Permitted Variance), or (c) as otherwise agreed to by the DIP Lender; |
| | | xii. | entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file or solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender; |
| | | xiii. | any Loan Party shall, directly or indirectly, seek to, or support any other Person's motion to, (a) disallow in whole or in part the DIP Obligations, (b) challenge the validity and enforceability of the DIP Liens or DIP Claims, or (c) contest any material provision of any DIP Document; |
| | | xiv. | any Debtor files a Plan that is not in form and substance acceptable to the DIP Lender, it being understood that a Plan will be acceptable to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender, balance sheet cash, or another source of funding acceptable to the DIP Lender sufficient to allow for the indefeasible Payment in Full of the outstanding DIP Obligations; |
| | | xv. | the occurrence of a "change of control" of any of the Borrowers through the purchase or otherwise of the beneficial ownership of 50% or more of the voting interest of such Borrower or all or substantially all of the asset of such Borrower without the prior written consent of the DIP Lender in its sole discretion; |

| | | |
|---|---|---|
| | | xvi. the occurrence of any event, condition, contingency, or circumstance that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of Borrowers, taken as a whole, or the other Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document;<br>xvii. any Loan Party files a motion seeking to settle a controversy or claim that could be reasonably expected to have a material adverse effect on the DIP Collateral without the prior written consent of the DIP Lender in its sole discretion; or<br>xviii. any Debtor files a motion for the approval of a sale of the DIP Collateral or any portion thereof, pursuant to section 363 of the Bankruptcy Code or otherwise, which proposed sale (including, for the avoidance of doubt, any order approving such sale) is not acceptable to the DIP Lender in its sole discretion unless such sale would generate cash proceeds sufficient for the Payment in Full of the DIP Obligations (pursuant to a signed commitment to lend acceptable to the DIP Lender from a recognized lender or another source of funding acceptable to the DIP Lender) upon the closing date of such sale). |
| 25. | ***Indemnification and Reimbursement of Expenses*** | • The DIP Documents (including the Interim Order) shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties (the "**Indemnitees**"), including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof.<br>• Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the documented fees and expenses of Norton Rose Fulbright US LLP, as counsel to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 26. | ***Release*** | • The DIP Orders shall include a customary release of the DIP Lender with respect to any and all claims and causes of action arising from or related to the DIP Facility, the Debtors, and/or the Chapter 11 Cases (including any related chapter 11 plan, sale or other disposition, reorganization transaction, or matters related thereto). |
| 27. | ***Waivers*** | • The DIP Orders shall include terms and conditions customary for interim and final DIP financing orders, as applicable, and shall be acceptable to the DIP Lender in its sole discretion, including, without limitation, waiver of the automatic stay, credit-bidding rights, "no marshaling" |

| | | |
|---|---|---|
| | | provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 28. | ***Counterparts and Electronic Transmission*** | • This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| 29. | ***Governing Law*** | • The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br>• The Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |

[*Signatures on following pages.*]

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

**RAGUSE FAMILY PARTNERSHIP**,
as Borrower and Borrower Representative, for and on behalf of itself and the Loan Parties

By: ______________________________

Name:
Title:

**EAST WEST BANK**,
as DIP Lender

By: Edward Hirshfield ______________________________

Name: Edward Hirshfield
Title: SVP-Head of DIP Lending and Distressed Situations

_

**Schedule 1**

Existing and Permitted Liens

For purposes of this Term Sheet, the term "**Existing Liens**" means the following:

- Ally Bank, Auto Loan; 2022 GMC Sierra; Claim Amount: $88,538.14
- Ascentium Capital; Equipment Loan; John Deere 560R; Claim Amount: $50,000
- Ascentium Capital; Equipment Loan; John Deer Accumulator; Claim Amount: $10,000
- Ascentium Capital; Equipment Loan; John Deere 8R370; Claim Amount: $350,000
- Avanza Capital, Merchant Cash Advance, Receivables, Claim Amount: $130,766.34
- CapFirst Equipment Finance, Inc: Equipment Loan, 2010 H&S Beet Cart; Claim Amount: $50,265.00
- CNH Capital, Equipment Loan; Claim Amount: $5,838,840.24
- CNH Capital, Equipment Loan; Case IH 475, Claim Amount: $93,000.00
- CHN Capital; Equipment Loan, Brent 2096; Claim Amount: $103,000.00
- CNH Capital; Equipment Loan, 2018 Corn Header; Claim Amount $215,000.00
- CNH Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,800,000.00
- CHN Capital; Equipment Loan, Case International Harvesters; Claim Amount $2,100,000.00
- CHN Capital; Equipment Loan, 2024 Geringhoff; Claim Amount $400,000
- Cornerstone Bank; Revolving Line of Credit, Claim Amount $19,051,122.68
- Deutsche Leasing USA, Inc.; Equipment Loan, Holmer Tarra Dos T5-40, Claim Amount $1,108,500.19
- Deutsche Leasing USA, Inc.; Equipment Loan, Beet Car, Claim Amount $239,825.00
- JPMorgan Chase Bank NA, Auto Loan, 2021 GMS 2500HD, Claim Amount $28,277.03
- Lazurus Capital, Merchant Cash Advance, Receivables, Claim Amount: $612,793.44
- Old Second National Bank; Promissory Note; Crops and Livestock, Claim Amount $500,000.00
- SBA Loan, Promissory Note; Tangible and Intangible Personal Property (subordinated), Claim Amount $2,000,000.00
- Vermeer Credit, Equipment Loan, Feed Mixer, Bail Processor, and Bail Rake, $130,000
- Wells Fargo, Equipment Loan, 2020 John Deere DB66, Claim Amount: $400,000.

For purposes of this Term Sheet, the term "**Permitted Liens**" means the following:

a. pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any lien imposed by ERISA;

b. pledges and deposits to secure or relating to the performance of bids, trade contracts, government contracts and leases (other than indebtedness), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

c. easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Borrowers taken as a whole and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property, and (ii) mortgages, liens, security interests, restrictions, encumbrances or any other matters of record that have been placed by

any government, statutory or regulatory authority, developer, landlord or other third party on property over which a Borrower has easement rights or on any leased property with respect to which a Loan Party or its subsidiary is the tenant and subordination or similar arrangements relating thereto and (iii) any condemnation or eminent domain proceedings affecting any real property;

d. liens existing on the Petition Date other than liens and any replacement, renewals, replacements or extensions thereof, provided that (i) such replacement, renewal or extension lien shall not apply to any other property or asset of any Borrower other than (A) improvements thereon or proceeds thereof and (B) after-acquired property that is affixed or incorporated into the property covered by such lien; notwithstanding anything herein, liens over the 2026 Crop and Livestock Collateral shall not be considered a Permitted Lien.

e. liens pursuant to any DIP Facility;

f. the Carve-Out;

g. statutory or common law liens of landlords and sub-landlords securing obligations that are not overdue by more than thirty (30) days or are being contested in good faith;

h. liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions and securities intermediaries;

i. Liens arising from precautionary UCC filings regarding operating leases, the consignment or bailment of goods to a Borrower on equipment of the Borrowers granted in the ordinary course of business to a client or supplier at which such equipment is located;

j. liens or rights of setoff against credit balances of Borrowers with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to such Borrower in the ordinary course of business; and

k. any interest or title of a lessor, sublessor, licensor or sublicensor under leases, subleases, licenses or sublicenses (including software and other technology licenses).

# EXHIBIT 2

Raguse Family Entities
13-Week Cash Flow Forecast

6/9/2026 8:36

| *($ and volume in thousands)* | Actual | Actual | Actual | Actual | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | 6-Jun-26 4-Sep-26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Ending** | 15-May-26 | 22-May-26 | 29-May-26 | 5-Jun-26 | 12-Jun-26 | 19-Jun-26 | 26-Jun-26 | 3-Jul-26 | 10-Jul-26 | 17-Jul-26 | 24-Jul-26 | 31-Jul-26 | 7-Aug-26 | 14-Aug-26 | 21-Aug-26 | 28-Aug-26 | 4-Sep-26 | 13-Week |
| **Company Period** | May | May | May | May/Jun | June | June | June | Jun/Jul | Jul | Jul | Jul | Jul/Aug | Aug | Aug | Aug | Aug | Aug/Sept | Period |
| **Model Week** | Wk 0 | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Wk 12 | Wk 13 | Wk 14 | Wk 15 | Wk 16 | Total |
| ***SALES*** | | | | | | | | | | | | | | | | | | |
| Net Sales | $ - | $ - | $ - | $ - | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ - | $ - | $ - | $ 3,000 |
| ***CASH FLOW SUMMARY*** | | | | | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | | | | | |
| Customer Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ 150 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 150 | $ 3,000 |
| Discounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Government Payments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 200 | - | 200 |
| Crop Insurance Indemnity Payments | - | - | - | - | - | - | 153 | - | - | - | - | 435 | - | - | - | 1,135 | - | 1,722 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| [] | | | | | | | | | | | | | | | | | | |
| **Net Receipts** | $ - | $ - | $ - | $ - | $ - | $ - | $ 303 | $ 300 | $ 300 | $ 300 | $ 300 | $ 735 | $ 300 | $ 300 | $ 300 | $ 1,635 | $ 150 | $ 4,922 |
| **General Disbursements** | | | | | | | | | | | | | | | | | | |
| Crop Input Costs | $ - | $ 1,110 | $ 30 | $ 41 | $ 357 | $ 100 | $ 50 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ 10 | $ - | $ 597 |
| Cattle Input Costs | - | - | 571 | 834 | 1,081 | 557 | 552 | 7 | 7 | 7 | 7 | 7 | 9 | 9 | 9 | 9 | 9 | 2,271 |
| Land & Equipment | - | 1,027 | 94 | - | 4 | 520 | 1 | 19 | - | 200 | 1 | 18 | 1 | 109 | 1 | - | 19 | 894 |
| Labor & Benefits | - | 114 | 49 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | - | 50 | 350 |
| Insurance | - | - | - | 229 | - | 7 | - | 4 | - | 7 | - | 39 | - | - | 7 | - | 4 | 68 |
| Utilities | - | - | - | - | 15 | - | - | 15 | - | - | - | 15 | - | - | - | - | 15 | 60 |
| Other Operating Expenses | - | 106 | 0 | 30 | 46 | 36 | 31 | 17 | 8 | 8 | 8 | 13 | 10 | 10 | 10 | 10 | 97 | 307 |
| [] | | | | | | | | | | | | | | | | | | |
| Total General Disbursements | $ - | $ 2,357 | $ 744 | $ 1,133 | $ 1,553 | $ 1,220 | $ 685 | $ 72 | $ 76 | $ 233 | $ 77 | $ 102 | $ 80 | $ 138 | $ 87 | $ 29 | $ 194 | $ 4,548 |
| **Other Operating Disbursements** | | | | | | | | | | | | | | | | | | |
| Critical Vendors | $ - | $ - | $ - | $ - | $ 50 | $ 50 | $ 50 | $ 50 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 200 |
| Capital Spending | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt Payments | - | 160 | - | - | 165 | 40 | 358 | 409 | 300 | 300 | 300 | 996 | 300 | 300 | 300 | 1,726 | 255 | 5,750 |
| [] | | | | | | | | | | | | | | | | | | |
| Total Other Operating Disbursements | $ - | $ 160 | $ - | $ - | $ 215 | $ 90 | $ 408 | $ 459 | $ 300 | $ 300 | $ 300 | $ 996 | $ 300 | $ 300 | $ 300 | $ 1,726 | $ 255 | $ 5,950 |
| **Net Operating Cash Flow** | $ - | $ (2,517) | $ (744) | $ (1,133) | $ (1,768) | $ (1,310) | $ (790) | $ (232) | $ (76) | $ (233) | $ (77) | $ (364) | $ (80) | $ (138) | $ (87) | $ (120) | $ (300) | $ (5,575) |
| **Professional Fees** | $ - | $ 250 | $ - | $ - | $ 535 | $ 86 | $ 51 | $ 50 | $ 57 | $ 82 | $ 47 | $ 47 | $ 57 | $ 81 | $ 46 | $ 46 | $ 46 | $ 1,228 |
| **Total Disbursements** | $ - | $ 2,767 | $ 744 | $ 1,133 | $ 2,303 | $ 1,396 | $ 1,144 | $ 581 | $ 432 | $ 614 | $ 424 | $ 1,146 | $ 437 | $ 519 | $ 433 | $ 1,801 | $ 496 | $ 11,725 |
| **U.S. Trustee Expenses** | $ - | $ - | $ - | $ - | $ - | $ - | $ 75 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 75 |
| **Cash Flow** | $ - | $ (2,767) | $ (744) | $ (1,133) | $ (2,303) | $ (1,396) | $ (916) | $ (281) | $ (132) | $ (314) | $ (124) | $ (411) | $ (137) | $ (219) | $ (133) | $ (166) | $ (346) | $ (6,878) |
| Weekly Starting Cash | - | - | 5,233 | 4,489 | 3,356 | 1,053 | 1,656 | 740 | 2,959 | 2,827 | 2,512 | 2,389 | 1,978 | 1,841 | 1,622 | 1,489 | 1,323 | 3,356 |
| Change in Cash before DIP Draw | - | (2,767) | (744) | (1,133) | (2,303) | (1,396) | (916) | (281) | (132) | (314) | (124) | (411) | (137) | (219) | (133) | (166) | (346) | (6,878) |
| Net Cash before DIP Draw | - | (2,767) | 4,489 | 3,356 | 1,053 | (344) | 740 | 459 | 2,827 | 2,512 | 2,389 | 1,978 | 1,841 | 1,622 | 1,489 | 1,323 | 977 | (3,523) |
| Plus: DIP Draw | - | 8,000 | - | - | - | 2,000 | - | 2,500 | - | - | - | - | - | - | - | - | - | 4,500 |
| **Ending Cash** | $ - | $ 5,233 | $ 4,489 | $ 3,356 | $ 1,053 | $ 1,656 | $ 740 | $ 2,959 | $ 2,827 | $ 2,512 | $ 2,389 | $ 1,978 | $ 1,841 | $ 1,622 | $ 1,489 | $ 1,323 | $ 977 | $ 977 |
| Initial DIP Draw | $ - | $ 8,000 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other DIP Draw | - | | | | $ - | $ 2,000 | $ - | $ 2,500 | - | - | - | - | - | - | - | - | - | 4,500 |
| **Total DIP Drawn** | $ - | $ 8,000 | $ 8,000 | $ 8,000 | $ 8,000 | $ 10,000 | $ 10,000 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 12,500 | $ 4,500 |